# Exhibit A

1

ROUGH   TRANSCRIPT

1    (Deposition Exhibit Nos. 4, 5, 7, 23-25,

2    27-29, 32-37, 48, 50-54, 59, 64 and 69

3    marked for identification by Ms. Amert.)

4    VIDEO TECHNICIAN:  This is disk number one to the

5    video recorded deposition of Robert Johnston in the matter of

6    Robert Johnston, et al versus Dow Employees' Pension Plan, et

7    al, case number 1:14-cv-10427.

8    This deposition is being held at 715 East Main Street,

9    Midland, Michigan on July 16, 2015; the time is approximately

10    9:04 a.m.  My name is Ed Boike, and I'm the videographer; the

11    court reporter is Heidi Cook.  If counsel would please

12    introduce themselves for the record.

13    MS. AMERT:  Amanda Amert from Jenner Block for the

14    Defendants.

15    MS. RENAKER:  This is Teresa Renaker with Renaker

16    Hasselman, LLP for Mr. Johnston, and with me is Jacob

17    Richards.

18    ROBERT JOHNSTON,

19    having been first duly sworn, testified as follows:

20    EXAMINATION

21    BY MS. AMERT:

22  Q   Good morning, Mr. Johnston.  We met off the record, but on

23    the record I am Amanda Amert, and I'm one of the attorneys

24    who represents the Defendants in this lawsuit.  You

25    understand you're here to have your deposition taken this

R O U G H   T R A N S C R I P T

20

1     you mentioned?

2  A   Merrick Castille, M-e-r-r-i-c-k, and then Castille, with an E

3     on the end; C-a-s-t-i-l-l-e.  Ah, finally got it.  All

4     right.  Participant 49   and Participant 50  .  That's what I can

5     think of at the moment.

6  Q   Okay.  Thank you.  Let's start with Participant 4  .

7  A   Okay.

8  Q   When did you communicate with Participant 4  about this lawsuit,

9     to the best of your recollection?

10  A   Probably it would have been in the -- I'll just say

11     approximately in the fall of 2014.

12  Q   And tell me about that communication?

13  A   It was a phone call; I believe he called me.  He had heard

14     about the lawsuit, and was asking me about it.

15  Q   Do you know how he had heard about the lawsuit?

16  A   That would be speculative.

17  Q   Did he tell you how he heard about the lawsuit?

18  A   I don't remember.

19  Q   What do you recall discussing with him?

20  A   That the dispute was over the way my benefits were

21     calculated, and I encouraged him to look at the documents

22     that were posted on my attorney's website to summarize the

23     case, and also encouraged him to contact them if he had

24     detailed questions.

25  Q   And what did he say to you?

ROUGH   TRANSCRIPT

```
 1   A    What did he say to me?  To be honest -- well, the

 2        conversation was about many other things because we were

 3        former colleagues, and he was catching me up on some

 4        acquaintances that we had, and so it had nothing to do with

 5        the lawsuit.  So he mentioned some of those kinds of things,

 6        the health of some of our former colleagues and so forth.

 7        Specific to the lawsuit, I don't remember what he might have

 8        said to me.

 9   Q    Have you spoken with Participant 4  about the lawsuit since that

10        fall 2014 phone call?

11   A    I don't remember speaking to him since then.

12   Q    Have you E-mailed with him or otherwise communicated with

13        him?

14   A    I don't believe so.

15   Q    What about Evelyn Morrison?  Is Evelyn a man or a woman?

16   A    Evelyn is a woman.

17   Q    A woman.  When did you speak with Ms. Morrison, or

18        communicate with Ms. Morrison?

19   A    When did I speak to Evelyn about the lawsuit?  It probably

20        would have been about that time, that same time frame,

21        maybe.

22   Q    So about the fall of 2014?

23   A    I'm trying to remember.  No, it would have been earlier than

24        that; probably summer of 2014, somewhere in that time frame,

25        maybe.  Late spring, early summer.
```

ROUGH   TRANSCRIPT

1   Q   And tell me about that communication.

2   A   Again, that I was involved in a lawsuit with, you know, with

3       the Pension Plan over the benefits that I was to receive.

4       I'm trying to remember if there were any specific details,

5       other than just that I was involved in the lawsuit, but I

6       don't recall any.

7   Q   Was this another telephone conversation?

8   A   No, this would have been over lunch.

9   Q   So you had lunch with Ms. Morrison in the summer of 2014?

10  A   Somewhere in that range, yes.

11  Q   And did Ms. Morrison already know about the lawsuit, or did

12      you bring it up?

13  A   I don't remember that she did.  I probably brought it up, but

14      I don't remember.

15  Q   Did Ms. Morrison say anything to you about the lawsuit in the

16      course of your conversation?

17  A   She may have asked some questions.  I don't remember,

18      specifically.

19  Q   Okay.  Have you communicated with Ms. Morrison about this

20      lawsuit since that conversation?

21  A   Yes, I believe so.

22  Q   When did you next communicate with her about the lawsuit?

23  A   Probably late 2014.

24  Q   Okay.  Tell me about that communication.

25  A   I believe it was probably another lunch; we'd just meet once

R O U G H   T R A N S C R I P T

23

1    in a while for lunch together and just catch up on each
2    other's lives.
3  Q  And Ms. Morrison is one of your former Dow co-workers?
4  A  Yes.
5  Q  Okay.  When did you work together?
6  A  Pretty much since about 1983.
7  Q  And do you remember any of the substance that you discussed
8    with Ms. Morrison in late 2014?
9  A  I don't remember, specifically.  I'd be speculating.
10  Q  Okay.  Did you communicate with Ms. Morrison about this
11    lawsuit after that conversation in late 2014?
12  A  I don't believe so, no.
13  Q  Okay.  Next you mentioned Participant 52 ?
14  A  (Witness nodding head.)
15  Q  Who is Participant 52 ?
16  A  He is a chemist at Dow Chemical.
17  Q  And when did you communicate with Participant 52 about this
18    lawsuit?
19  A  I believe it would have been in probably December of 2014.
20  Q  Tell me about that communication.
21  A  At a Christmas party.
22  Q  And what did you discuss about this lawsuit at the Christmas
23    party?
24  A  If I remember right, I was probably asked what I'm doing with
25    my life, and I probably mentioned that one of the things

R O U G H   T R A N S C R I P T

```
 1        taking quite a bit of my time right now is I was involved in

 2        a lawsuit with Dow Pension Plan over pension benefits.

 3   Q    And did Participant 52  say anything to you about the lawsuit?

 4   A    I don't remember.  He probably said, Good luck.

 5   Q    Did you discuss any of the details of the lawsuit with

 6        Participant 52  ?

 7   A    I don't believe so.

 8   Q    Have you spoken -- is that the only time you've spoken with

 9        Participant 52  about this lawsuit?

10   A    Yes.

11   Q    Have you communicated with him in any other way about the

12        lawsuit?

13   A    I might have contacted him by E-mail.

14   Q    You're saying you might have.  Do you have --

15   A    I don't remember.

16   Q    Why would you have contacted him by E-mail about the lawsuit?

17              MS. RENAKER:  Objection, calls for speculation.

18        You can answer if you know why you did, if you know that you

19        did and why you did, but you shouldn't speculate about why

20        you would have, if you did, if you don't know whether you did

21        or not.

22              THE WITNESS:  I don't know if I did or not.

23   Q    (BY MS. AMERT)  You said your might have contacted him by

24        E-mail.  So what I'm trying to get at is, why you think you

25        might have contacted him by E-mail about the lawsuit, but are
```

ROUGH   TRANSCRIPT

1    not sure?

2  A    I might --

3              THE WITNESS:  Can I answer this question?

4              MS. RENAKER:  Yeah.

5              THE WITNESS:  I might have contacted him to ask him

6      to read the documents on my attorney's website, to be aware

7      of the lawsuit.

8  Q    (BY MS. AMERT)  Was there a point in time when you were

9      contacting a number of your former colleagues and asking them

10     ` to read the materials on your attorney's website?

11  A    I can't answer that question, I don't believe.

12  Q    What don't you understand about the question?

13              MS. RENAKER:  Do you -- I think that Mr. Johnston

14     may want to have a discussion with me about an issue of

15     privilege, so maybe we could step outside and do that.  If

16     that's the case -- are you confused about a privilege

17     question?

18              THE WITNESS:  Yes.

19              MS. AMERT:  Okay.  Sure.  Let's take a short break

20     so you can do that.

21              VIDEO TECHNICIAN:  Off the record at 9:48.

22              (Off the record discussion.)

23              VIDEO TECHNICIAN:  We are back on the record at

24     10:06.

25  Q    (BY MS. AMERT)  Mr. Johnston, before we took a break so that

26

R O U G H   T R A N S C R I P T

```
 1      you could confer with your counsel, we had been talking about

 2      your communications with Participant 52 , and I believe I had

 3      asked you whether there was a point in time when you were

 4      communicating with a number of your colleagues about this

 5      lawsuit.  Do you remember that?

 6  A   Yes.

 7  Q   Are you prepared to answer that question now?

 8  A   Yes.

 9  Q   What's your answer?

10  A   So I'm not sure of the exact timing.  I think it was

11      somewhere in the range of summer of 2014, I sent an E-mail to

12      as many of my former colleagues who had worked at Dow, and

13      gone to work at DuPont Dow Elastomers and had returned to

14      Dow, to basically do two things:  Let them know that I was

15      involved in a lawsuit about my pension benefits, and that

16      they might be interested to read the documents on my

17      attorney's website to summarize the case, and to contact them

18      if they had questions about the case.

19  Q   When you say contact them, you mean contact your counsel?

20  A   Yes.

21  Q   You have made reference to documents that have been produced

22      in this litigation earlier in your testimony, so from that I

23      gather you have an understanding that there are certain

24      documents that you provided to your counsel so that they

25      could be produced in this case, is that correct?
```

R O U G H    T R A N S C R I P T

27

1   A   Yes.

2   Q   Do you know whether the E-mail that you've just described has

3       been produced in this lawsuit?

4   A   I don't know.

5   Q   Did you provide that E-mail to your counsel?

6   A   Yes.

7   Q   Did you receive responses from the recipients of that E-mail?

8   A   Well, I asked them to contact my attorneys, but I did get

9       probably a couple responses directly to myself asking about

10      my E-mail.

11  Q   Who responded?

12  A   Participant 4   was one, and that's the nature of the phone call

13      that I talked about.

14  Q   Other than Participant 4 , do you remember anyone else

15      specifically who responded to you?

16  A   I don't.  I believe there was at least one other person, but

17      I just don't remember who it was.  I got very few direct

18      responses, because I really asked them to contact my

19      attorneys.

20  Q   When you said you believed there was at least one other, do

21      you have any recollection of whether that was a phone call or

22      an E-mail, or some other type of communication?

23  A   It would have been a phone call.

24  Q   Do you have a specific recollection of another phone call?

25  A   No.

28

ROUGH   TRANSCRIPT

1  Q    Okay.  All right.  So going back to Participant 52 , you'd

2       previously mentioned that you had a conversation with him at

3       a Christmas party in December of 2014, and then I take it

4       he's one of the people who was a recipient of the E-mail that

5       we just can discussed?

6  A    Yes.

7  Q    Have you had any other communications with Participant 52  about

8       this lawsuit?

9  A    No.

10 Q    You also mentioned Participant 21    .  Is that a man or a woman?

11 A    It's a man.

12 Q    And when did you communicate with Participant 21  about this

13      lawsuit?

14 A    So he was also on this E-mail.

15 Q    Other than the E-mail that we've previously discussed, have

16      you had any other communications with Participant 21  about this

17      lawsuit?

18 A    I believe he was at the Christmas party; there were a number

19      of former colleagues at this Christmas party, and several of

20      them asked me about it.

21 Q    Do you remember any specific comments or questions from

22      Participant 21  at the Christmas party?

23 A    No.  I mean, basically, several people would have asked me,

24      you know, How's it going kind of thing, and I would have

25      responded.  I mean, I believe I responded, probably, that,

29

R O U G H   T R A N S C R I P T

```
 1        you know, the lawsuit is under way and I can't really talk
 2        about it in detail at this time.
 3   Q    Was this a group conversation, or do you remember a series of
 4        individual --
 5   A    Yes, a series of individual conversations.
 6   Q    Thank you.
 7   A    Or small groups, you know, clusters.
 8   Q    Okay.  Other than that Christmas party conversation and the
 9        E-mail, have you had any other communications with Participant 21
10        about this lawsuit?
11   A    No, I don't think so.
12   Q    The next person you mentioned is Participant 27  ?
13   A    Yes.
14   Q    When did you communicate with Participant 27  bout this lawsuit?
15   A    I believe it would have been the same way as the other ones.
16        I included him on the E-mail that I sent out.  I also had
17        a -- I know I specifically had a phone conversation with him.
18   Q    When was that phone conversation?
19   A    I don't remember, but it would have been sometime between the
20        E-mail and the Christmas party.
21   Q    Okay.  So the E-mail was in the summer of 2014, and the
22        Christmas party was in December of 2014, so --
23   A    I'll even say spring/summer of 2014, I think it's somewhere
24        in that range.
25   Q    So the phone conversation that you recall, did you call
```

R O U G H   T R A N S C R I P T

30

```
 1    Participant 27  or did he call you?
 2  A   Let me put it this way:  I still live in the community that
 3        I've worked since 1981, and I've worked with many of these
 4        people for a number of years, and so I still have ongoing
 5        social contact with some of them as good friends. Participant 27
 6            is one of those, and we have had some conversations in
 7        grocery stores, or running into each other at events,
 8        Christmas parties or other events.
 9            There have been phone conversations, because we were
10        scheduling to get together for a Domino tournament.  So in
11        the context of one of those calls, and I don't remember if he
12        initiated or I did, it wasn't to specifically discuss the
13        lawsuit, but we would have had a conversation, and this would
14        have been one of the topics, so I can't tell you who actually
15        made the call.
16  Q   What do you remember discussing about this lawsuit during
17        that call?
18  A   With  Participant 27  , I -- he was a recent retiree, retired near
19        the time I did.  And I believe I asked him for a little more
20        detail on what his benefit was, and what options he chose for
21        the distribution of payout options.  And I don't remember the
22        specific details, though, of what that was, but I know -- I
23        did have a little more detailed conversation with
24  Participant 27  .
25  Q   When you say you don't remember the detail of what that was,
```

ROUGH TRANSCRIPT

1    do you mean you don't remember how he responded to your

2    questions?

3  A   He shared information with me, but I don't remember what it

4    was.

5  Q   Okay.  Did you discuss anything -- do you remember discussing

6    anything with him about the substance of this lawsuit, as

7    opposed to his own retirement decisions?

8  A   Well, I guess the simple answer is yes.

9  Q   What did you discuss?

10  A   I think I mentioned it, but I mean, I wanted to learn more

11    about his benefit calculation so I could understand how it

12    was done in comparison to how mine is done.  And so he shared

13    with me some information, I just don't remember the details

14    of exactly what I received.

15  Q   Did --

16  A   I know he didn't have enough information for me to be able to

17    do the calculation myself to compare.

18  Q   Okay.  Did Participant 27 say anything to you about the lawsuit?

19  A   I don't think so.  I mean, he was aware it was going on, he

20    knew why I was asking information, but I don't think we

21    discussed the -- there wasn't much information for me to

22    share.

23  Q   Okay.  Other than what you've just told me, did you and

24    Participant 27, in this phone conversation, discuss anything else

25    relating to the lawsuit?

R O U G H     T R A N S C R I P T

32

1  A     I don't think so.

2  Q     Other than the E-mail that you sent to your former colleagues

3        about the lawsuit, and this phone conversation, have you had

4        any other communications with Participant 27 about this lawsuit?

5  A     That phone conversation might have been two; I don't

6        remember.  There were some communication in a period of, a

7        short period of time when I was trying to get some

8        information from him, and there was a little back and forth,

9        and I don't remember specifically, exactly how many

10       communications that was, but I believe it was in the nature

11       of phone call or calls.

12 Q     Why were you trying to get information from him?

13 A     Because I wanted to know -- I wanted to understand how his

14       calculation was done in comparison to how mine was done.

15 Q     What information were you asking him for?

16            MS. RENAKER:  Objection, asked and answered.

17            MS. AMERT:  She's going to object periodically.

18            MS. RENAKER:  You can answer.

19            MS. AMERT:  And you should go ahead and answer, and

20       she'll stop me if I'm giving you a bad instruction, but you

21       should go ahead and answer unless she specifically instructs

22       you not to, if you understand my question.

23            THE WITNESS:  Okay.

24 Q     (BY MS. AMERT)  So my question was, what information were you

25       asking him for?

R O U G H   T R A N S C R I P T

1   A   I would have liked to have had enough information to be able

2       to calculate his benefit, according to the same method that

3       Dow had used to calculate mine, and see how it compared.

4   Q   And did he provide you with that information?

5   A   Not all of it, so I wasn't able to do the calculation.

6   Q   Okay.  Other than what we've just discussed, did you have any

7       other communications with Participant 27 about this lawsuit?

8   A   No.

9   Q   Okay.  I'm going to move on to the next person, and I wrote

10      all of the names down that you listed, but I don't

11      necessarily have them in exactly the same order that you

12      listed them, so I'll do my best.

13  A   There was no significance to the order.

14  Q   Okay.  I believe the next person you mentioned was Merrick

15      Castille?

16  A   Merrick hosted the Christmas party.

17  Q   Did you also -- was Merrick also copied on the E-mail that

18      we've been discussing?

19  A   I don't think so.

20  Q   Is Merrick another of your former co-workers from Dow?

21  A   Yes.

22  Q   What do you remember -- I'm assuming that you talked with

23      Merrick at the Christmas party about this lawsuit.  Is that a

24      fair assumption?

25  A   I think so.

ROUGH   TRANSCRIPT

34

1  Q    What do you remember discussing with Merrick?

2  A    Nothing.  I don't have any recollection of what was

3       discussed.

4  Q    Other than the Christmas party, have you had any other

5       communications with --

6  A    No.

7  Q    I know you're going to know where I'm going with these

8       questions, but I'm going to ask you to let me finish --

9  A    I'm sorry.

10  Q    -- so that --

11  A    Yes.

12  Q    It will be less obvious in the transcript, so --

13  A    I'm sorry.

14  Q    To finish my question --

15  A    Yes.

16  Q    -- did you have any other communications with Merrick

17       Castille about this lawsuit, other than the Christmas party?

18  A    No.

19  Q    Thank you.  Why didn't you include Merrick Castille on your

20       E-mail to your former colleagues?

21  A    Merrick -- well, first of all, I think my statement was that

22       I don't remember if I did or did not --

23  Q    Okay.

24  A    -- include him.

25  Q    Okay.

ROUGH  TRANSCRIPT

1  A    But I'll go ahead and answer it for you, just to be nice.

2  Q    Sure.

3  A    I don't believe that I included him on the E-mail, and the

4       reason would have been because Merrick Castille did not

5       return to Dow in 2005.  He was Dow employee, went to DDE, and

6       did not come back to Dow.

7  Q    Okay.  The next person you mentioned was James Hayes?

8  A    Yes.

9  Q    What communications have you had with Mr. Hayes about this

10      lawsuit?

11 A    So I had -- James Hayes was included on the E-mail, but I

12      believe before the E-mail, to be honest, I just don't

13      remember the exact timing, but James Hayes retired from Dow

14      in that time frame.  And so I did reach out to James to let

15      him know that I had questions about how the benefit was

16      calculated.  And that he might want to look into this and

17      talk to an attorney, if need be to -- because there was a,

18      you know, a specified deadline for filing an appeal, and so I

19      wanted him to know that I was involved in an appeal process

20      and a litigation, and that he might want to look into that.

21          So in my conversation with James, I believe I summarized

22      just the key issues that I had disputes on.  And he also

23      provided me a little of his salary history information so

24      that I could, again, see how his benefit was calculated

25      relative to what I might have expected it should be.  And to

R O U G H   T R A N S C R I P T

36

| | | |
|---|---|---|
| 1 | | try to -- and to specifically resolve some erroneous |
| 2 | | statements that seemed to exist on Dow Pension Estimate Forms |
| 3 | | generated by the PAS Modeler that Dow uses. |
| 4 | Q | Okay.  Believe it or not, we're going to go through that in a |
| 5 | | little more detail. |
| 6 | A | I believe it. |
| 7 | Q | First, you said that Mr. Hayes retired from Dow in that time |
| 8 | | frame.  What time frame do you mean? |
| 9 | A | I hate to speculate when I know the documentation exists on |
| 10 | | paper, but I believe it was somewhere in the early 2014 |
| 11 | | period, but I don't remember specifically. |
| 12 | Q | We all understand that the human memory is fallible, |
| 13 | | especially about dates, so when -- you should do what you're |
| 14 | | doing in answering my questions, and give me your best |
| 15 | | recollection, understanding that you're right, there are |
| 16 | | documents, and if we need the dates exactly, we can track |
| 17 | | them down. |
| 18 | A | I'm sure they're more reliable than my memory. |
| 19 | Q | They're not always, actually, but I appreciate you're doing |
| 20 | | your best, especially with dates.  You said that you reached |
| 21 | | out to Mr. Hayes? |
| 22 | A | I did. |
| 23 | Q | How did you do that? |
| 24 | A | I called him, and then I went and visited him at his home. |
| 25 | Q | And did both the call and the visit happen in about that |

R O U G H   T R A N S C R I P T

37

```
1        early 2014 time frame?

2    A   Yes, they were probably a couple weeks apart or something

3        like that.

4    Q   You said you summarized some key issues for him?

5    A   (Witness nodding head.)

6    Q   What were those key issues?

7    A   I probably discussed with him concerns about the, you know,

8        93 percent salary factor, the proration versus carve out

9        approach to dealing with the DDE pension benefit.

10            In his case, he was early retirement eligible from DDE,

11       so that was different than me.  And there was a statement in

12       the PAS Modeler output for his pension benefit estimate,

13       which contradicted the Plan Document.  And I was trying to

14       understand if his benefit was calculated, the benefit that he

15       received was calculated according to the Plan Document or

16       according to the method given in the statement that was in

17       the PAS Modeler output.

18   Q   The PAS Modeler is the on-line tool that Dow provides to

19       pension plan participants to estimate their benefits, is that

20       correct?

21   A   Yes.

22   Q   Do you know what PAS stands for?

23   A   I don't.

24   Q   Okay.  It's P-A --

25   A   Probably Pension something System.
```

R O U G H   T R A N S C R I P T

```
 1  Q   It's PAS?

 2  A   Administrative maybe.  Yes.

 3  Q   What were the erroneous statements that you believed were on

 4      the PAS Modeler?

 5  A   I couldn't quote it to you, but it had to do with the --

 6      there was a paragraph, kind of caveat paragraph on the

 7      statement that described how employees who were of certain

 8      age, which corresponded to early retirement eligible under

 9      the DuPont Plan, DuPont Dow Elastomers Plan, how their

10      calculation would be done.  In the -- in the Dow Plan Section

11      10.46 there is a carve out provision that subtracts, you

12      know, a DuPont Dow benefit from the Dow benefit.  And that

13      provision has a proration formula for adjusting the DuPont

14      Dow age 65 benefit down to whatever age the employee is when

15      they commence their Dow pension benefit.  And there was, on

16      the PAS Modeler -- and this is the best of my memory.  On the

17      PAS Modeler I believe there was a provision that altered that

18      in the case of employees who were, like, age 58 or age 60, or

19      something like that at the time they left DuPont Dow.  And

20      that was not in the plan anywhere, in the Plan Document

21      anywhere, so I was curious to know which language was

22      followed in calculating his specific benefit.

23  Q   Why were you curious about that?

24  A   I was curious because, number one, James Hayes was a friend,

25      I'd worked with him for many years.  He had some -- he was
```

ROUGH   TRANSCRIPT

39

1      surprised by the -- he had a lower value for his pension

2      benefit than he expected, and he was surprised by that, and I

3      was trying to help him understand that.  And I also wanted to

4      understand -- I had had questions about the accuracy of the

5      PAS Modeler statements, and this was another one, and I was

6      curious to know if it was accurate, and if it was followed,

7      or if the Plan Document was followed.

8   Q   Did you reach a conclusion about that?

9   A   Unfortunately, he had incomplete records and I wasn't able

10     to.

11  Q   If I understand the time frame correctly, this conversation

12     took place relatively shortly after Mr. Hayes retired, is

13     that correct?

14  A   Yes.

15  Q   And you mentioned, I think, that you advised him that he had

16     a relatively short period of time to appeal his pension

17     determination?

18  A   I don't recall that I advised him of that, but I knew that

19     might be an issue.

20  Q   But you don't recall whether you told him that?

21  A   I don't remember.

22  Q   Do you remember any discussion with him about appealing his

23     benefits determination?

24  A   I don't remember any discussion, but it seems probable that I

25     would have.

ROUGH  TRANSCRIPT

1   Q    Okay.

2   A    But I'm speculating.

3              MS. RENAKER:  Yeah, we don't want you to guess or

4        speculate.

5   Q    (BY MS. AMERT)  Do you know whether he submitted an appeal of

6        his pension?

7   A    I do not know.

8   Q    What did Mr. Hayes say to you about his pension benefit

9        during this discussion?

10  A    The point that I mentioned, that he was concerned that it

11       seemed that the benefit was lower than he had expected.  He

12       also described to me what payout options he had selected, and

13       when he had commenced his benefit from DuPont Dow.  When his

14       next dive trip was.

15  Q    I did ask if, what he said to you about his pension

16       benefits.  I understand --

17  A    His concern was that he might not have enough money to go on

18       the dive trip he planned because his benefit was lower than

19       he anticipated.

20  Q    I see.  Did he explain to you why he expected a higher

21       benefit?

22  A    He didn't explain why, he just thought he was going to

23       receive a higher one than he did.  My impression was that

24       James Hayes was not very knowledgeable about the details of

25       either of the Dow or the DuPont Dow pension plans, nor how to

R O U G H   T R A N S C R I P T

41

```
 1      optimize the benefit selection.
 2  Q   Did you and Mr. Hayes specifically discuss your lawsuit over
 3      your pension benefits during this conversation?
 4  A   Again, what exactly do you mean by specifically, but he knew
 5      I was involved in the lawsuit, and I, I tried not to go into
 6      details of my lawsuit with anybody during this period of
 7      time, so I would have probably told him -- well, again, I
 8      won't speculate, but I think I told him that, you know, the
 9      lawsuit was filed and it was ongoing.
10  Q   Did you discuss with him whether he might be a member of the
11      Proposed Class in this lawsuit?
12  A   I believe I probably told him that he might be.
13  Q   Do you remember him responding to that in any way?
14  A   Yes.
15  Q   How did he respond?
16  A   He didn't want to get dragged into litigation.  Primarily he
17      didn't want to have any financial risk, because he was
18      concerned about his situation.
19  Q   Other than your E-mail to your former colleagues and this
20      conversation that you've just described, have you had any
21      other communications with Mr. Hayes about this lawsuit?
22  A   No.  No, I take that back.  He was also at the Christmas
23      party, but I mean, sorry, but that's a given for quite few of
24      them.
25  Q   It sounds like a good Christmas party, actually.  I'm sad I
```

R O U G H   T R A N S C R I P T

```
 1       wasn't invited.

 2   A   Next year.  If you settle, favorably.

 3   Q   Do you recall any specific discussion with Mr. Hayes at the

 4       Christmas party about this lawsuit?

 5   A   No.

 6   Q   The next person you mentioned is Participant 10  .  When did you

 7       communicate with Participant 10  about this lawsuit?

 8   A Participant 10 - oh, I copied Participant 10   on the E-mail.

 9   Q   Participant 10 is another of your former Dow co-workers?

10   A   Yes.

11   Q   And why did you copy him on the E-mail?

12   A   Because I thought he would be interested.

13   Q   Why did you think he would be interested?

14   A   Because he had been a Dow employee, DuPont Dow employee and

15       Dow employee.

16   Q   Do you know whether Participant 10 is still working at Dow?

17   A   He is not.

18   Q   Is he retired?

19   A   I believe so.  I don't -- define retirement, besides going to

20       France.

21   Q   That actually sounds pretty good for a definition to me.  Do

22       you know that he is working at any other company?

23   A   Yes, he is.

24   Q   Where is he working?

25   A   I believe he's working for Sadara, which is a Dow joint
```

ROUGH  TRANSCRIPT

43

```
 1      venture with, I'm not sure, a Saudi oil company, or some

 2      Saudi entity.

 3   Q  Do you know whether Participant 10 has commenced his Dow pension?

 4   A  I don't know, as of this date.

 5   Q  Other than copying Participant 10 on your E-mail, have you had

 6      any other communications with him about this lawsuit?

 7   A  No.

 8   Q  Did Participant 10 respond to your E-mail?

 9   A  I don't think so, to me.  I don't know about communications

10      my attorneys may have had with these individuals.

11   Q  Was he at the Christmas party?

12   A  I'm trying to remember.  I believe he was.  I think he was

13      getting ready to leave, in fact, like the next week, for

14      Saudi Arabia for a long time.

15   Q  Do you recall any specific conversation with Participant 10 about

16      this lawsuit at that Christmas party?

17   A  I don't.

18   Q  Have you had any other communications with Participant 10 about

19      his Dow pension benefits?

20   A  Yes.

21   Q  When did that happen?

22   A  When I had heard that he retired, and by retired I just said

23      I wasn't sure if he received his benefits, but I mean he

24      had -- I understood that he had retired from Dow, and I

25      believe that would have probably been, shoot -- I believe it
```

R O U G H   T R A N S C R I P T

44

```
 1      was sometime in 2012 or something like that, maybe even 2013,
 2      but I don't remember, it's not clear to me.  It was before
 3      the lawsuit was in play.
 4    Q When you say before the lawsuit was in play, do you just mean
 5      before the Complaint was filed in this case?
 6    A I had filed an appeal, my administrative appeal.  I believe
 7      it was -- I believe it was while, in the period while I was
 8      waiting for a response on my appeal.
 9    Q Okay.  So you heard that Participant 10 had retired?
10    A Yes.
11    Q And did you reach out to him?
12    A Yes.
13    Q How did you do that?
14    A By phone.
15    Q You called him?
16    A Yes.
17    Q And what did you say?
18    A I had -- again, I went through the issues that I had raised
19      in my appeal pretty much item-by-item, and reviewed them with
20      him, and discussed what my concerns were and, again, with the
21      intent that if any of those were concerns to him and he
22      wanted to pursue an administrative appeal, you know, he might
23      be under some deadline to do so, so I wanted to share with
24      him my concerns and let him know of timing issues.
25    Q How did Participant 10 respond?
```

ROUGH  TRANSCRIPT

```
 1  A   At that time he had not commenced benefits, so he was in a

 2      different situation.  So, basically, I think he said he was

 3      basically going to take it under advisement, you know, but I

 4      don't believe he was going to do anything afterwards.

 5  Q   Do you remember anything else that you discussed with

 6      Participant 10 pertaining to his pension benefits?

 7  A   Well, I mean, again, I went through my appeal document,

 8      pretty much item-by-item, so it was mixed into the

 9      conversation.  That's all I remember.

10  Q   Do you remember anything else that Participant 10 said about what

11      you told him, other than he would take it under advisement?

12  A   No.

13  Q   Have you had any other communications with Participant 10 about

14      his pension benefits?

15  A   No, other than what I already described to you.

16  Q   Have you had any further communications with Participant 10 about

17      this lawsuit since you sent your E-mail to former colleagues?

18  A   No.

19  Q   You also mentioned Steve Edmondson?

20  A   Yes.

21  Q   Is Mr. Edmondson another of your former Dow colleagues?

22  A   Yes.

23  Q   What -- how have you communicated with Mr. Edmondson about

24      this lawsuit?

25  A   I had lunch with him, and at that lunch we were catching up
```

46

R O U G H   T R A N S C R I P T

1     on each other's lives and, again, I mentioned that I was

2     involved in this litigation, and that was taking quite a bit

3     of my time.

4  Q  Are you describing one lunch or more than one lunch?

5  A  One lunch.

6  Q  About when did that lunch take place?

7  A  I believe it was maybe January or February of this year,

8     something like that.

9  Q  Okay.  Did Mr. Edmondson say anything about the lawsuit to

10    you?

11 A  I don't remember anything specific.

12 Q  Have you had any other communications with Mr. Edmondson

13    about the lawsuit?

14 A  No.

15 Q  Was Mr. Edmondson included on your E-mail to your former

16    colleagues?

17 A  No.

18 Q  Why did you not include him?

19 A  He was a Dow employee who went to work for DuPont Dow

20    Elastomers and did not return to Dow.

21 Q  Was Mr. Edmondson at the Christmas party in 2014?

22 A  No.

23 Q  The next person you mentioned is Rajan Vara.  Do I have that

24    right?

25 A  R-a-j-a-n, V-a-r-a.

R O U G H   T R A N S C R I P T

```
 1   Q    Who is Mr. Vara?

 2   A    He is another chemist, polymer scientist.

 3   Q    Is he one of your former Dow colleagues?

 4   A    Yes.

 5   Q    Does he still work for Dow?

 6   A    No.

 7   Q    Is he retired?

 8   A    Yes.

 9   Q    Does he work for anyone else now?

10   A    I don't know.

11   Q    When did you communicate with Mr. Vara about this lawsuit?

12   A    I'm going to guess -- well, I'm not going to guess.  I think

13        there were two occasions.  I think the first was probably

14        somewhere around the May 2014 time frame, maybe, and then the

15        other one in, like, October 2014, something like that,

16        perhaps.  And that may not be right.  The October one for

17        sure; the May one might have been earlier, I think like --

18        sorry.

19   Q    In your first conversation with him, or in your first

20        communication with him, which may have been around May of

21        2014, how did you communicate with him?

22   A    Over lunch.

23   Q    What did you discuss about this lawsuit?

24   A    Again, that I was involved in litigation with Dow about my

25        pension benefit.  That I was hoping that other people that
```

48

R O U G H   T R A N S C R I P T

1   were in DuPont Dow Elastomers that were similarly situated

2   might be able to benefit from my efforts, and that I was

3   sorry that he was not one of those.

4  Q   Why was he not one of those?

5  A   He was not a Dow employee before DuPont Dow Elastomers.

6  Q   What did Mr. Vara say to you about the lawsuit?

7  A   I don't remember anything specifically.  Again, this is a

8   social conversation, catching up with old friends kind of

9   thing.

10  Q   And in that first lunch conversation, do you recall any other

11   specific discussions about the lawsuit?

12  A   No.

13  Q   Did you discuss Mr. Vara's pension benefits with him?

14  A   No.

15  Q   The second conversation you said you were sure was in, or the

16   communication, sorry, you said you were sure was in October

17   of 2014?

18  A   September, October of 2014.

19  Q   Tell me about that communication.

20  A   Again, it was over lunch, catching up on our lives.  And he

21   probably asked me how it was going, and I probably said,

22   again, I don't remember specifically what the conversation

23   was, but --

24  Q   Did you discuss the substance of the lawsuit?

25  A   No.

49

R O U G H   T R A N S C R I P T

1   Q    Is there a particular reason that you recall specifically

2        that this lunch was in September or October of 2014?

3   A    Yes.

4   Q    What is that?

5   A    Travel.

6   Q    Okay.

7   A    Fall colors.

8   Q    Okay.

9   A    Mr. Vara lives in Pennsylvania.

10  Q    Other than the two lunch conversations you've just described,

11       have you had any other communications with Mr. Vara about the

12       lawsuit?

13  A    Not that I remember.

14  Q    Was he copied on your E-mail to your former colleagues?

15  A    No.

16  Q    Was he at the Christmas party?

17  A    No.

18  Q    You also mentioned Gary Williams?

19  A    Yes.

20  Q    Who is Mr. Williams?

21  A    Gary Williams is another polymer scientist, chemist.

22  Q    Is he another of your former Dow colleagues?

23  A    I don't believe so.

24  Q    How do you know Mr. Williams?

25  A    I used to work with him.

ROUGH   TRANSCRIPT

1   Q   Where?

2   A   At DuPont Dow Elastomers.

3   Q   When --

4   A   My wife also teaches his daughter flute lessons, and I also

5        ride a bicycle with him.

6   Q   When did you communicate with Mr. Williams about this

7        lawsuit?

8   A   So, I believe once while he was at my home waiting to pick up

9        his daughter after a flute lesson, we were just sharing

10       information about what was going on in each other's lives,

11       and I mentioned I was involved in this litigation.

12  Q   Did you tell him anything about the substance of the

13       litigation?

14  A   No, just that we were disputing the calculation of benefits.

15  Q   Did Mr. Williams say anything to you about the litigation?

16  A   I believe he, he wished me success.

17  Q   Do you remember about when this conversation took place?

18  A   Oh, shoot.  No.

19  Q   Okay.

20  A   He comes every week, so I don't remember which one.

21  Q   Do you remember whether there was more than one conversation

22       along these lines?

23  A   I don't remember.  It's not a subject of ongoing discussion,

24       certainly.

25  Q   And did you have any other communications with Mr. Williams

ROUGH TRANSCRIPT

51

1       about this lawsuit?

2   A   I don't think so.

3   Q   You also mentioned Antenneh Worku?

4   A   Uh-huh.

5               MS. RENAKER:  You need to answer with a yes or no.

6               THE WITNESS:  I'm sorry.  Yes.

7   Q   (BY MS. AMERT)  And is that a man or a woman?

8   A   That's a man.

9   Q   So who is Mr. Worku?

10  A   He is a chemist.

11  Q   Is he one of your former Dow colleagues?

12  A   Yes.

13  Q   When did you communicate with Mr. Worku about this lawsuit?

14  A   I don't remember, it was probably -- it was sometime in 2014.

15  Q   How did you communicate with him?

16  A   Over lunch.  I eat a lot.

17  Q   Tell me what, about this lawsuit, you discussed at that

18      lunch?

19  A   Again, that I was involved in litigation.  Yeah, that's all I

20      can really remember, specifically.  I think there might have

21      been some discussion about discrimination, but I don't -- I

22      don't recall, specifically, the details.

23  Q   What type of discrimination?

24  A   Age discrimination.

25  Q   You said that you don't recall any of the details.  What do

52

R O U G H   T R A N S C R I P T

1  you recall about a discussion of age discrimination?

2 A What I recall was that there were concerns within his

3  organization about age discrimination for some employees, and

4  so he was interested in whether that was an aspect of our

5  litigation.

6 Q And when you say his organization, what are you referring to?

7 A The unit within Dow Chemical in which he works.

8 Q Do you know what the name of that unit is?

9 A I don't know today.  At that time it was -- well, I'll give

10  it a generic name, and you can figure it out.  It was Epoxy

11  R & D, but I don't know what they call themselves, actually.

12 Q Is Mr. Worku still employed by Dow?

13 A Yes.

14 Q Did you have any other communications with Mr. Worku about

15  this lawsuit?

16 A Yes.

17 Q What were those?

18 A It would have been another lunch and, again, that one would

19  have been just a social, you know -- well, as they both were,

20  but I'm sure he -- there was lawsuits ongoing, you know, just

21  nothing specific.

22 Q So you're saying you don't remember any specifics that were

23  discussed, just that the lawsuit was mentioned?

24 A No.  Typically, when people ask me what's going on in my

25  life, what am I doing, because people always ask what are you

ROUGH   TRANSCRIPT

53

1    doing when you're retired?  I'm traveling, I'm researching

2    things on line, and I'm involved in a pension litigation.

3    That's kind of my answer.  That's my life right now.  So it

4    comes up in the very generic sort of way with many people,

5    but we don't get into specifics.

6  Q   Other than the two lunches you've just described, have you

7    had any other communications with Mr. Worku about this

8    lawsuit?

9  A   It's going to make an interesting video recording.  No, I

10   don't think so.

11             MS. AMERT:  Let's take a short break.

12             VIDEO TECHNICIAN:  Off the record, 10:59.

13             (Whereupon, a short break was taken.)

14             VIDEO TECHNICIAN:  We are back on the record at

15   11:11.

16  Q   (BY MS. AMERT)  Mr. Johnston, before we took our break we

17   were talking about your conversations with Mr. Worku about

18   this lawsuit, and you had described two lunch conversations

19   from 2014.  Other than those two conversations, have you had

20   any other conversations with Mr. Worku about this lawsuit?

21  A   I don't remember any.

22  Q   Was Mr. Worku a recipient of your E-mail?

23  A   No.

24  Q   Why not?

25  A   He was not a DuPont Dow Elastomers employee.

R O U G H   T R A N S C R I P T

54

1  Q    Was Mr. Worku at the Christmas party in 2014 that you

2       previously described?

3  A    No.

4  Q    Have you ever had any discussions with Mr. Worku about his

5       pension benefits?

6  A    No.

7  Q    You also mentioned Participant 49    and Participant 50   , is that

8       correct?

9  A    Yes.

10 Q    Are the two of them married to one another?

11 A    Yes.

12 Q    Did you communicate with them individually or together?

13 A    Let me answer it this way:  They were on the E-mail, which I

14      presume they received in their individual mailboxes; they

15      were both at the Christmas party.

16 Q    Did either of them respond to your E-mail?

17 A    I don't remember.

18 Q    Do you recall a specific discussion with either of them at

19      the Christmas party about this lawsuit?

20 A    Same as with others, just if they asked, I would have said I

21      was involved in a lawsuit.  I think they were obviously aware

22      because they received the E-mail, so --

23 Q    But you don't remember saying anything specifically to them

24      about the lawsuit?

25 A    I don't remember.

R O U G H   T R A N S C R I P T

55

1  Q  Or them saying anything specifically to you about the

2      lawsuit?

3  A  I don't remember.

4  Q  Other than that E-mail and the Christmas party, have you had

5      any other communications with Participant 49 about the lawsuit?

6  A  No.

7  Q  Have you had any communications with Participant 49 about her

8      Dow pension benefits?

9  A  No.

10  Q  Other than the E-mail and the Christmas party, have you had

11     any other communications with Participant 50 about the lawsuit?

12  A  No.

13  Q  Have you had any communications with Participant 50 about his

14     pension benefits?

15  A  Actually, let me make a correction, if I may.

16  Q  Of course.

17  A  I think I did not copy Participant 50 on the E-mail.

18  Q  Why do you think you did not copy him?

19  A  I don't think he returned to Dow in 2005.

20  Q  Before you made your correction, I believe I had asked you if

21     you had any conversations with Participant 50 about his pension

22     benefits?

23  A  Not about his pension benefits.

24  Q  About your pension benefits?

25  A  No.  You asked about the lawsuit.

56

ROUGH  TRANSCRIPT

1  Q   Okay.  I'll just start over.

2  A   Okay.

3  Q   It's repetitive for me, too, so I also get a little bit

4      lost.

5          Have you had any conversations, other than the E-mail

6      and the Christmas party, with Participant 50 about the lawsuit?

7  A   I don't believe --

8          MS. RENAKER:  Objection, misstates his testimony.

9      You can answer.

10         THE WITNESS:  I don't believe I copied him on the

11     E-mail.

12  Q  (BY MS. AMERT)  Okay.  Thank you.  I understand, and I

13     appreciate that correction.  Have you had any communications

14     with Participant 50 about his pension benefits?

15  A   No.

16  Q   Have you had any communications, other than the Christmas

17     party, with Participant 50 about your pension benefits?

18  A   Again, I don't think that's what I told you a minute ago.  We

19     talked about the lawsuit, not about my pension benefits.

20  Q   I understand that.  I'm actually asking you a different

21     question.

22  A   Okay.

23  Q   I'm asking if you --

24  A   Well, you --

25         MS. RENAKER:  Can I --

ROUGH   TRANSCRIPT

57

1                MS. AMERT:  Uh-huh.

2                MS. RENAKER:  Let's let Ms. Amert finish her

3       question, and then I'll interpose an objection.  Assuming I

4       don't instruct you not to answer, you can answer.

5    Q   (BY MS. AMERT)  If I've got this straight, you recall that

6       Participant 50   was at the 2014 Christmas party where you

7       discussed this lawsuit, correct?

8    A   Yes.

9    Q   And you don't have a specific recollection of talking, what

10      you said to him or he said to you about the lawsuit at that

11      Christmas party, correct?

12   A   Yes.

13   Q   Have you discussed the lawsuit with Participant 50  at any other

14      point in time?

15   A   No.

16   Q   Have you discussed your pension benefits with Participant 50  at

17      any other point in time?

18   A   No.

19                MS. RENAKER:  So I'm going to object that that's,

20      potentially, a very broad period of time.  And you've said at

21      any period of time, but wondering, I'm thinking it's a little

22      vague as to time.  You can answer.

23                THE WITNESS:  And I'm glad you said that, because

24      in my mind I was still thinking in terms of the lawsuit time

25      frame, but I don't remember having any discussion with

ROUGH   TRANSCRIPT
58

1   Participant 50  ever about pension benefits.

2   Q    (BY MS. AMERT)  You said that Participant 49  was included on

3        your E-mail, correct?

4   A    Yes, I believe so.

5   Q    Have you had any communications with Participant 49 , other than

6        that E-mail, about whether she might be a member of the Class

7        on whose behalf your bringing this lawsuit?

8   A    Have I ever said that?  I mean, you're changing your question

9        from what I said before that was in the E-mail, but --

10  Q    Do you understand my question?

11  A    I understand your question, but you're -- you're saying I

12       said something that I didn't say.

13  Q    What -- I didn't intend to do that.  What do you think I

14       misstated?

15  A    That I think you said the E-mail was about whether people

16       were potential class members.  I didn't say that.  I think I

17       said that the E-mail told people that I was involved in

18       litigation, that there was information on my attorney's

19       website about the litigation, and that they were encouraged

20       to contact them about the litigation.

21  Q    Thank you for that clarification.  My question now is whether

22       you have ever discussed with Participant 49  whether she might be

23       a member of the class on whose behalf you're bringing this

24       lawsuit?

25  A    I don't believe so.

R O U G H   T R A N S C R I P T

59

1  Q    Okay.  The last person that you mentioned when I asked who

2        you had had conversations about this lawsuit with was Manu

3        Rego.  Am I pronouncing his name correctly?

4  A    Yes.

5  Q    And I believe you said you weren't sure whether you had

6        talked with Mr. Rego or not, correct?

7  A    About the lawsuit.

8  Q    About the lawsuit.  Why do you think you might have talked to

9        him about the lawsuit?

10 A    We had a social conversation over lunch after I retired, and

11       I think -- I'm trying to remember.  He was concerned about my

12       well-being, and how I was doing after the termination, and I

13       probably misspoke, because I think I answered with respect to

14       the lawsuit and, really, I think my conversation with him was

15       well before the lawsuit, and it would have been with respect

16       to the pension benefit calculation, and the issues I had at

17       that time in terms of trying to get information from Dow that

18       I was seeking.  So it really was more about my initial

19       information seeking in the appeal process.  I probably

20       shouldn't have -- I think I misanswered your question

21       originally.

22 Q    And if I understand you, you're recalling a conversation that

23       took place relatively soon after you retired?

24 A    Yeah, so it was late 2011 sometime.

25 Q    Did Mr. Rego say anything to you about your pension

ROUGH TRANSCRIPT

```
 1      calculations?

 2  A   I don't think so.  He wouldn't have been in a position to.

 3  Q   Other than the conversation you just described, have you had

 4      any other conversations with Mr. Rego about your pension

 5      benefits?

 6  A   No.

 7  Q   Have you had any conversations with Mr. Rego about this

 8      lawsuit?

 9  A   I don't believe so.

10  Q   Was Mr. Rego copied on your E-mail?

11  A   No.

12  Q   Was Mr. Rego at the Christmas party?

13  A   No.

14  Q   So we've just discussed the people who you were able to

15      recall this morning having had communications about this

16      lawsuit with.

17  A   (Witness nodding head.)

18  Q   In the course of our discussion, have you recalled any other

19      individuals who you may have had communications with?

20  A   Nobody has popped into my mind, but I'm thinking right now --

21      I can say this:  I know there were more people than I listed

22      here today on the E-mail distribution, but I don't recall who

23      they were.

24  Q   How did you decide who to include on that E-mail

25      communication?
```

ROUGH   TRANSCRIPT

61

```
 1  A    I was trying to include people who I knew had worked for, or

 2       that I believed had worked for Dow, gone to work for DuPont

 3       Dow Elastomers and then come back to Dow in 2005.

 4  Q    And just for clarity for the record, when we're talking about

 5       the E-mail, we're talking about the E-mail that you sent in

 6       the spring or summer of 2014, informing some of your former

 7       colleagues that you had filed a lawsuit, and encouraging them

 8       to look at your counsel's web Page, correct?

 9  A    Yes.  And another name that comes to mind is Participant 41      .

10  Q    Participant 41      was another recipient of your E-mail?

11  A    I don't remember.

12  Q    Okay.  Why does his name come to mind now?

13  A    If you could tell me how my memory works, we'd both be

14       happy.  It popped in.

15  Q    It popped in because you remember communicating with

16       Participant 41      about this lawsuit?

17  A    Yes.

18  Q    When did you communicate with Participant 41      about this

19       lawsuit?

20  A    I don't remember.  I would say probably the latter half of

21       2014, but --

22  Q    How did you communicate with him?

23  A    By telephone.

24  Q    Did he call you, or did you call him?

25  A    I called him.  I think he returned my voicemail or something.
```

R O U G H   T R A N S C R I P T

62

1   Q    Why did you call him?

2   A    He was the Vice-President for Manufacturing at DuPont Dow

3        Elastomers, and I wanted to know his employment history.

4        And, also, since he was involved in the formation of DDE, at

5        a leadership level, I was trying to get clarity on the time

6        line of that process.

7   Q    What did you discuss with Participant 41     ?

8   A    The, the question I think I had for Participant 41     was whether

9        manufacturing personnel at the -- let me just say, personnel

10       at our manufacturing plants that were associated with DuPont

11       Dow Elastomers had formation, if those personnel were DuPont

12       Dow Elastomers personnel or Dow's personnel.  And if the

13       latter, when they became DuPont Dow personnel, if they did.

14  Q    Why did you want to know that?

15  A    I wanted to know that because I wanted to understand what

16       personnel might be involved in the asset transfer referred to

17       in Section 10.46.

18  Q    What did Participant 41     tell you?

19  A    I believe the answer was that manufacturing personnel never

20       were DuPont Dow Elastomers' employees, as I thought they had

21       become.

22  Q    Can you explain to me who you mean when you say the

23       manufacturing personnel?

24  A    Operators, foremen, that kind of thing, people that operate

25       the manufacturing plant.

ROUGH TRANSCRIPT

63

```
 1   Q    What else did you and Participant 41      discuss?

 2   A    I believe that's all.  I mean, I'm sure I mentioned I was

 3        involved in litigation about pension benefits.  I don't

 4        remember anything specifically but, of course, I was, you

 5        know, I needed to set the stage for why I was having the

 6        contact with him, so --

 7   Q    Do you remember anything else he said to you?

 8   A    No.

 9   Q    Okay.  Is Participant 41     still employed by Dow?

10   A    No.

11             MS. RENAKER:  You need to let her finish her

12        question, and give me a moment just in case --

13             THE WITNESS:  Sorry.

14             MS. RENAKER:  -- there's something objectionable,

15        although, generally there's not.

16   Q    (BY MS. AMERT)  Do you know where Participant 41     works now?

17   A    Can we back up a minute?

18   Q    Sure.

19   A    Reask your last question.

20   Q    I asked if he still works for Dow?

21   A    I don't know.

22   Q    Okay.

23   A    Because the question is not properly framed, I guess.

24        Because I'm not sure he -- you say still works for Dow; I'm

25        not sure he did work for Dow after DuPont Dow.
```

R O U G H   T R A N S C R I P T

64

1  Q     Okay?

2  A     I don't know that, frankly.  I believe he's retired now.

3  Q     And I believe you said you did not copy him on your E-mail?

4  A     I don't think so.  I don't remember, though.  I don't

5        remember.

6  Q     Okay.

7  A     I don't remember.

8  Q     Have you had any other communications with Participant 41

9        about this lawsuit?

10 A     No.

11 Q     Have you had any communications with Participant 41     about your

12       pension benefits?

13              MS. RENAKER:  Is that at any time?

14              MS. AMERT:  Sure.

15 Q     (BY MS. AMERT)  Do you recall ever talking with Participant 41

16       about your pension benefits?

17 A     What do you mean, talking with Participant 41   ?  Could that

18       include a public presentation by Participant 41   ?

19 Q     Sure.

20 A     At which I was in the audience?

21 Q     Sure.

22 A     Because I don't recall Participant 41    having such a

23       presentation, but I do remember early in the formation

24       process for DDE, Senior Leadership was involved in a kind of

25       formation meeting, at which benefits were discussed by DuPont

R O U G H   T R A N S C R I P T

65

1     benefit specialists and some Q and A afterwards with

2     Leadership, and I believe he was part of that team, but I

3     don't remember the specifics.

4  Q  Okay.  Other than that presentation, do you ever recall

5     communicating with Participant 41    about your pension benefits?

6  A  No.

7  Q  Okay.  Other than the people we've just discussed --

8  A  Yeah, another one popped in.

9  Q  Okay.

10 A  I'll let you finish.

11 Q  No, go ahead.  I would -- it's a question for after we finish

12    discussing all of the people who pop up, so who else did you

13    think of?

14 A  Participant 45     .

15 Q  Is that a man or a woman?

16 A  It's a woman.

17 Q  You recall communicating with Participant 45   about this lawsuit?

18 A  Yes.

19 Q  When did you communicate with Participant 45   about this lawsuit?

20 A  I really don't remember.  Between 2012 and 2014, inclusively.

21 Q  How did you communicate with Participant 45   ?

22 A  I believe it was by phone.

23 Q  Tell me what you remember about that phone conversation?

24 A  I, I was asking when she became a DuPont Dow employee, and if

25    she knew when other -- she was an office professional at

ROUGH   TRANSCRIPT

66

1       DuPont Dow, and I was asking when other office professionals

2       became DuPont Dow employees.

3   Q   Did you call Participant 45   or did she call you?

4   A   Well, again, I initiated it.  I don't remember if she was

5       returning my call or I directly called her, but I made the

6       first call.

7   Q   What did she tell you?

8   A   I don't remember.

9   Q   Why were you interested in finding out when office

10      professionals became employees?

11  A   Because it was my belief that -- I knew there was a class of

12      employees who had not come into DuPont Dow, that formation,

13      they came later, and I wanted to understand who was included

14      in that.  And I should maybe -- well, I think I should say

15      this because it's a bit of a correction to what I said

16      earlier.  I believe when you were asking me about Evelyn

17      Morrison you probably asked me if I had any other

18      conversations or so forth, and I probably said that was it,

19      but I do recall I also communicated with Evelyn Morrison on

20      the same question.  She was a technologist in the

21      organization, and my concern was with, basically, with

22      non-exempt employees.  And so office professionals and

23      technologists were in that group, and so I asked Participant 45 as a

24      representative of office professionals, and I asked Evelyn

25      Morrison as a representative of technologists, to help me

ROUGH   TRANSCRIPT
67

```
 1     understand when they became Dow employees, or DuPont Dow
 2     employees.  I'm sorry.
 3  Q  And why were you interested in that information?
 4  A  So I was interested in that information because I was trying
 5     to understand what the July 1997 date and Section 10.46
 6     referred to.
 7  Q  You said earlier that you weren't sure exactly when you had
 8     contacted Participant 45 , but it was between 2012 and 2014?
 9  A  Yes.  I don't remember.  Yes.
10  Q  Do you recall why you were particularly interested at that
11     point in understanding that July of 1997 date?  Did it relate
12     to your appeal, for example, or to this lawsuit?
13  A  Since I don't remember the timing, I don't remember which of
14     those was my concern.  I know -- I can tell you this:  When I
15     was working on the appeal, I had this question.  I believe --
16     I believe I sent Participant 45 an E-mail and never got a response,
17     and then it was a long time later that I actually was able to
18     communicate with her by phone, like, maybe a year later or
19     so.  I just don't remember.
20  Q  Were either Participant 45  or Ms. Morrison copied on your E-mail
21     to your former colleagues?
22  A  Yes.
23  Q  Have you discussed with either of them whether they might be
24     members of the potential class in this lawsuit?
25                 MS. RENAKER:  I'm going to object that it's
```

ROUGH   TRANSCRIPT

1   compound.  I'm not actually sure that the answer to the prior

2   question is clear, because it wasn't either, and it got a

3   yes, and I think there's the same problem here.

4          MS. AMERT:  Fair enough.

5   Q   (BY MS. AMERT)  Why don't you answer my compound question

6       about discussing with either of them whether they'll be a

7       class member or not, and then I can clarify from there.

8   A   You have switched your line of questioning, and so I'm going

9       to make a clarification so that we both understand what I'm

10      responding to, if you don't mind.

11             As you can tell, I've had conversations with my fellow

12      colleagues about my lawsuit.

13  Q   Uh-huh.

14  A   And that they may have an interest in what's transpiring, and

15      that they should talk to my attorneys.  As to whether they're

16      specifically in some class or not, no.  So if you want to

17      define that first conversation as a conversation about

18      whether they would be a class member then, yes, I have, but

19      have I said that these are the part, or claims, you know this

20      is how we want to get the class certified, and you might be

21      within that and so on.  No, I have not.

22             So it would help me answer your question in a way that's

23      not confusing for either of us if you could maybe clarify

24      what your intent is on the questioning.  But what I've

25      answered so far has not been with respect to whether they're

ROUGH   TRANSCRIPT
69

```
 1       a class member or not, but it's been with respect to the fact
 2       that there's this lawsuit.  It might be a class action
 3       lawsuit, who knows, but I don't know if they were a class
 4       member or not, anything like that.  So is that --
 5   Q   I --
 6   A   -- helpful?
 7   Q   -- appreciate that clarification.
 8   A   So, then, if you ask the question again, then maybe I can
 9       answer it.
10   Q   Sure.  And let's do them one at a time just so that we're
11       clear exactly who we're talking about.
12           You described a conversation with Participant 45  where you
13       were seeking information from her about when non-exempt
14       employees became DDE employees.  Have you had any other
15       communications with Participant 45  about this lawsuit?
16   A   Yes.
17   Q   What were those communications?
18   A   She was on the E-mail distribution.
19   Q   Did she respond to you, to the E-mail?
20   A   I don't believe so.
21   Q   Other than the conversation about non-exempt employees and
22       the E-mail that you copied her on, have you had any other
23       communications with Participant 45  about this lawsuit?
24   A   No.
25   Q   Was Ms. Morrison also copied on your E-mail?
```

ROUGH   TRANSCRIPT

70

1   A    No.

2   Q    Okay.  Have you had any conversations with Ms. Morrison about

3        this lawsuit, other than the conversation you described when

4        you were trying to understand when non-exempt employees

5        became DDE employees?

6   A    If you'll go back in the record you'll see that I testified

7        about conversations I had had with her over lunch --

8   Q    Okay.

9   A    -- in which it was mentioned in social context, and I'm

10        adding to that the comment about the exchange that we had on

11        information about non-exempt employees, but that's all I'm

12        remembering at the time now.

13   Q    Okay.  All right.  Has anyone else popped up in your memory?

14   A    They only come one at a time.

15   Q    Okay.

16   A    No, no.  Those were triggered because of conversation we had

17        about specific issues, but not at the moment, nothing else.

18   Q    Other than the people that we've just discussed, have you

19        talked with any former or current Dow employees about whether

20        they might participate in this lawsuit?

21   A    Can you ask the question one more time, please.

22             MS. AMERT:  Can you read it back.

23             (Requested portion of the record

24              was read by the reporter.)

25             MS. RENAKER:  I'll object that it's vague as to

R O U G H   T R A N S C R I P T

1    participate, but you can answer if you understand the

2    question.

3              THE WITNESS:  By conversation, you include written

4    communication?

5              MS. AMERT:  Yes.

6              THE WITNESS:  So, obviously, there are people on

7    the Dow side of this litigation, Debbie Salo and others I

8    have communicated with about the lawsuit, and they're

9    participants in the process, so I guess to that extent, yes.

10   Q    (BY MS. AMERT)  Other than those individuals on the Dow side

11   of the litigation, have you communicated with any other

12   current or former Dow employees about their participation in

13   the litigation?

14             MS. RENAKER:  And I'll object again that it's vague

15   as to participation.  You can answer.

16             THE WITNESS:  Again, the broadest scope of contact

17   would be the E-mail that I sent out, and I don't think I

18   communicated with anybody that I didn't E-mail or that I

19   didn't mention to you.  I can't remember any other names at

20   this time.

21   Q    (BY MS. AMERT)  Okay.  And we've talked about everyone you

22   remember who was copied on that E-mail, correct?

23   A    Yes.

24   Q    Okay.

25   A    Well -- okay.  No names, but my E-mail was redistributed by

ROUGH TRANSCRIPT
72

```
 1    some people.  I don't know who received it, but I got a call
 2    from a gentleman in Louisiana who asked me some questions
 3    about it.  And I don't remember his name, I didn't know him,
 4    but he had received the E-mail distributed by someone else,
 5    and did call me.
 6          Again, this would have been in that same spring/summer
 7    of 2014 type time frame and, again, I encouraged him to read
 8    the information on line and talk to my attorneys.  So sorry,
 9    I don't have a name, but there was a conversation.
10 Q  Do you -- were you copied on any redistributions of your
11    E-mail?
12 A  Not that I remember.
13 Q  Did anyone tell you that they had redistributed your E-mail?
14 A  Well, this gentleman told me he had received it, you know,
15    and I hadn't put him on the list, so obviously it had been
16    redistributed.  And I trying to remember, at the time I knew
17    who redistributed it, and I don't remember now, and I believe
18    there were maybe four or five names that he distributed them
19    to.  I believe it was a man.
20 Q  So your recollection is that there was one person who
21    redistributed --
22 A  Well, actually, I take that back.  Sorry.  Finish your --
23 Q  No, if you want to correct what you just said, please go
24    ahead.
25 A  Another name would be       Participant 15            .  I
```

ROUGH   TRANSCRIPT

1       believe that she -- I believe that she -- I believe she was

2       the one that redistributed the E-mail; she works in

3       Louisiana.

4    Q  Is she one of your former Dow co-workers?

5    A  Yes.

6    Q  Other than that E-mail, have you had any communications with

7       Participant 15   about this lawsuit?

8    A  No.

9    Q  Did you discuss with her the fact that she redistributed your

10      E-mail?

11   A  I don't remember.

12   Q  Do you know of anyone else who may have redistributed your

13      E-mail?

14   A  No.

15   Q  And I think you said that it was your recollection that

16      Participant 15   had distributed it to four or five other people,

17      is that correct?

18   A  I believe so.

19   Q  Did you hear from anyone else that Participant 15   distributed

20      your E-mail to?

21   A  I don't think so.  I don't remember.

22   Q  So Mr. Johnston, we've been talking this morning about the

23      lawsuit that you've filed against the Dow Employees' Pension

24      Plan and the Retirement Board of the Company, correct?

25   A  Yes.

R O U G H   T R A N S C R I P T

1    and as this says, I misspelled the name because at that time,

2    I think I had heard Debbie Sabo, but it was Salo, and she

3    wasn't in, so she had Cherie call me, and all she could say

4    was that, because apparently they outsource that calculation

5    to actuaries, and those people were needed to provide the

6    details of how the calculation was done, and apparently those

7    people had not yet responded to my request.  And so she's

8    just saying that they've looked at it and said the estimate

9    was correctly calculated but, again, no details on how that

10   was done.  And so she couldn't answer my questions, because

11   she was just filling in and, obviously, the document also, I

12   was seeking clarification on whether the SPD is the governing

13   legal document or not, and she clarified it is not.  And

14   since I didn't have that document, I asked for it and she

15   said they would have to get it from legal.  And so, again, I

16   asked for a copy of it immediately because I was going to be

17   meeting with legal counsel.  And I don't remember when I

18   received it; I don't believe I had it at my meeting with

19   legal counsel, though.

20  Q   Okay.  Toward the end of your notes there's a sentence that

21      says, I asked for a copy immediately as I had to meet with

22      legal counsel on Wednesday, so need it by tomorrow evening.

23         Did I read that correct, your handwriting correctly?

24  A   Yes.

25  Q   Okay.  For the moment, you can take my word for it that

R O U G H    T R A N S C R I P T

1   September 26, 2011 was a Monday.  Would you interpret this

2   note to mean you were meeting with legal counsel the

3   following, the Wednesday directly after --

4   A   9/28, yes.

5   Q   Okay.

6            MS. AMERT:  Can we take a short break so he can

7       change the tape.

8            VIDEO TECHNICIAN:  We're going off the record at

9       5:49.

10           (Whereupon, a short break was taken.)

11           VIDEO TECHNICIAN:  We are back on the record at

12      5:53, beginning disk five.

13           MS. AMERT:  Okay.  Can I have --

14  Q   (BY MS. AMERT)  Mr. Johnston, I'm handing you a document

15      that's been marked Defendant's Exhibit 54.  Defendant's

16      Exhibit 54 is a letter dated September 27, 2011 with,

17      addressed to you bearing production numbers P5286 and 87.  Do

18      you have this letter in front of you, Mr. Johnston?

19  A   Yes.

20  Q   And I'll note that September 27, 2011 is the day after the

21      conversation with Cherie Farms that we were just discussing,

22      correct?

23  A   Yes.

24  Q   Do you recognize this letter?

25  A   Yes.

200

R O U G H   T R A N S C R I P T

1    Q    What is this letter?

2    A    This is in response to my E-mail of September 19, 2011.

3    Q    And in that E-mail you raised concerns about how your Pension

4         Benefit Estimate had been calculated, correct?

5    A    Yes.

6    Q    And about two-thirds of the way down the page -- sorry.  This

7         letter is from Debbie Salo, who was a Pension Plan Manager

8         for Dow, correct?

9    A    It's from Debbie Salo.  I have no personal knowledge of her

10        title, other than what's in the letterhead, but --

11   Q    Do you believe that she works for Dow in its Plan, Benefit

12        Plan Administration?

13   A    Yes, in some capacity.

14   Q    Okay.  About two-thirds of the way down the first page of

15        this document, Ms. Salo writes, I have confirmed with the Dow

16        Plans's actuaries that your pension calculation was performed

17        correctly, and that the pension calculation in your

18        transitions binder is correct.  Do you see that?

19   A    Yes.

20   Q    What did you understand that sentence to mean when you

21        received this letter?

22   A    That I was no further along or no less when I wrote it in

23        terms of understanding the correctness of the calculations

24        because it's just a reaffirmation of what the estimate said,

25        it didn't provide any step-by-step of how the calculation was

R O U G H   T R A N S C R I P T

201

1     done.

2  Q   Was it your understanding that Dow's position was that the

3      calculation was correct?

4  A   Yes.

5  Q   Okay.  You can set that down, or set it aside.

6           MS. AMERT:  Can I have 59, please.

7  Q   (BY MS. AMERT)  Mr. Johnston, I'm handing you a document

8      that's been marked Defendant's Exhibit 59, which is a

9      document titled, Termination, General Release, stamped

10      Received October 7, 2011, and with the production number, Dow

11      0005976 through 5983.  Do you recognize in document,

12      Mr. Johnston?

13 A   No, I do not.

14 Q   Would you please turn to the last page of the document.

15 A   Yes.

16 Q   Do you see your signature on that document?

17 A   Yes, I do.

18 Q   Do you need a minute to look at the document?

19 A   No.

20 Q   Okay.  Why -- do you understand what this document is?

21 A   Yes.

22 Q   What is it?

23 A   It's the Termination, General Release Form that I was asked

24      to sign.

25 Q   And did you sign it?

R O U G H   T R A N S C R I P T

1  A   Yes, I did.  That's my signature on the back.

2  Q   When you said you don't recognize it, why did you say that?

3  A   This is a modified copy of what I saw.  This has stamps on

4      it, some numbers circled, stamp over here, a signature by a

5      Dow representative that I've not seen, so I didn't receive a

6      copy of this document.

7  Q   Okay.  Other than the additional annotations that you've

8      noted, is this the Termination, General Release that you

9      signed?

10 A   It looks like that's all the annotations so, yes.

11 Q   Okay.  And on the last page next to your signature, it says,

12     Date of signing, October 3, 2011, correct?

13 A   Yes.

14 Q   Okay.  So on October 3rd of 2011, when you signed this

15     Termination, General Release, you understood that you had a

16     disagreement with Dow about how your pension benefit should

17     be calculated.  Is that a fair statement?

18 A   Yes.

19 Q   And you had previously expressed that you were concerned that

20     signing this release might impact your ability to pursue

21     action to correct your calculation, is that fair?

22 A   Yes.

23 Q   Okay.  Why did you -- well, when you signed this release, did

24     you understand that you were waiving your right to do that?

25 A   To do what?