# Exhibit D

```
 1                 San Francisco, California
 2                 Tuesday, August 4th, 2015
 3                   9:09 a.m. - 4:29 p.m.
 4                        ---oOo---
 5
 6           THE VIDEOGRAPHER:  This is Tape No. 1 to
 7      the videotaped deposition of Ian H. Altman in the
 8      matter of Robert Johnston, et al., versus Dow
 9      Employees' Pension Plan, et al., being heard before
10      the U.S. District Court for the Eastern District of
11      Michigan, Case Number 114-cv-10427.
12           This deposition is being held at
13      235 Montgomery Street, Suite 944, San Francisco,
14      California 94104, on August 4th, 2015, at 9:09 a.m.
15           My name is Peter Yaroschuk.  I'm the
16      videographer.  The court reporter is Monica Georg.
17           Counsel will you please introduce
18      yourselves and affiliations and the witness will be
19      sworn.
20           MS. AMERT:  Amanda Amert for the defendant.
21           MS. RENAKER:  Teresa Renaker for the
22      plaintiff.
23      /////
24      /////
25      /////
```

6

1                    IAN H. ALTMAN, FSA,

2    having been administered an oath, was examined and

3    testified as follows:

4

5                    EXAMINATION

6    BY MS. AMERT:

7        Q.   Mr. Altman, we met earlier but as you know

8    I'm Amanda Amert and I'm one of the attorneys for

9    the defendants in this lawsuit.

10            You understand that you are here to have

11   your deposition taken this morning, correct?

12       A.   Correct.

13       Q.   And I understand that you've done this

14   before.

15       A.   I have been deposed before.

16       Q.   About how many times would you say?

17       A.   More than 20.

18       Q.   Okay.  So I am going to go over the ground

19   rules of the deposition 'cause that's what we do as

20   lawyers, but I'll try to keep them brief for your

21   sake and obviously if there's anything along the way

22   that you don't understand or that you need me to

23   explain just let me know, okay.

24            You are being videotaped this morning, but

25   we also have a court reporter here who is

1   page 14.  It's Footnote 20.  And it reads, "I do not

2   retract the position from my initial report that

3   applying the .925 factor, which scales back benefit

4   by implying a 7.5 percent rate of annual pay

5   increase, is likely detrimental to most class

6   members to whom it is applied."

7            Did I read that correctly?

8        A.   You did.

9        Q.   What do you mean by detrimental to class

10  members?

11       A.   Provides them with lower benefits than

12  would have been provided if we had reflected their

13  actual pay.

14       Q.   Their actual pay at DDE?

15       A.   Or -- in this particular case, yes, but

16  it's also that in general applying a factor of .925

17  for three-year final average compensation

18  calculation in this time frame is likely to be

19  ungenerous to participants.

20       Q.   Whether it is detrimental or not to a

21  particular participant would depend on what their

22  DDE compensation was, correct?

23       A.    In this example, yes, or more broadly, it

24  would depend on what their actual salary was

25  relative to this factor.

1        Q.    And you have testified that you do not have

2    information about the class members' DDE

3    compensation, correct?

4        A.    Correct.

5        Q.    Do you know how DDE's compensation was

6    structured generally?

7        A.    I know it was different.  In fact I've

8    heard perhaps that some people think it was higher

9    than Dow, but -- but I don't know the specifics of

10   it.

11       Q.    So if the DDE compensation were

12   significantly lower than the Dow compensation it's

13   possible that the .925 calculation could be

14   beneficial, correct?

15       A.    It's possible.

16       Q.    And that could also happen if the DDE

17   compensation had a large component that was not

18   considered part of compensation for pension purposes

19   under the Dow plan, correct?

20       A.    I'm sorry, try again.

21       Q.    Not all compensation automatically

22   in caduntiating someone's pension, right?

23       A.    Right.

24       Q.    And the Dow plan has a lengthy definition

25   of what compensation is included, correct?

1      A.    Right.   Uh-hm.

2      Q.    It's possible that DDE could have paid a

3   portion of its compensation in a form that would not

4   count under the Dow plan, correct?

5      A.    Yeah, I suppose that's possible.   I guess

6   in that circumstance Dow would look at it closely to

7   see what the -- what they felt the plan dictated in

8   that circumstance.

9      Q.    And it's possible that a participant in

10   that scenario could be better off with a .925

11   calculation?

12      A.    Again, it's possible but those are

13   all -- they're all possible, but I think they're all

14   not likely outcomes.

15           In general I think people in this time

16   frame would have their salary increase at less than

17   7.5 percent increase a year.

18      Q.    And you'd have to make that determination

19   on a person-by-person basis --

20      A.    You would.

21      Q.    -- correct?

22           Could you turn to Paragraph 8 of your

23   rebuttal report, please.   This is on page 5.

24      A.    Paragraph 8?

25      Q.    That's what I wrote down let me check --

1   zero damages because they chose to retire early from

2   both plans, from one plan, from the other plan, in

3   such a way to maximize their situation given the way

4   the rules were being applied.  So they may have no

5   damages on my report, but perhaps they would have

6   elected to retire at a different date that would

7   have been more beneficial had the 9.6 proration

8   calculation been applied.

9       Q.   So for purposes of this chart you didn't

10  make any adjustments to benefit commencement dates

11  or anything like that to calculate damages, correct?

12      A.   That's correct.

13           And where there haven't -- where they

14  haven't commenced payment I assumed payment would

15  commence at 65.

16      Q.   Is it your understanding for individuals

17  who do not have damages listed in this chart that

18  these individuals did not experience a reduction in

19  benefits under section -- due to the amendment to

20  add $10.46?

21      A.   Yes.  I agree with that with the proviso

22  that again it may have -- they may still have

23  suffered in some manner because they were coerced or

24  encouraged to retire at a date that might have been

25  different than they would have preferred.

1      Q.   But you have no way of knowing why a
2   particular person retired on a particular
3   date.   A.   Right.   I'm just saying that that's --
4   potentially, that that would have happened.
5           So even some of the people with zero
6   damages in this -- under this methodology might
7   potentially have an argument that they were damaged,
8   but I'm not valuing it.
9      Q.   Okay.   This seems obvious, but just to
10   confirm, the numbers at the bottom of this page, "No
11   Damages, 23, Positive Damages, 33"; does that mean
12   you concluded that 23 of the individuals listed on
13   this chart did have not damages and 33 did?
14      A.   Did not -- did not have positive damages
15   under the methodology that I'm utilizing here.
16      Q.   Okay.   23 did not and 33 did?
17      A.   Right.   There're 23 dashes here because the
18   values were zero, less than zero, and 33 positive
19   numbers.
20      Q.   And the 5,375,595.55 number, that's a total
21   of all the numbers listed in the damages column?
22      A.   Correct.
23      Q.   Did you remove any participants from the
24   list when you revised Exhibit 1 from your original
25   report?

1   Mr. Johnston appears again.  He is about a third of

2   the way down the list; do you see that?

3       A.   I do.

4       Q.   With a different social security number

5   than at the top of the list.

6       A.   Hmm, sorry, I --

7       Q.   That's okay.

8       A.   No, I wasn't intending for the full social

9   security number to appear.

10      Q.   Well, we had them already, so --

11      A.   No, it's just I'm just always worried about

12  social security numbers appearing somewhere.

13      Q.   But otherwise you'll see that the numbers

14  for the two instances where Mr. Johnston appears are

15  the same I think, other than the social security

16  numbers.

17      A.   Right.  So that was -- that was inadvertent

18  and I cannot give you a reason.  I -- I have some

19  idea as to how that happened in the way we were

20  making the calculations and sorting them, but --

21          So the results would be slightly different

22  and probably slightly lower.

23      Q.   Okay.  Do you know whether the removal of

24  Participant 56      from this chart was intentional?

25      A.   I don't think it was.  I think it was just

156

1   3:23 p.m.

2              (Short recess was taken from 3:23 p.m.

3              until 3:27 p.m.)

4              THE VIDEOGRAPHER:  We're back on the record

5   at 3:27 p.m.

6   BY MS. AMERT:

7       Q.   Mr. Altman, we've talked at some lengths

8   about how you calculated the damages which required

9   you to calculate benefits for the participants who

10  transferred to DDE and back, correct?

11      A.   I'm sorry, maybe I just didn't hear you.

12  Could --

13      Q.   I just meant that as an introductory.

14      A.   I understand you're getting rolling, but I

15  just want to make sure --

16      Q.   Sure.

17      A.   -- that we talked about how I calculated

18  the benefits.

19      Q.   Of the participants who transferred from

20  Dow to DDE and then back to Dow, right?

21      A.   Correct.  Correct.

22      Q.   What are the factors that influence the

23  calculation for an individual participant's benefits

24  as you calculate them?

25      A.   Their service with the two different

1  companies.

2          Their pay at the two different companies.

3          The different formulas as described in

4  plan.    the

5      Q.    What about their benefits' commencement

6  date?

7      A.    Their benefit commencement date would

8  affect the amount they are ultimately paid.

9      Q.    As well as their retirement date?

10     A.    It's typically driven by the benefit

11 commencement date.

12     Q.    And for a participant who is not yet

13 retired do you also need to make projections about

14 future years of service and rates of pay?

15     A.    Oh, in my calculations?

16     Q.    Yes.

17     A.    Yes, we would have -- well, we assumed that

18 they stayed employed until -- until the age 65

19 benefit commencement date and that they're -- right,

20 that the terms of the plan continued uninterrupted

21 until that point.

22     Q.    For employees -- participants who have not

23 yet commenced their benefits some of the factors we

24 just talked about will change over time, correct?

25     A.    Meaning they won't come out exactly as

1

2

3        I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6        That the foregoing proceedings were taken

7  before me at the time and place herein set forth;

8  that any witnesses in the foregoing proceedings,

9  prior to testifying, were placed under oath; that a

10  verbatim record of the proceedings was made by me

11  using machine shorthand which was thereafter

12  transcribed under my direction; further, that the

13  foregoing is an accurate transcription thereof.

14        I further certify that I am neither

15  financially interested in the action nor a relative

16  or employee of any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:  August 6th, 2015

21

22                    _____

23                    MONICA LEPE-GEORG, No. 11976

24

25