# Exhibit I

Carr v. International Game Technology, Not Reported in F.Supp.2d (2013)
2013 WL 638834
1:14-cv-10427-TLL-CEB Doc # 35-11 Filed 08/10/15 Pg 2 of 46 Pg ID 1396

2013 WL 638834
Only the Westlaw citation is currently available.
United States District Court,
D. Nevada.

Christopher CARR, Roxanne Clayton,
and Brian Bennett, Plaintiffs,
v.
INTERNATIONAL GAME
TECHNOLOGY, et al., Defendants.
Randoph K. Jordan and
Kimberly J. Jordan, Plaintiffs,
v.
International Game Technology, et al., Defendants.

Nos. 3:09–cv–00584–RCJ–WGC, 3:09–
cv–00585–RCJ–WGC. | Feb. 20, 2013.

**Attorneys and Law Firms**

Thomas J. McKenna, Gainey & McKenna, Michael J. Klein, Stull, Stull & Brody, New York, NY, Matthew L. Sharp, Matthew L. Sharp, Ltd ., Reno, NV, Patrice L. Bishop, Stull, Stull & Brody, Beverly Hills, CA, for Plaintiffs.

Boris Feldman, Cynthia A. Dy, David S. Steuer, Diane Walters, Jacob Thayer Veltman, Nikki Stitt Sokol, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Bret F. Meich, Lance P. Maiss, Richard G. Campbell, Jr., Armstrong Teasdale, LLP, Reno, NV, for Defendants.

**ORDER**

ROBERT C. JONES, District Judge.

**\*1** Plaintiffs are former employee participants in Defendant International Game Technology's ("IGT" or the "Company") profit-sharing plan (the "Plan") who have brought a class action suit pursuant to Federal Rule of Civil Procedure 23 to allege breach of fiduciary duty claims under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2). Currently before the Court are Plaintiffs' motion for partial reconsideration (# 131) and Defendants' motion to exclude (# 147).

**BACKGROUND**

The Plan is a voluntary defined contribution plan whereby participants make contributions to the Plan and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants, which are then allocated to participants' individual accounts. While the parties disagree as to whether the terms of the Plan mandate that IGT common stock ("IGT Stock") be offered as an investment option, IGT Stock was offered during the relevant period and its performance provides the basis for this suit.

Plaintiffs filed the amended consolidated complaint (# 36) on March 10, 2010, alleging several breaches of fiduciary duty under ERISA § 502(a)(2). On March 16, 2011, the Court issued an Order (# 80) in which we granted in part and denied in part Defendants' motion to dismiss (# 40) and denied Defendants' motion for summary judgment (# 44) and Defendant IGT Profit Sharing Committee's alternative motion for summary judgment (# 46). Only the following claims remain: (i) Plaintiffs' claim that IGT and the Committee breached their fiduciary duties by failing to provide complete and accurate information about the IGT stock to the Plan Participants (the "communications claim"); (ii) Plaintiffs' claim that Defendants Matthews, Bittman, Burt, Hart, Heisz, Matthewson, Miller, Rentschler, Roberson, Satre (collectively the "Director Defendants") breached their duty to monitor the IGT Profit Sharing Committee (the "Committee") (the "monitoring claim"); and (iii) breach of co-fiduciary duty pursuant to 29 U.S.C. § 1132(a)(2) with respect to (i) and (ii) (the "co-fiduciary claim").

On March 16, 2012, the Court denied (# 130) Plaintiffs' motion for class certification (# 106), finding, *inter alia,* that Plaintiffs have failed to establish the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a) because the misrepresentation claim will require individualized analysis of each putative class member's detrimental reliance on the alleged misrepresentations.

Plaintiffs have requested (# 131) partial reconsideration of the Order (# 130). Defendants request (# 147) that we exclude new arguments and evidence contained in Plaintiffs' reply (# 139) in support of the motion for partial reconsideration (# 131).

**DISCUSSION**

**A. Motion for Reconsideration (# 131)**

Plaintiffs request that the Court revisit footnote 2 of the Order (# 130), in which the Court stated:

> **\*2** The Court finds it necessary to clarify that Plaintiffs cannot now base their communications claim upon "Company-wide emails and newsletters" (Pls.' Reply Memo. at 1 (# 120)) when the complaint alleges that Defendants made misleading communications to Plan participants via inaccurate SEC filings, press releases, and other specific communications with analysts and the press. (*See* Am. Compl. ¶¶ 76, 87, 91–97, 103–06, 108–14, 119–21, 135–37, 143(# 36).) Moreover, the Court's previous order (# 80) ruled that IGT and the Committee were fiduciaries with regard to communications regarding the Plan only to the extent that Defendants converted the allegedly inaccurate SEC filings, press releases, and other specific communications with analysts and the press into fiduciary communications.

Plaintiffs argue that recently discovered evidence demonstrates that their theory of the case has not changed, and that there is no distinction between the Company-wide emails and the allegations contained in the complaint (# 36). Plaintiffs also request that the Court reconsider its analysis of the issues of typicality and commonality and its decision to deny the motion for class certification in light of this "recently discovered evidence." Federal Rule of Civil Procedure 60(b) provides that a court may relieve a party from an order for (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or misconduct by an opposing party; and any other reason that justifies relief.

To the extent that the Court appeared to categorically deny Plaintiffs an opportunity to present evidence concerning possibly misleading communications in the form of Company emails on the basis that such emails were not specifically referenced in the Complaint, the Court may have been in error. The consolidated amended complaint (# 36) alleges that IGT and the Committee disseminated "the Plan's documents and related materials, which incorporated by reference, among other things, IGT's inaccurate SEC filings, thus converting such materials into fiduciary communications."(Consol.Compl.¶ 76(# 36).) In the motion for class certification (# 106), Plaintiffs failed to address the element of detrimental reliance, and Defendants' opposition (# 117) thoroughly discussed whether individualized issues of reliance should preclude class certification in this action. While doing so, Defendants focused on the proposed class representatives' deposition testimony that they did not rely on IGT SEC filings. In their reply (# 120), Plaintiffs directed the Court's attention to deposition testimony in which the proposed class representatives testified that they relied upon Company-wide emails and newsletters which incorporated SEC filings.

Plaintiffs' complaint does not specifically reference Company emails as a source of allegedly misleading fiduciary communications. Instead, the complaint refers to Plan documents and "related materials", press releases, and other communications with analysts and the press. (Consol.Compl.¶¶ 76, 87, 91–97, 103–106, 108–114, 119–121, 135–137, 143(# 36).) As we noted in our previous Order (# 80), a statement may incur ERISA liability if a defendant "intentionally connects its statements about the company's financial health to statements it makes about the future of plan benefits."*Carr v. Int'l. Game Tech.,* 770 F.Supp.2d 1080, 1089 (D.Nev.2011). In *Quan v. Computer Sciences Corporation,* the Ninth Circuit recognized that the act of incorporating SEC filings into plan communications may give rise to ERISA liability. *Quan v.. Computer Scis. Corp.,* 623 F.3d 870, 886 (9th Cir.2010) ("[w]e assume, without deciding, that alleged misrepresentations in SEC disclosures that were incorporated into communications about an ERISA plan are 'fiduciary communications' on which an ERISA misrepresentation claim can be based.").

**\*3** Plaintiffs' reply (# 120) to the motion for class certification (# 106) stated that "Defendants have not yet produced all communications from Class members and each Plaintiff that was asked testified that they relied upon Company-wide emails and newsletters."(Reply at 1 (# 120).) Plaintiffs provide transcripts of depositions in which each Plaintiff testified that they received SEC filings via email from the Company, and with varying degrees of certainty, that they may have relied on these communications when making investment decisions, or that they did not. For example, K. Jordan testified that he recalled an email sent to all employees by IGT at the end of every fiscal quarter, and that he believed

the statements contained in those emails are "what this case is about." (K. Jordan Tr. 23:2–25, 24:1–2 (# 120–5).) K. Jordan also stated that he thought IGT lied in e-mails to employees by stating that the company was doing great and giving false projections of "where [IGT] stock is." (K. Jordan Tr. 20:13–25 (# 120–5).)

In the motion for reconsideration (# 131), Plaintiffs argue that "recently discovered evidence" that the Company-wide emails contained the text of press releases attached to SEC filings and other such communications referenced in the consolidated complaint requires the Court to consider those emails as fiduciary communications upon which the communications claim is based. While the Court disagrees that any of this evidence is new, the Court grants the motion for reconsideration to the extent that we agree that the footnote in the Order (# 130) was incorrect in finding that Plaintiffs cannot use the Company emails as evidence of misleading communications simply because the emails were not specifically named in the complaint. Those emails, which communicated press releases and SEC filing information to Company employees, are encompassed by the complaint's language, which refers to materials disseminated by IGT and the Committee which incorporated by reference, among other things, IGT's SEC filings. Therefore, the Court erred in finding that Plaintiffs cannot base their communications claim based upon Company-wide emails and newsletters announcing SEC filings and including information about the state of the Company and IGT Stock. In our Order dated March 16, 2011(# 80), the Court noted that the SPD incorporated IGT's SEC filings by reference, including those filed after the date of the SPD. If emails containing misleading SEC filings, press releases, and other such information were sent to all Class Members by Company emails, those emails may be the basis of a misleading communications claim if class members relied upon that information to their detriment.

This finding, however, does not require reconsideration of the Court's denial of class certification. We denied class certification because we found that individual issues of reliance in a communications claim brought pursuant to ERISA § 502(a)(2) defeat commonality, and the two remaining claims, the monitoring claim and the co-fiduciary claim, are derivative of the communications claim. We also found that the claims of the named plaintiffs are not typical of the claims or defenses of the class, as required under Rule 23(a), because the named Plaintiffs testified that they did not rely on the alleged misrepresentations referred to in the amended complaint, namely, the SEC

filings. All of the named Plaintiffs had also signed releases by which they expressly waived the right to bring any claims under ERISA. Therefore, we found that Plaintiffs' claims are not typical of class members' claims and class certification must be denied. Our reconsideration of the footnote in the Order does not change the analysis under Rule 23(a). While certain named Plaintiffs testified that they relied on Company emails communicating SEC filings to employees, others testified that those emails were not part of their investment decisions. Therefore, Plaintiffs have failed to establish the typicality and commonality requirements of Federal Rule of Civil Procedure 23(a) because the communications claim will require individualized analysis of each putative class member's detrimental reliance on the alleged misrepresentations.

**B. Motion to Exclude (# 147)**

 **\*4** Defendants request that we exclude allegedly new matter and arguments presented in Plaintiffs' reply brief (# 139) to the motion to reconsider (# 131). [1] In the reply (# 139), Plaintiffs request that the Court allow Plaintiffs to pursue the action derivatively on behalf of the Plan as a whole. The Court agrees that the amended complaint (# 36) and this Court's Order (# 130) both contemplate that the action is brought on behalf of the Plan. Plaintiffs assert that a plaintiff in a derivative ERISA action need not show personal reliance as part of a fraud and/or misrepresentation claim. Plaintiffs request leave to amend the complaint if a derivative claim has not been properly alleged. Defendants request that we strike this argument as it was brought for the first time in a reply, and that if the argument is to be considered, Defendants must be given adequate opportunity to respond.

[1]    Defendants' request that we strike the "new evidence" in the reply shall be denied. The Court finds that the allegedly new evidence submitted with the reply was not new and was properly attached in response to arguments made in Defendants' opposition. Furthermore, the allegedly new evidence included in the reply was not the basis of the Court's findings in ruling on the motion to reconsider (# 131), and therefore, the request to strike the evidence is moot.

Therefore, the Court shall grant the parties additional time to brief the matter of whether the action should proceed as a derivative ERISA action despite our findings in the Order (# 130) denying class certification, and whether an amended complaint is required. Plaintiffs' request that the Court convene a status conference shall be denied at this time.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Motion to Reconsider (# 131) is **GRANTED IN PART AND DENIED IN PART** on the following basis: **GRANTED** with respect to the footnote in our previous Order (# 130), **DENIED** with respect to class certification.

IT IS FURTHER ORDERED that the Motion to Exclude (# 147) is **DENIED** on the basis that the new arguments contained in the reply (# 139) to the motion for reconsideration (# 131) shall be considered a separate motion. Defendants shall have twenty-one (21) days of the date of entry of this Order within with to file an opposition to the arguments concerning whether this action should proceed as a derivative ERISA action. Thereafter, Plaintiffs shall have fourteen (14) days to file a reply.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 638834

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 7527874

2008 WL 7527874
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
C.D. California.

In re COMPUTER SCIENCES
CORP. ERISA LITIGATION.
This Document Relates To: All Actions.

No. CV 08–02398 SJO (JWJx).  |  Sept. 2, 2008.

**Attorneys and Law Firms**

Edwin J. Mills, James E. Lahm, Jules Brody, Mark Levine, Melissa R. Emert, Michael J. Klein, Patrick K. Slyne, Stull Stull and Brody, New York, NY, Patrice L. Bishop, Stull Stull and Brody, Los Angeles, CA, for Plaintiffs.

Brenda Lynn Kleidosty, Dean J. Kitchens, Michael M. Farhang, Jeremy W. Stamelman, Gibson Dunn and Crutcher, Los Angeles, CA, Charles C. Jackson, Deborah S. Davidson, Thomas F. Hurka, Morgan Lewis and Bockius LLP, Chicago, IL, D. Ward Kallstrom, Donald P. Sullivan, Nicole A. Diller, Morgan Lewis and Bockius LLP One Market, San Francisco, CA, Jennifer Schulp, Paul Blankenstein, Gibson Dunn and Crutcher LLP, Washington, DC, Lee G. Dunst, Gibson Dunn and Crutcher LLP, New York, NY, for Defendants.

**ORDER DENYING PLAINTIFFS' "MOTION FOR CLASS CERTIFICATION" [Docket No. 29]**

S. JAMES OTERO, District Judge.

**\*1** This matter is before the Court on Plaintiffs' "Motion for Class Certification," filed June 11, 2008. Defendants filed an Opposition, to which Plaintiffs replied. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for August 25, 2008. See Fed.R.Civ.P. 78(b). For the following reasons, Plaintiffs' Motion is DENIED.

**I. BACKGROUND**

Plaintiffs are current and former employees of the Computer Sciences Corporation ("CSC") who participated in the CSC Matched Asset Plan (the "Plan"), a plan governed by the Employee Retirement Income Security Act ("ERISA"). [1] During the time Plaintiffs participated in the Plan, the Securities and Exchange Commission investigated CSC and other companies for "backdating" stock options granted to management. Backdating stock options permitted management to realize an immediate profit on the options by purchasing them at a lower price. An internal CSC investigation ultimately found that thousands of stock options were granted at a price lower than they should have been granted.

[1]     Plaintiffs are Frederico Quan, Walter Gray, Don Tyrone Ballard, and Jeanine Shamaly.

Based on this alleged backdating and other imprudent mismanagement, Plaintiffs filed suit against the CSC Retirement Plans Committee (the "Committee"), several individuals associated with CSC (the "Individual Defendants")—including several directors (the "Director Defendants")—and CSC (collectively, "Defendants"). Plaintiffs bring claims on behalf of themselves and the Plan for imprudent investment, negligent misrepresentation, and failure to monitor. In addition, Plaintiffs seek to represent a class of "[a]ll Participants in the Plan for whose individual accounts the Plan held shares of the common stock of [CSC] as part of the Company Stock Fund or CSC Stuck Fund investment option in the Plan, at any time between December 31, 1998 and January 23, 2008, inclusive" (the "Class"). (Mot.1.)

Now, Plaintiffs move to certify the Class under Federal Rule of Civil Procedure 23.

**II. DISCUSSION**

Rule 23 establishes two sets of requirements for class certification. First, every proposed class action must satisfy the four prerequisites of Rule 23(a). Second, the parties seeking class certification must show that the proposed class is certifiable under Rule 23(b)(1), (2), or (3). See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Plaintiffs argue that the Class is certifiable under either Rule 23(b)(1) or (2).

**A. The Class Is Not Certifiable Under Rule 23(b)(1).**

In re Computer Sciences Corp. ERISA Litigation, Not Reported in F.Supp.2d (2008)
2008 WL 7527874

**1.** *The Class Is Not Certifiable Under Rule 23(b)(1)(A).*

Rule 23(b) (1)(A) permits class action if "separate actions would create a risk of varying adjudications 'which would establish incompatible standards of conduct for the party opposing the class.' " *McDonnell Douglas Corp. v. U.S. Dist. Court,* 523 F.2d 1083, 1086 (9th Cir.1975) (quoting Fed.R.Civ.P. 23(b)(1)(A)). The purpose of this rule is "primarily to prevent a defendant from being caught in a classic 'Catch 22' situation where one court orders a defendant to take certain action which another court orders the same defendant not to take." *Bogosian v. Gulf Oil Corp.,* 62 F.R.D. 124, 131–32 (E.D.Pa.1973), *vacated on other grounds,*561 F.2d 434 (3d Cir.1977); *see also In re Ikon Office Solutions, Inc. Sec. Litig.,* 191 F.R.D. 457, 466 (E.D.Pa.2000) ("[Rule] 23(b)(1)(A) considers possible prejudice to the defendants.").

**\*2** Accordingly, the "incompatible standards of conduct" language must be interpreted to mean that separate judgments in separate actions could impose requirements on the defendants that are impossible to simultaneously fulfill.*McDonnell Douglas,* 523 F.2d at 1086 (citing *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466 (9th Cir.1973)).Rule 23(b)(1)(A) envisions multiple lawsuits resulting in two diametrically opposed injunctive orders. This danger is not a concern in this litigation. Should Plaintiffs succeed in obtaining their proposed injunctive relief (*see* Compl. Prayer for Relief), there is little chance another court in another lawsuit will enter an injunction that cannot be satisfied simultaneously. For example, Plaintiffs request "[a]n order enjoining Defendants ... from any further violations of their ERISA fiduciary obligations."(Compl. Prayer for Relief ¶ E.) There is little chance another court will order Defendants to violate their ERISA fiduciary obligations.

Here, there is potential that, should separate plaintiffs bring separate lawsuits, the result could be conflicting outcomes: one court could find no breach of fiduciary duties, while another court could find Defendants liable. Yet, this argument —that the same legal question could be decided differently by different courts—has been rejected by the Ninth Circuit. *See, e.g., McDonnell Douglas,* 523 F.2d at 1086 ("[Although] separate actions could reach ... inconsistent resolutions of the same question of law [and] might establish 'incompatible standards of conduct' in the sense of different legal rules governing the same conduct[,] subdivision (b)(1)(A) was not intended to permit class actions simply when separate actions would raise the same question of law.").

Accordingly, the Class is not certifiable under Rule 23(b)(1) (A).

**2.** *The Class Is Not Certifiable Under Rule 23(b)(1)(B).*

Rule 23(b) (1)(B) permits class action if separate actions "inescapably will alter the substance of the rights of others having similar claims."*McDonnell Douglas,* 523 F.3d at 1086.; *see*Fed.R.Civ.P. 23(b)(1)(B) (protecting against situations that would "substantially impair or impede" other class members' "ability to protect their interest" after adjudication of the instant case); *see also Ikon,* 191 F.R.D. at 466 ("[Rule] 23(b) (1)(B) looks to possible prejudice to the putative class members."). Because Rule 23(b)(1)(B) class actions are mandatory—no class members may opt out—the Supreme Court "counsel[s] against adventurous application of Rule 23(b)(1) (B)...."*Ortiz v. Fireboard Corp.,* 527 U.S. 815, 845, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

The Supreme Court's recent decision in *LaRue v. DeWolff, Boberg & Associates, Inc.,* cures any concern that the potential class members' claims would essentially be disposed of by this litigation. In *LaRue,* the Supreme Court determined that participants in a defined contribution ERISA plan—such as the Plan—could bring ERISA § 502(a)(2) claims on their own behalf. 552 U.S. 248, 128 S.Ct. 1020, 1026, 169 L.Ed.2d 847 (2008) (distinguishing these claims from ERISA § 502(a) (2) claims concerning *defined benefit* ERISA plans, which can only be brought on behalf of the plan). Because the putative class members have an individual remedy, they can pursue relief on their own behalf.

**\*3** Accordingly, the Class is not certifiable under Rule 23(b) (1) (B).

**B.** *The Class Is Not Certifiable Under Rule 23(b)(2).*

Rule 23(b)(2) permits class action if the defendant has acted in a manner applicable to the class generally, making injunctive or declaratory relief appropriate with respect to the class as a whole. "In order to permit certification under [Rule 23(b)(2) ], [any] claim for monetary damages must be secondary to the primary claim for injunctive or declaratory relief."*Molski v. Gleich,* 318 F.3d 937, 947 (9th Cir.2004); *see also*Fed.R.Civ.P. 23(b) (2) advisory committee note (1966) ("The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.").

Here, Plaintiffs' claim is primarily for money damages. Although Plaintiffs seek "[a]n order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations," this "don't do it again" injunction could be issued in any case and adds little to Plaintiffs' relief. For this reason, monetary damages are the "essential goal" of the litigation. *Kanter v. Warner–Lambert Co.,* 265 F.3d 853, 860 (9th Cir.2001) ("[I]f Plaintiffs succeed in obtaining a significant award of monetary damages, they will likely accomplish ... their essential goal [even] without ... an injunction.").

Accordingly, the Class is not certifiable under Rule 23(b)(1).

### III. *RULING*

For the above reasons, Plaintiffs' Motion is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 7527874

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3153993
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Puerto Rico.

In re Armando A. DIAZ CRUZ,
Leida M. Bula Lopez, Debtors.
Armando A. Diaz Cruz, Leida
M. Bula Lopez, Plaintiffs
v.
P.R. Treasury Department, et al., Defendants.

Bankruptcy No. 10–11393 (ESL). | Adversary
No. 11–00263 (ESL). | June 19, 2013.

**Attorneys and Law Firms**

Noemi Landrau Rivera, San Juan, PR, for Plaintiffs.

Yanina Rufat Garcia, Department of Justice, Federal
Litigation Division, Wallace Vazquez Sanabria, San Juan,
PR, for Defendants.

### *OPINION AND ORDER*

ENRIQUE S. LAMOUTTE, United States Bankruptcy
Judge.

**\*1** This case is before the court upon the Plaintiffs'
*Motion for Reconsideration of Order to Clarity Status of
Security Interest Over Real Property and Request for Order
Cancelling Lien* (the "*Motion for Reconsideration*", Docket
No. 59) and the *Response* thereto (Docket No. 63) filed
by defendant Puerto Rico's Department of Treasury ("PR
Treasury"). The Plaintiffs move the court to reconsider its
*Order* entered on April 4, 2013 (Docket No. 57) dismissing
the instant case as moot arguing that there are still remedies
to be adjudicated, such as their request for an order to
cancel PR Treasury's lien on their principal residence at
the Property Registry so that a mortgage modification can be
registered. PR Treasury reiterates that the instant adversary
proceeding is moot and request the court to deny the *Motion
for Reconsideration* (Docket No. 63). For the reasons stated
below, the *Motion for Reconsideration* is hereby denied.

### *Procedural Background*

The Plaintiffs filed their Chapter 13 Petition on December 3,
2010 (Lead Case Docket No. 1).

On April 20, 2011, PR Treasury filed a Proof Claim in the
secured amount of $42,226.69 and an unsecured amount of
$2.20 (Claims Register No. 10–1).

On June 5, 2011, the Plaintiffs filed a *Motion Objecting
Claim 10 Filed by the PR Department of Treasury* (Lead
Case Docket No. 49) averring that the supporting documents
filed by PR Treasury in its Proof of Claim failed to state
how the creditor calculated the amounts claimed as penalties,
interest and late charges pursuant to Local Bankruptcy Rule
3002–1 and that the computer print-out attached thereto stated
that the penalties, interest and late charges were calculated
up to October 9, 2014, which did not allow for the precise
corroboration of the amounts due as to the filing of the
bankruptcy petition. On July 8, 2011, the court entered an
*Order* granting the Plaintiff's *Objection* (Lead Case Docket
No. 57).

On August 12, 2011, PR Treasury filed an amended Proof
Claim in the secured amount of $33,624.02 and an unsecured
amount of $2.20 (Claims Register No. 10–2).

On December 6, 2011, the Plaintiffs filed their original
*Complaint* (Docket No. 1) requesting an order to allow the
registration of a modified mortgage in favor of co-defendant
Banco Popular de Puerto Rico ("BPPR") on the Debtors'
residential property and to direct the Guaynabo Property
Registrar to maintain the tax lien in favor of PR Treasury as
a junior lien.

On December 13, 2011, Plaintiffs filed *Motion for Leave to
File Amended Complaint* (Docket No. 8) and an *Amended
Complaint* (Docket No. 9) to set forth a more detailed and
clear exposition of the remedies requested for which relief
was sought.

On February 3, 2012, BPPR filed a *Motion to Dismiss*
under Fed.R.Civ.P. 12(b)(6) (Docket No. 17) arguing that
the Plaintiffs had failed to state a claim upon which relief could
be granted against it.

On February 15, 2012, the court issued an *Order* (Docket No.
23) granting the Plaintiffs 21 days to show cause as to why the
*Amended Complaint* should not be dismissed against BPPR
(Docket No. 18) for the reasons stated in its *Motion to Dismiss*
(Docket No. 17).

*2 On March 5, 2012, PR Treasury filed its *Answer to the Complaint* (Docket No. 23) sustaining that the Plaintiffs failed to state a cognizable claim upon which relief may be granted under any applicable federal or state statue and that PR Treasury has acted at all times within the established legal and regulatory framework.

On April 2, 2012, the Plaintiffs filed another *Motion for Leave to File Amended Complaint* (Docket No. 24) alleging that in preparation for the pretrial conference, counsels for the Plaintiffs and BPPR met in compliance with the Local Rules and in that meeting the parties exchanged new evidence and information not previously available to counsel for the Plaintiffs, which allowed for the simplification of controversies in the instant case, including eliminating BPPR as a defendant.

On April 5, 2012, the Plaintiffs filed a *Second Amended Complaint* (Docket No. 25) only against PR Treasury, eliminating the previous cause of action for declaratory judgment for a determination of the extent of liens pursuant to Sections 506 and 522(f) of the Bankruptcy Code. They also submitted as Exhibit B an appraisal report of the property in the amount of $320,000.00 and sustain that because they claimed a homestead exemption in the amount of $43,250.00 on that property under 11 U.S.C. § 522(d)(1), the value of PR Treasury's secured interest in said property is zero after the deduction of the balance of the BPPR's first mortgage and therefore, PR Treasury is an unsecured creditor pursuant to Section 506 of the Bankruptcy Code. Consequently, the Plaintiffs allege that PR Treasury's lien is worthless and request the court to enter judgment to determine: (a) that the value of PR Treasury's collateral at $320,000.00; (b) that the extent of PR Treasury's lien over the Plaintiffs' principal residence is zero; (c) that the extent of PR Treasury's claim number 10 filed on August 12, 2011 be deemed allowed as unsecured claim; and (d) enter any additional order or judgment the court may deem just and proper.

On April 9,2012, Plaintiffs and co-defendant BPPR jointly filed a *Stipulation for Entry of Dismissal with Prejudice as to Defendant, Banco Popular de Puerto Rico* whereby the Plaintiffs voluntarily dismissed the instant adversary proceeding against BPPR with each party bearing their own costs, expenses and attorneys' fees (Docket No. 28). The court approved the *Stipulation* on May 11, 2012 (Docket No. 32) and *Partial Judgment* was entered on May 21, 2012 (Docket No. 34).

After a series of procedural events (Docket Nos. 39, 40 and 42), on September 10, 2012 PR Treasury filed its *Answer to Amended Complaint* (Docket No. 45) reiterating that the Plaintiffs failed to state a cognizable claim upon which relief may be granted under any applicable federal or state statue and that PR Treasury has acted at all times within the established legal and regulatory framework.

On February 11, 2013, Plaintiffs filed a *Motion for Summary Judgment* (Docket No. 51) requesting the entry of an order to: (a) determine that PR Treasury's claim is a wholly unsecured claim in the instant case; (b) determine the avoidance of tax lien levied upon Plaintiff's residence [1]; (c) enter any additional order or judgment the court may deem just and proper.

[1] The court notes that this particular relief was requested by the Plaintiffs for the very first time in their *Motion for Summary Judgment,* as it was not plead in the *Complaint* (Docket No. 1), the *Amended Complaint* (Docket No. 9) or the *Second Amended Complaint* (Docket No. 25).

*3 On February 13, 2013, the court entered an *Order* (Docket No. 53) for PR Treasury to reply to the Plaintiff's *Motion for Summary Judgment* within 30 days to show cause why the same should not be granted.

On March 13, 2013, PR Treasury filed an amended Proof of Claim in the unsecured nonpriority amount of $33,626.22 and an unsecured priority claim of $25.09 (Claims Register No. 10–3).

On March 18, 2013, PR Treasury filed a *Motion to Dismiss* (Docket No. 55) arguing that because it had amended its proof of claim to reclassify it as completely unsecured (Claims Register No. 10–3), the *Second Amended Complaint* (Docket No. 25) had become moot and thus the instant adversary proceeding should be dismissed with prejudice.

On April 4, 2013, the Plaintiffs filed a *Request for Entry of Order Granting Summary Judgment in Favor of Plaintiffs and Opposition to Motion to Dismissed Filed by Defendant [PR Treasury]* (Docket No. 56) arguing that PR Treasury did not dispute the facts established in the *Motion for Summary Judgment* nor did it show cause why judgment should not be entered in the instant case. They also aver that PR Treasury did not set forth any grounds upon which this court should dismiss the instant case.

2013 WL 3153993

On April 5, 2013, the court entered an *Order* (Docket No. 57) ruling that PR Treasury's Amended Proof of Claim (Claims Register No. 10–3) has mooted the instant controversy in favor of Plaintiffs as it recognizes that PR Treasury's claim is unsecured. Therefore, the court ordered the dismissal of the adversary proceeding as moot.

On April 9, 2013, Plaintiff filed the *Motion for Reconsideration* (Docket No. 59) under both Fed. Rs. Civ. P. 59 and 60 arguing that although PR Treasury amended its Proof of Claim to a wholly unsecured claim, the lien registered at the Property Registry is still encumbering their principal residence. They further submit that the *Second Amended Complaint* specifically requested a remedy as to this registered lien[2] and that PR Treasury's amended proof of claim does not solve the matter of the registered lien at the Property Registry. Thus, in view of the request for reconsideration, the Plaintiffs request an order to the Property Registrar for the cancellation of PR Treasury's lien that encumbers their real property.

[2]    *See* footnote no. 1, *supra*.

On April 30, 2013, PR Treasury filed a *Sur Reply to Debtor's Motion in Request for Reconsideration* (Docket No. 63) reiterating that the instant case is moot inasmuch it is no longer pursuing a secured credit, which disposes of the Plaintiffs' request under 11 U .S.C. § 506(a). PR Treasury also opposes the Plaintiffs' request to cancel its lien arguing that just because it amended its proof of claim to declare its debt as unsecured (Claims Register No. 10–3) does not mean that its registered lien must be cancelled before the closing of the bankruptcy petition. It further avers that an order from the court to cancel its lien before the closing of the bankruptcy case could result in a failure to justice if Plaintiffs fail to comply with the payment plan, making an otherwise secured creditor lose its rank in the Registry of Property. In addition, PR Treasury sustains that pursuant to 11 U.S.C. § 350(a) and Puerto Rico's Mortgage Law, the cancellation of the lien will take place once the court enters a discharge order and closes the case.

**\*4** On May 13, 2013, Plaintiffs filed a *Reply to PR Department of Treasury's Sur Reply...* (Docket No. 64–1) restating that if PR Treasury's lien is left encumbering their principal residence in spite of the fact that a request for the cancellation of such lien has been made[3] and that PR Treasury has filed an unsecured proof of claim in this case would result in a failure of justice because an unsecured

creditor would have a lien encumbering a property of the bankruptcy estate.

[3]    *See* footnote no. 1, *supra*.

### Legal Analysis & Discussion

#### (A) Standard for Motions for Reconsideration

Plaintiffs seek reconsideration under Fed. Rs. Civ. P. 59 and 60 (Docket No. 59, p. 3). They contend that although PR Treasury is now a wholly unsecured creditor, its lien at the Property Registry is still encumbering their principal residence, which impedes the registration of a mortgage modification with BPPR. They further submit that the *Second Amended Complaint* specifically requested a remedy as to this registered lien[4] and that PR Treasury's amended proof of claim (Claims Register No. 10–3) does not solve the matter of the registered lien at the Property Registry. Thus, the Plaintiffs reiterate their request for an order to the Property Registrar for the cancellation of PR Treasury's lien.

[4]    *See* footnote no. 1, *supra*.

"Motions to reconsider are not recognized by the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure *in haec verba*." *In re Lozada Rivera,* 470 B.R. 109, 112 (Bankr.D.P.R.2012), citing *Jimenez v. Rodriguez (In re Rodriguez),* 233 B.R. 212, 218–219 (Bankr.D.P.R.1999), *conf 'd* 17 Fed. Appx. 5 (1st Cir.2001); *Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991); *Lavespere v. Niagara Mach. & Tool Works Inc. .,* 910 F.2d 167, 173 (5th Cir.1990), *cert. denied* 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131,abrogated on other grounds by*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075–76 (5th Cir.1994). Rather, federal courts have considered motions so denominated as either a motion to "alter or amend" under Fed.R.Civ.P. 59(e) or a motion for relief from judgment under Fed.R.Civ.P. 60(b).*See Fisher v. Kadant, Inc.,* 589 F.3d 505, 512 (1st Cir.2009) (noting a motion for reconsideration implicated either Fed. R. Civ. Pro. 59(e) or 60(b)); *Equity Security Holders' Committee v. Wedgestone Financial (In re Wedgestone Financial),* 152 B.R. 786, 788 (D.Mass.1993). "These two rules are distinct; they serve different purposes and produce different consequences. Which rule applies depends essentially on the time a motion is served. If a motion is served within [fourteen[5]] days of the rendition of judgment, the motion ordinarily will fall under Rule 59(e). If the motion is served after that time, it falls under Rule 60(b)." *In re Lozada*

*Rivera,* 470 B.R. at 113, quoting *Van Skiver,* 952 F.2d at 1243. *Also see Universal Ins. Co. v. DOJ,* 866 F.Supp.2d 49, 73 (D.P.R.2012) ("A motion is characterized pursuant to [Fed.R.Civ.P.] 59(e) or [Fed. R. Civ. P .] 60(b) based upon its filing date.") "The substance of the motion, not the nomenclature used or labels placed on motions, is controlling." *In re Lozada Rivera,* 470 B.R. at 113.

5    See the most recently amended version of Fed. R. Bankr.P. 9023, which makes Fed.R.Civ.P. 59 applicable to bankruptcy cases.

**\*5** Because in the instant case, the Plaintiffs filed their *Motion for Reconsideration* within the 14 days provided in Fed. R. Bankr.P. 9023, it will be entertained under Fed.R.Civ.P. 59(e).

Fed.R.Civ.P. 59(e) itself does not state the grounds on which relief under the rule may be granted. Therefore, trial courts have considerable discretion in deciding whether to grant or deny a motion to alter or amend under Fed.R.Civ.P. 59(e).*See ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 55 (2008) ("[Trial] courts enjoy considerable discretion in deciding [Fed.R.Civ.P.] 59(e) motions, subject to circumstances developed in the case law."); *Venegas–Hernandez v. Sonolux Records,* 370 F.3d 183, 190 (1st Cir.2004), citing *Edward H. Bohlin Co. v. Banning Co.,* 6 F.3d 350, 355 (5th Cir.1993); *Robinson v. Watts Detective Agency,* 685 F.2d 729, 743 (1st Cir.1982).

Generally, in order for a motion for reconsideration to proceed under Fed.R.Civ.P. 59(e), the movant must clearly establish a manifest error of law or present newly discovered evidence that could not have been diligently found during the case. *See Schwartz v. Schwartz (In re Schwartz),* 409 B.R. 240, 250 (B.A.P. 1st Cir.2008), citing *In re Rodriguez,* 233 B.R. at 219. The Court of Appeals for the "First Circuit has explained that a motion for reconsideration brought under Fed.R.Civ.P. 59(e) must be based upon newly discovered evidence or a manifest error of law or fact."*Banco Bilbao Vizcaya Argentaria P.R. v. Vazquez (In re Vasquez),* 471 B.R. 752, 760 (B.A.P. 1st Cir.2012), citing *Aybar v. Crispin–Reyes,* 118 F.3d 10, 16 (1st Cir.1997)."To meet the threshold requirements of a successful [Fed.R.Civ.P.] 59(e) motion, the motion must demonstrate the reason why the court should reconsider its prior decision and must set forth facts or law of a strongly convincing nature to induce the court to reverse its earlier decision."*Id.* at 219 (quotations omitted).

"A motion under [Fed.R.Civ.P.] 59(e) also is appropriate if the court in the original judgment failed to give relief on a certain claim."Charles Wright, Arthur Miller & Mary Kane, 11 *Federal Practice and Procedure* § 2810.1 at pp. 154–155 (West 2012).*Also see Continental Casualty Co. v. Howard,* 775 F.2d 876, 883 (7th Cir.1985).

In the instant case, the Plaintiffs are entitled to have their *Motion for Reconsideration* entertained under the scope of Fed.R.Civ.P. 59(e). Because the Plaintiffs move the court to grant them relief on a certain claim that they allege was sought in their *Second Amended Complaint,* the court will consider the *Motion for Reconsideration* on its merits.

**(B) Amending Reliefs in Motions for Summary Judgments**
Initially, the Plaintiffs filed the instant adversary proceeding seeking an order to allow the registration of a modified mortgage in favor of co-defendant BPPR on their residential property and to direct the Guaynabo Property Registrar to maintain the tax lien in favor of PR Treasury as a junior lien. *See* the original *Complaint* (Docket No. 1). The Plaintiffs later amended the complaint to elaborate a more detailed exposition of the remedies requested for which relief was sought. *See* the *Amended Complaint* (Docket No. 9). None of the remedies sought in the *Amended Complaint* included an order from the court to the Property Registrar (Docket No. 9, p. 7) to cancel PR Treasury's lien. Subsequently, the Plaintiffs filed a *Second Amended Complaint* requesting the court to enter judgment to determine: (a) that the value of PR Treasury's collateral at $320,000.00; (b) that the extent of PR Treasury's lien over the Plaintiffs' principal residence is zero; (c) that the extent of PR Treasury's claim number 10 filed on August 12, 2011 be deemed allowed as unsecured claim; and (d) enter any additional order or judgment the court may deem just and proper (Docket No. 25, p. 24). The *Second Amended Complaint* is currently the controlling set of pleadings in the instant case. Notwithstanding, it was not until the *Motion for Summary Judgment* that the Plaintiffs moved the court, for the very first time [6], to "determine the avoidance of tax lien [*sic* ] upon Plaintiffs' residence" (Docket No. 51, p. 7).

6    See footnote no. 1, *supra.*

**\*6** The facts in the instant case are similar to those in *Cole v. Cortner (In re Cortner Container & Concrete Co.),* 2007 Bankr.LEXIS 264, 2007 WL 269854 (Bankr.E.D.Mo.2007). In that case, the Chapter 7 Trustee, James S. Cole, sued defendants, the part owners of debtor corporation and another company, on several counts. The Chapter 7 Trustee

moved for summary judgment as to counts I and II of the complaint, claiming that the owner received a preference in contravention of 11 U.S.C. § 547(b). The Chapter 7 Trustee also moved for summary judgment on count IV of the complaint in regards to alleged fraudulent transfers. The court granted the plaintiff's motion for summary judgment on counts I and II, but because he failed to properly plead count IV in his original complaint under Fed. R. Bankr.P. 7008(a), it was denied. The court ruled that although the "[Chapter 7] Trustee allege[d] that he [was] entitled to judgment as a matter of law as to count IV of the Complaint ... he failed to properly plead [the] same in his original complaint under [Fed. R. Bankr.P.] 7008(a)."2007 Bankr.LEXIS 264 at —— 6–7, 2007 WL 269854 at *2. Thus, the court determined that "Count IV[was] not properly before the court and [would] not be considered for summary judgment."Id. The Cortner court reasoned that "while ... the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims ..."Id., quoting N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir.2004).Also see Rodgers v. City of Des Moines, 435 F.3d 904, 910 (8th Cir.2006) ("While we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."); Puglisi v. Town of Hempstead, 2012 U.S. Dist. LEXIS 133281 at *29, 2012 WL 4172010 at * 10 (E.D.N.Y.2012) (refusing to consider the plaintiff's claim for promissory estoppel in a motion for summary judgment because he did not plead it in the complaint). Likewise, the "liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a)... does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage."Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir.2004). Thus, courts have routinely held that a party cannot seek summary judgment for himself on a new claim that has not been pled in his complaint. See Crow v. Fabian, 2010 U.S. Dist. LEXIS 17480 at*58, 2010 WL 2464865 at *18 (D.Minn.2010); White v. McHughes, 2011 U.S. Dist. LEXIS 118010 at *5, 2011 WL 4833093 (W.D.Ark.2011) ("[n]ewly asserted claims are not proper for consideration in a motion for summary judgment

or a response thereto"); Satchel v. Sch. Bd. of Hillsborough Cnty., 2007 U.S. Dist. LEXIS 11696 at *22, 2007 WL 570020 at *7 (M.D.Fla.2007) (denying a plaintiff's motion for summary judgment on a claim that was "not clearly pled in her complaint," ruling that "plaintiff cannot now raise this claim for the first time in a motion for summary judgment"); cf. Bonenfant v. Kewer, 2007 U.S. Dist. LEXIS 64104 at*20, 2007 WL 2492030 at *6 (D.Conn.2007) (refusing to address a claim that was "nowhere in [the] complaint" and raised for the first time in an opposition to a motion for summary judgment); Spann v. Word of Faith Christian Ctr. Church, 589 F.Supp.2d 759, 771 n. 8 (S.D.Miss.2008) (same); Roofers Local No. 20 Health & Welfare Fund v. Mem'l. Hermann Hosp. Sys., 2007 U.S. Dist. LEXIS 34089 at *18, 2007 WL 1407058 at *6 (W.D.Mo.2007) ("a party cannot amend its pleadings through its response to a motion for summary judgment").

*7 Because the Plaintiffs in this case intend to raise a new claim at the summary judgment stage that was not included in the Complaint, the Amended Complaint or the Second Amended Complaint, the new remedy sought in the Motion for Summary Judgment is denied. Moreover, the remedies sought in the Complaint, the Amended Complaint or the Second Amended Complaint became moot upon PR Treasury's filing of the unsecured proof of claim (Claims Register No. 10–3) as ruled in the Order entered on April 5, 2013 (Docket No. 57).

### Conclusion

In view of the foregoing, the Plaintiffs' Motion for Reconsideration is hereby denied on its merits under Fed.R.Civ.P. 59(e).

SO ORDERED.

### All Citations

Slip Copy, 2013 WL 3153993

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 7218827, 57 Employee Benefits Cas. 1706

2013 WL 7218827
United States District Court,
S.D. Iowa,
Central Division.

In re PRINCIPAL U.S. PROPERTY
ACCOUNT ERISA LITIGATION.

No. 4:10–cv–00198–JEG.   |   Sept. 30, 2013.

**Attorneys and Law Firms**

Andrew Eugene Lencyk, Wolf Popper LLP, New York, NY, Margaret E. Wetherald, Cari C. Laufenberg, Derek W. Loeser, Keller Rohrback L.L.P., Seattle, WA, Jeffrey I. Carton, Denlea and Carton, White Plains, NY, David Harris Goldman, Kodi A. Brotherson, Michael J. Carroll, Babich Goldman, P.C., Des Moines, IA, Gary A. Gotto, James A. Bloom, Ron Kilgard, Keller Rohrback P.L.C., Phoenix, AZ, for Plaintiffs.

Angel Anna West, Matthew R. Eslick, Nyemaster Goode PC, Des Moines, IA, Nicole A. Diller, Morgan Lewis & Bockius LLP, San Francisco, CA, Deborah S. Davidson, Sean K. McMahan, Morgan Lewis & Bockius, Washington, DC, Gregory C. Braden, Shannon M. Callahan, Morgan Lewis & Bockius LLP, Chicago, IL, for Principal U.S. Property Account Erisa Litigation.

***ORDER FILED UNDER SEAL*** [1]

[1]   Pleadings, exhibits, and documents submitted and relied upon in support and resistance of the pending Motions were filed under seal subject to the Stipulation and Order for the Production and Exchange of Confidential Information filed on June 2, 2010, ECF No. 71. In resolution of these Motions, it was necessary for the Court to discuss material that is subject to the Stipulation and Order, and therefore the Court filed this Order under seal.

JAMES E. GRITZNER, Chief Judge.

**\*1** This matter is before the Court on Plaintiffs' Corrected Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 of this action brought against Defendants under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1131, 1132(a)(3) for alleged

breaches of fiduciary duty. Defendants resist. Also before the Court is Defendants' Motion to Strike the report of Plaintiffs' expert Dana Messina, which Plaintiffs resist. A hearing was held on the Motions on June 25, 2013. Attorneys Cari Laufenberg, James Bloom, and David Goldman were present representing Plaintiffs, with attorney Andrew Lencyk appearing by telephone. Attorneys Brian Campbell and Gregory Braden were present representing Defendants. The Motions are fully submitted and ready for disposition.

## I. BACKGROUND

### A. Factual Background

#### 1. The Account

Since 1982, the Account has been an "open-end, commingled real estate fund sponsored by Principal Life Insurance Company ("Principal"). The Property Account is managed by PrinREI."Berg Decl. ¶ 4, ECF No. 161. "The Account is managed as a diversified real estate equity fund that acquires and holds primarily high quality, well-leased real estate properties in the multi-family, industrial, office, retail and hotel sectors."Id. ¶ 5. John Berg (Berg) has been the lead portfolio manager for the Account since 2003, and he has been the Managing Director of Portfolio Management since 2005. He and three other individuals manage the Account on a day-to-day basis and are involved in the Account's investment property selection, strategic development, marketing, and investor relations.

Berg stated that "Principal estimates the net asset value for the Property Account on a daily basis," which, along with valuation adjustment recommendations provided by an independent valuation consultant, are incorporated into the Account's unit value; the public can access the daily unit values at Principal's website. Id. ¶ 6. Berg stated that the Account returns for 1999–2007 were between 4.9–20.0%; 2008 had negative 12.2% returns; 2009 had negative 30.8% returns; and the Account returns improved in 2010 for a 17.3% return and in 2011 for a 16.7% return. The annualized return since the Account's inception in 1982 is 7.14%, as of December 31, 2011. The Account directly owns actual buildings and land, and "[s]ince 1999, over 90% of the Account's gross asset value is and has been invested in real property," with two brief exceptions. Id. ¶ 10.

Berg noted that "[c]ash is generally held for investor liquidity, transactional and property maintenance purposes only," and "[c]ash holdings are generally limited as cash dilutes the

In re Principal U.S. Property Account ERISA Litigation, Not Reported in F.Supp.2d (2013)
1:14-cv-10427-TLL-CEB    Doc # 35-11    Filed 08/10/15    Pg 15 of 46    Pg ID 1409

2013 WL 7218827, 57 Employee Benefits Cas. 1706

Account's returns. *Id.* ¶¶ 11–12. "Levels of cash are disclosed and publicly accessible in the Account's Annual Reports and Quarterly Reports"; Quarterly Reports can be accessed at Principal's website. *Id.* ¶ 12 (footnote omitted). Berg stated that from 1999 to 2011, the Account's year-end cash balances ranged anywhere from 0.9% to 6.7% of the Account's gross assets. Berg further explained,

> **\*2** The underlying real estate in the Property Account is sold in private transactions that may take months or even years to complete and are subject to the vagaries of the real estate and credit markets. This process involves listing the property, offers and counteroffers, property inspections, obtaining buyer financing, etc. Accordingly, the ability to impose a withdrawal limitation is part of every contract entered into by Property Account investors.

*Id.* ¶ 13.

As defined in the Separate Account Plan of Operation (SA Plan of Operation)—Introduction, Separate Accounts are "designed to be used in conjunction with certain group annuity contracts and funding agreements ... issued by Principal Life...." SA Plan of Op.—Intro., Ex. 14 to Pls.' Br. on Mot. for Class Cert., ECF No. 162–1. The SA Plan of Operation goes on to detail that "Principal Life has reserved the right to temporarily or permanently terminate the ability of all contractholders to make contributions or transfers to this Separate Account," and "Principal Life also reserves the right to limit or defer any particular contractholder's right to make contributions or transfers to this account." *Id.* ¶ 16. Before the 2008 economic crisis hit, the Account never imposed a withdrawal limitation for its investors. However, the Account imposed its first limitation on cash-inflows from 2004–2007 to "allow for orderly Account growth and prevent dilution of Account earnings." Berg Decl. ¶ 15.

Then, starting in 2008, Berg states that "the unprecedented crisis in the real estate and credit markets materially impacted asset values, impaired liquidity and significantly diminished commercial real estate transaction volume." *Id.* ¶ 17. From 2007 to 2009, there was an 89% drop in the real estate transaction volume, so "the ability to dispose of real estate, including Account assets, was significantly compromised—with much of the available capital for acquisition coming

from 'bottom fishers' looking to buy at 'fire sale' prices." *Id.* Berg stated that "[c]ash flows out of the Property Account dramatically outpaced new contributions as investors sought to reduce their real estate allocations or exit the real estate market entirely." *Id.*

The SA Plan of Operation defines that "[t]he purpose of this Separate Account is to give eligible contractholders of Contracts more investment flexibility and diversification than would otherwise be possible." SA Plan of Op.-Part I: Separate Acct. Ops. ¶ 2, ECF No. 162–1. Additionally, it promises that "Principal Life shall not sell, exchange, or otherwise transfer any asset held for investment, other than cash, between separate accounts or between separate and other accounts except as permitted by New York Insurance Law." *Id.* ¶ 7. The Separate Account is limited almost entirely to holding real estate, as "[n]o stock, bond, note, or other security of any subsidiary or affiliate of Principal Life shall be allocated to this Separate Account, nor shall any stock, bond, note, or other security of any company controlling or under common control with Principal Life be so allocated." *Id.* ¶ 8. In keeping with the "separate" nature of the Separate Account, "[i]ncome, gains, or losses, whether or not realized, from assets allocated to this Separate Account shall, in accordance with the applicable Contracts, be credited to or charged against the Separate Account without regard to Principal Life's other income, gains, or losses." *Id.* ¶ 9.

**\*3** The SA Plan of Operation, which was provided to investors and accessible on Principal's website, specifically states that

> Principal Life has reserved the right to temporarily or permanently terminate the ability of all contractholders to make contributions or transfers to this Separate Account. In addition, upon due notice as specified in a particular Contract, Principal Life may also close out this Separate Account and require that the assets associated with each Contract be redirected to another investment option available under the Contract in accordance with the directions of the contractholder or, if the contractholder fails to provide directions, as specified under the terms of the Contract.

*Id.* ¶ 16.The SA Plan of Operation further provides that "Principal Life also reserves the right to limit or defer any particular contractholder's right to make contributions or transfers to this account" and promises that they will give advance notice to the contractholder if any such limitation is to be implemented. *Id.*

In addition to limitations on investors' abilities to transfer assets into the Separate Account, the SA Plan of Operation also sets forth Principal's contractual rights to limit withdrawals, stating "[t]he maximum delay possible for making payments and transfers from this Separate Account is three (3) years, unless a longer delay is approved by the New York Insurance Department."*Id.* ¶ 17.The SA Plan of Operation further states that

> While transfers and withdrawals are normally processed within seven days after Principal Life receives the request, Principal Life reserves the right to defer payment.... If the total amount of withdrawal requests exceeds the limits specified in the Contract, Principal Life reserves the right to make these payments in installments, using the procedure specified in the Contract. This procedure "spreads out" the payments over a period of months, which should limit the harm caused by such withdrawals to the other contractholders with an interest in the Separate Account. Payments or transfers which are deferred or paid in installments, in accordance with this paragraph, will be made using the applicable unit value for the valuation date immediately preceding the date payment or transfer of each installment is to be made.

*Id.* ¶ 18."The value of an interest on any date is determined by multiplying the number of units held by the unit value at the close of that valuation date."*Id.* ¶ 21."Any delayed transfer is treated as if it were a 'payment' for purposes of this Paragraph, *i.e.,* these transfers will be made using the unit value in the computer system at the time the payment is made. Transfers are considered to be delayed transfers

if ... the request for a transfer is delayed in accordance with Paragraphs 17 and 18."*Id.*

As set forth in the Plan of Operation–Part Two: Investment Policy,

> The primary investment objective of the account is to maximize total returns from investments in commercial property at a risk level appropriate for retirement plans. Secondary investment objectives for this Separate Account are to provide orderly cash flows for the separate account, to maintain the type of liquidity required for the day-to-day operations of the separate account, and to reduce the risks associated with investing in any one type of investment or maybe one particular investment. Because of the pooled nature of this Separate Account, Principal Life will balance these investment objectives based on the needs of all contractholders and plan members who have assets in this Separate Account.

**\*4** SA Plan of Op.-Part II: Inv. Policy ¶ 1, ECF No. 162–1. The Plan of Operation Investment Policy section further states that the Separate Account's "investment portfolio will primarily contain real estate investments that are producing income or will ultimately produce current income," and that "[b]ecause of the inherently illiquid nature of the real estate investments, Principal Life generally will select the investments and manage this Separate Account in a manner which is designed to meet the anticipated liquidity needs of the Separate Account."*Id.* ¶ 2.

The Plan of Operation Investment Policy section also provides the Liquidity Policy for the Separate Accounts:

> Liquidity to cover contingencies is provided through several sources. Among these sources are: new deposits and cash flow from scheduled principal and interest payments from investments are available; the account may be partially invested in short-term (cash equivalent) instruments and cash

holdings can be increased as needed; account holdings can be sold; and finally, funds may be borrowed from external sources.

*Id.* ¶ 5.“In implementing this Liquidity Policy, Principal Life will attempt to balance the needs of the various contractholders and plan members with assets in the Separate Account .”Liquidity Policy—Attachments to SA Plan of Op. ¶ 2. This means seeking “to balance the needs for quick payments of benefits against the long-term investment needs of those with ongoing investments in the Separate Account.”*Id.*“However, in seeking to balance these needs, Principal Life will pay special attention to the needs of plan members who have benefit payments due under a plan because of death, disability, retirement, or termination of employment.”*Id.*

In order to meet the short-term cash needs of the Separate Account, Principal will use assets available from the following: “(i) cash or cash equivalent investments, (ii) cash flow from properties (*e.g.,* rent payments), (iii) sale of more liquid types of real estate, (iv) sale of Real Estate Investment Trust (“REIT”) investments, (v) short-term borrowing by the Separate Account, and (vi) sale of other properties.”*Id.*“Over time any one of these liquidity sources ... will be used in different combinations or amounts depending on Principal Life's experiences, anticipated liquidity needs for the Separate Account, specific circumstances existing at a given time, and other appropriate factors.”*Id.*

As set forth in the Addendum to the Account Investment Policy Statement, the Separate Account “operates as a well-diversified, open-end real estate equity fund consisting primarily of higher quality, well leased real estate properties in the multifamily, industrial, office, and retail sectors,” and “is designed to have a moderate risk profile compared to other open-end real estate funds .”Add. to Acct. Inv. Pol. Stmt. 4, ¶ 5.a., ECF No. 162–2. This “[m]oderate fund level risk is accomplished by operating with a strong liquidity focus, strong client diversification, and more limited fund-level obligations, such as forward commitments and fund-level leverage.”*Id.* Additionally, “[a] moderate real estate property risk profile is accomplished by investing primarily in smaller and stable properties on an un-leveraged and direct basis .”*Id.* The Separate Account “remains well diversified by property type, tenant, and geographic area.”*Id.* The Separate Account's liquidity strategy is set forth numerically in the Addendum to the Account Investment Policy Statement as follows:

| Short term liquidity: | | |
|---|---|---|
| | 1) Cash balances | 1–5% |
| | 2) Short-term borrowings: | 7–10% |
| | 2) Property cash flow | 2–5% |
| | Total | 10–20% |
| Longer term Liquidity: | Long term borrowing capacity (to a maximum of 33% leverage) and property sales | |

**\*5** *Id.* ¶ 5.c.
Michael Gaul (Gaul) has worked at Principal in its Retirement and Investment Services (RIS) division since 1989. Gaul has “been responsible for day to day corporate retirement plan operations since 2007, as a Director for RIS.”Gaul Decl. ¶ 2, ECF No. 165. Primarily through its RIS division, Principal “is a leading provider of retirement services for defined contribution (“DC”) and defined benefit (“DB”) plans, serving more than 30,000 qualified retirement plans and over 3.2 million participants and retirees.”*Id.* ¶ 3.“Principal currently makes available thousands of investment options to its retirement plan customers: over 3,000 mutual funds and over 70 sub-advised collective trust funds and insurance

company separate accounts, including the Principal U.S. Property Separate Account.”*Id.* ¶ 5.

Julia Fitzgerald (Fitzgerald) has been the Assistant Director of Investment Operations for Principal Life since 2009, and she is “responsible for project operations related to Principal's investment platform and [is] aware of investment materials available to retirement plan participants and fiduciaries related to the ... Account.”Fitzgerald Decl. ¶ 2, ECF No. 163. In her Declaration, Fitzgerald explained that “[t]he Account's investment materials were and are available to plan participants, plan fiduciaries and independent financial advisors [at] Principal's public website,” and that “[f]rom January 1, 2004 to present, Principal disclosed in a number of

2013 WL 7218827, 57 Employee Benefits Cas. 1706

ways that the Property Account is subject to liquidity risk and that payment of principal and earnings may be delayed."*Id.* ¶¶ 4–5.Fitzgerald stated that due to the "unprecedented economic conditions," Principal acted on September 26, 2008, to exercise "its contractually permitted right to delay withdrawal requests from the Property Account."*Id.* ¶ 6.

**2. The Withdrawal Queue**

Berg explained that "[f]rom March 2008 through September 2008, the Account experienced for the first time six consecutive months of negative outflows which reached a total of over $900 million, or approximately 15% of the Account's net asset value by September 2008 ."Berg Decl. ¶ 18, ECF No. 161. Based on these unprecedented outflows, Principal decided on September 26, 2008, to exercise its right to impose a withdrawal limitation on investors seeking to withdraw or transfer their assets from the Account. *Id.* This resulted in withdrawal requests being delayed and put into a queue (the Queue) "until property could be sold to generate sufficient liquidity to satisfy the requests."*Id.* (citing Exs. 29 & 10 to Berg's Decl.).

Berg explained that "[i]n order to satisfy all requests, the Account would have required almost 20% liquidity in late 2008 and almost 35% in 2009," which would have necessitated that the Account sell its real estate assets at "fire sale" prices due to the incredibly unfavorable market conditions. *Id.* ¶ 19.The Account's management, including Berg, believed such action "would not have been in the best interest of all Account investors, especially the majority that did not request withdrawals."*Id.* In the face of these two options—satisfy withdrawal requests and sell at fire sale prices or implement the Queue and protect the majority of investors who had not filed withdrawal requests—the Account management "believed [it] had a fiduciary duty to act," and that "[i]mplementing the withdrawal queue was the only option that had the potential to permit an orderly liquidation of property to satisfy the withdrawal requests, preserve as much of the Account's value as possible and balance the needs of all Property Account investors."*Id.* ¶ 20.Berg stated that by the end of 2008, numerous other investment companies offering similar private equity real estate funds had instituted withdrawal limitations like the one imposed by Principal.

**\*6** Fitzgerald explained in her Declaration,

> To notify plan fiduciaries, participants and advisors of the withdrawal

limitation, Principal sent on September 25, 2008, an e-mail informing them that an important message regarding the Property Account was available in their secured access site at principal.com. The statement on the secured access site explained that the payment of most withdrawal requests would be delayed, outstanding withdrawal requests would be paid proportionally and requests would be paid as sufficient cash becomes distributable and would be based upon the unit value as of the date of the distribution.

Fitzgerald Decl. ¶ 7, ECF No. 163 (citation and internal quotation marks omitted).

On September 26, 2008, "Principal made available on its secured access site a Question & Answer document which was linked to the withdrawal limitation announcement."*Id.* ¶ 8. Also on September 26, 2008, Principal "added a pop-up prompt to the secured access site utilized by plan participants to change investment elections warning of the Account's withdrawal limitation when a participant attempted to transfer funds into the Account."*Id.* ¶ 10.To further inform investors about the Queue, in its Fourth Quarter 2008 participant account statements, Principal advised every putative class member that the Queue was in place and that it would delay the payment of most withdrawal requests for a period of time. "Periodically, Principal also created and made available on its secured access site additional information to update participants and plan fiduciaries on the Property Account and the withdrawal limitation."*Id.* ¶ 12.

Over one year after the Queue was implemented, the Account was able to make its first distribution on January 28, 2010. This first distribution "satisfied approximately 13% of the value of transaction requests subject to the queue."Berg Decl. ¶ 23, ECF No. 161. "In accordance with the Account's Plan of Operation ... all payments were made on a pro-rata basis and based on the unit values on the day payment was made."*Id.* In a similar fashion, partial distributions were made on May 13, 2010; June 17, 2010; July 22, 2010; September 9, 2010; and October 21, 2010. *Id.* ¶ 24.The distribution made on October 21, 2010, was the final pro-rata payment, and all delayed withdrawal requests were satisfied on that day. Any withdrawal requests submitted after October 21, 2010, were also subject to withdrawal restrictions, though none of these

2013 WL 7218827, 57 Employee Benefits Cas. 1706

later requests were subject to delay in excess of 30 days. "Each post-October 21 distribution resulted in a full payout of all queued withdrawal requests," and "[p]ayments were based on the unit values on the date that payment was made."*Id.* ¶ 25."As of March 24, 2011, all requests subject to the withdrawal queue ha[d] been processed and paid."*Id.* ¶ 26.

### 3. Plaintiffs' Statements

Several plaintiffs/putative class members were deposed regarding what they experienced when attempting to access assets from their Separate Accounts and ultimately being placed in the Queue.

**\*7** Plaintiff and putative class member John Fischer (Fischer) testified that he transferred assets to the Account after the Queue was in place. During a telephone call between Fischer and a man named Solawi at Principal, Fisher admitted that he had received a notice message when he transferred assets into the Account, but said he had not read it. After Solawi consulted others at Principal about the issue, Fischer was informed that because he received the notice message before he transferred funds into the Account, Principal would not allow him to avoid application of the Queue to his withdrawal request. Fischer threatened to talk to people he knew at the U.S. Attorney's office, and he requested to meet with Principal's CFO and was willing to fly to Des Moines immediately to figure out how to deal with the problem. When presented with the transcript of his telephone call with Solawi, Fischer confirmed that it was accurate and that the telephone call occurred, but continued to dispute that he had seen the notice message before he transferred his assets into the Account informing him that the Account had limited liquidity and any withdrawal requests would be queued.

Plaintiff and putative class member Jaime Rose Jover (Jover) confirmed in her deposition that her first request to withdraw part of her assets from the Account was denied and she then requested withdrawal of her entire investment in the Account to "pay bills." Jover Dep., ECF No. 160–2. Jover stated that she was unable to pay her mortgage, and she had to file for bankruptcy but admitted that she never filed a hardship request with Principal to try and transfer her assets out of the Account. She also admitted never contacting Ms. Pidcock, who worked for Wynn Resorts, the administrator of Jover's 401(k) plan, and who had told Jover to call her if Jover had any questions about the hardship application. Jover stated that she could not claim bankruptcy personally because of her 401(k) in the Account, and that she put her condo into bankruptcy in the summer of 2010 though she had no idea

if it actually went into foreclosure sales. She called Principal on January 21, 2009, to obtain copies of transcripts from her phone calls with individuals at Principal, and that was the first time she learned about the opportunity to use a hardship withdrawal, though that information was readily available on Principal's website. She explained that she never filed the hardship request because she thought it would only cover her most recent mortgage payment and not her arrears.

Plaintiff and putative class member Greta De Kock (De Kock) stated in her deposition that she wanted to move her assets from the Account to something more "secure," which she considered to be something that would guarantee interest and not decrease in value. De Kock Dep. 134:1–134:13, ECF No. 160–3. When she was laid off from her job in December of 2008, she wanted to roll her money over into an IRA rather than the Account, but her request was placed in the Queue. De Kock explained during her deposition that she wanted to get her money out of the Account to use those funds for college tuition, as she only had a two-year degree. Principal informed De Kock that she may qualify for a hardship withdrawal to avoid the Queue, but she never followed through with such a request. Additionally, she has not cashed out any of her other assets from other non-Principal accounts to use the money for college or any other purpose. Her understanding of the Queue is that she "know[s] that something is wrong if I can't transfer my money out, and it's locked, and—and being at the mercy of Principal. I mean, something is wrong. Someone is not doing something right."De Kock Dep. 170:3–170:6. De Kock felt that no matter what Principal had to do to the Account—even sell real estate at 50% of its value—Principal should have made sure she received her money on the day she requested it to be transferred. Additionally, when posed the question, De Kock agreed that Account investors should have received thirty to sixty days advanced notice before the Queue was put in place in September of 2008.

**\*8** Plaintiff and putative class member Michael Zall (Zall) stated in his deposition that he "should recover whatever [his] value was at the time that that account was frozen" on September 26, 2008, regardless of when he requested such funds. Zall Dep. 210:6–210:8, ECF No. 160–4.

Plaintiff and putative class member David Engelbert (Engelbert) agreed with the position espoused by the putative class representatives that all class members should be paid the value of their investment in the Account on the day the Queue was imposed—September 26, 2008. Engelbert also thought that Principal should have given investors in the Account

advance notice of the Queue so they could withdraw funds before the Queue was in place.

Plaintiff and putative class member Eric Cruise (Cruise) stated in his deposition that he had not yet calculated what losses he wants to recover. Cruise said that he had no claim regarding the investment management fees charged by Principal.

### 4. Expert Reports

#### a. Lassaad Turki

Lassaad Turki, Ph.D. (Turki) is Senior Vice President and head of the securities practice at Cornerstone Research, an economics and finance consulting firm. Turki submitted an expert report on behalf of Defendants regarding the economic merits of Plaintiffs' proposed class. Turki stated that "Plaintiffs incorrectly assert that all Account investors were impacted identically by the portfolio management of the Account, the withdrawal limitations, and the Queue ."Turki Report 3, ECF No. 160–7. He reasoned that additional liquidity in the Account would have negatively impacted pre-Queue Account returns, based in part on the additional liquidity utilized prior to implementation of the Queue. Turki observed that the investment strategy utilized by Principal in 2008 affected Account investors differently: "On one hand, long-term Account investors benefitted from the Account's actual pre-withdrawal limitation liquidity strategy as compared to plaintiffs' proposed liquidity strategy. In contrast, other putative class members would not have been negatively affected by the higher liquidity levels demanded by plaintiffs."*Id.* Additionally, "[d]etermination of the effect of maintaining a liquidity level deemed 'prudent' by the plaintiffs would have to take into account transfers in and out of the Account."*Id.*

According to Turki, the timing of each investor's entry into the Queue and the fact that some individuals cancelled their withdrawal requests while waiting in the Queue requires individualized analysis about the Queue's effect on each investor. *Id.* at 4, 6. Turki concluded that if Principal had done what Plaintiffs now believe to be the most prudent strategy and "had been forced to sell properties at distressed prices due to the lack of buyers and available credit in the market, this would have disproportionately harmed investors who did not request withdrawals and may have resulted in a permanent impairment to the assets of the Account."*Id.* at 4.

**\*9** As Plaintiffs would prefer to use the best-performing alternative when calculating how the class members' investments would have increased had they been able to transfer their assets out of the Account and into another fund, Turki explains that this alternative is problematic at the class certification stage, as "even if two participants entered and exited the Queue on the same days, they will likely have different 'best performing' alternatives in their 401(k) plans," and that differs even further when the individuals' entrance and exit days vary. *Id.* at 7. Because there were more than 13,000 plans represented in the Queue, Turki asserts that an incredibly individualized analysis to determine each individual's damages is required. Turki opines that it is not possible to develop a class-wide formula to calculate damages due to all of these individualized variables, and even if it were possible, "plaintiffs' use of multiple damage theories results in multiple distinct and conflicting classes."*Id.*

#### b. Saul Solomon

Saul Solomon (Solomon), Director of the Berkeley Research Group, LLC, was retained by Plaintiffs to respond to portions of Turki's expert report, as well as to "explain how damages can be calculated in this matter on a class-wide basis and to provide a few examples of a typical ERISA damages methodology which could be implemented in this case."Solomon Report 2, ECF No. 193–1. Solomon noted that he had done a preliminary damages calculation of class members' out-of-pocket losses as well as calculations with an alternative investment method. *Id.* Solomon agreed with Turki's premise that the time at which an individual entered the Queue impacts the damages amount for each person and for the class as a whole but does not agree that factor precludes class-wide calculation of damages. *Id.* at 4. According to Solomon, "[i]f the timing of contributions and withdrawals, or in this case the timing of requests for withdrawals, was accepted as an argument against class certification, then no class would ever be certified in any ERISA matter, or, indeed, any securities matter."*Id.*

Solomon reported having used an alternative investment damages methodology numerous times in ERISA class action cases and has never had to perform individualized inquiries regarding whether each class member would have invested in the alternative. However, he noted as follows:

> [I]f the Court determines that the alternative investment should be a weighted-average mix of the other investments held by each class

member in his or her 401(k) plan, one can perform that calculation for each class member and sum up the results for all class members in order to arrive at damages for the class. In addition, any rebalancing that occurred in each class member's 401(k) plan as well as any difference between the pending Queue transaction and the actual mix of investments held can be taken into account (assuming the necessary data is available).

**\*10** *Id.* at 8. Solomon reasoned that "if the Court were to direct that damages for each class member be based on the best performing alternative in that class members' particular plan, [Solomon] could perform that calculation as long as the data were available."*Id* . at 10.

Solomon disagreed with Turki's position "that it is necessary to determine the reason for a cancellation," asserting it is unnecessary "to determine the reason for a withdrawal request in any ERISA class action damages calculation."*Id.* at 7. However, Solomon posited that "if the Court determines that different categories of cancellations should be treated differently for purposes of calculating damages, such a difference can be accounted for in a damages model."*Id.*

Solomon discounted Turki's assessment that the fee disgorgement theory proposed by Plaintiffs "by definition, includes all participants in the Queue," and clarified that it "relates to the pro-rata portion of the fees relating to funds of the Plaintiffs and class members held in the Queue."*Id.* According to Solomon, both the best alternative theory and the fee disgorgement theory apply to the same group of individuals. *Id.* at 9."Furthermore, the 'losses' damages methodology ... incorporates into it the fee component of damages by virtue of the fact that the value of the account is reduced as a result of fees and damages are based on the differential between the value in the alternative and the Account."*Id.*"[I]f the Court finds it necessary to separately calculate the damages relating to the fees, this can be done for the class assuming the relevant data is made available."*Id.*

Solomon believes the term "loss" in Plaintiffs' Motion for Class Certification refers to "out-of-pocket loss," not loss relative to the alternative investment option. *Id.* at 10.Solomon explains that "one would first determine the members of the class by calculating which Account investors had an out-of-pocket loss as a result of the implementation

of the Queue.... Next, for those class members damages would be calculated based on one or more alternative investments."*Id.* As Solomon noted, since Turki was able to calculate those individuals who experienced an out-of-pocket gain, it stands to reason that Solomon should be able to identify those who experienced an out-of-pocket loss.

In sum, to determine who is in the class, Solomon believes the Court must determine who has an out-of-pocket loss, which means the Court must "compare [ ] the value that each investor would have received had his or her withdrawal requests not been placed in the Queue with the value that he or she actually received once the requested funds were eventually released or the request was cancelled."*Id.* at 10–11.Then, once the class is identified, the Court can calculate damages by comparing "the value that class members actually received once the funds were released from the Queue with the value they would have received had their withdrawal requests not been placed in the Queue and had instead been placed in one or more alternative investments."*Id.* at 10."In the case of calculating damages relative to an alternative investment other than cash, [Solomon] placed the value of the request that went into the Queue into the alternative investment on the date of the request. Then, on the date of the release ... [he] compared the value in the alternative with the value actually received ... to arrive at damages."*Id.* at 11.Solomon added up the out-of-pocket loss for the entire class, calculating that it was $173,345,516.*Id.* He also added the damages under his alternative investment methodology, finding a class-wide damages amount of $577,622,156. *Id.*

**\*11** In his deposition, Solomon conceded that he had never created "a damages calculation involving a single case claiming losses under thousands of 401(k) plans."Solomon Dep. 21:12–21:14, ECF No. 193–2. With regard to the fact that the 145,000 putative class members have differing investment options in their 401(k) plans, Solomon stated that "you could track their investments individually and make a separate calculation," but "[i]t would be extremely costly to do because everybody's account, 145,000, would have individual transactions and individual activity that would have to be tracked into a variety of investments."*Id.* 21:20–21:25.In past cases, Solomon used the best alternative investment and applied it to each individual separately, but he had never applied more than a few alternative investment options in a case.

Solomon clarified in his deposition that the MSCI U.S. Real Estate Investment Trust Index [2] (the Index) is not

2013 WL 7218827, 57 Employee Benefits Cas. 1706

actually an investment option and that he had not checked to see if any of the investments available to the putative class members tracked the Index when making investment decisions. Solomon stated that his goal in using the Index as the alternative investment method was "not to find an investment that was offered in the fund that could have been used as an alternative," but rather "to locate a fund that was basically, as close as we can get, similar to the type of investment that the Principal fund was intended to be and generated a return that we could use as a benchmark that the Principal fund theoretically could have achieved if they had invested in a manner similar to the index." *Id.* 33:21–34:3. He used the Index "in order to provide a proxy for a well-managed real estate investment option." *Id.* 35:20–35:22. He did this because "had the queue not been necessary because of lack of liquidity, the fund would have been in a different position in terms of its earnings and the return that would have been earned by the plan participants who were desiring their money when they got it." *Id.* 37:10–37:18. Thus, he was "measuring ... the return that these other real estate funds were able to generate during that time period as a proxy for what, if this fund were managed at least in a similar manner to the index funds, would have realized during that time period." *Id.* 37:18–37:15.

2    The Morgan Stanley Capital International United States Real Estate Investment Trust Index "is a free float-adjusted market capitalization weighted index that is comprised of equity REITs" that "is an end of day, gross return index, available via Bloomberg and Reuters." MSCI, *Index Definitions,* http://www.msci.com/products /indices/country_and_ regional/domestic_equity_ indices/reit/definitions.html (last visited Sept. 23, 2013).

Solomon also concedes that he has no basis for using another real estate investment proxy as the alternative investment option, as his objective was to find a similar type of fund, "not to try to indicate where people may have chosen to put the money on an individual basis." *Id.* 39:21–39:22. However, when Solomon does his "ERISA damages calculations in the context of a stock drop case," he looks "first for an alternative investment to the options that are offered under the plan." *Id.* 39:24–40:1. He does so because "that's what is offered in the plan and that's the type of returns that the participants could have realized." *Id.* 40:3–40–4. Solomon admitted that he never compared the returns shown in the Index to the returns of the investment options the named Plaintiffs selected for their withdrawal requests from the Account, even though that would have indicated what position the named Plaintiffs

would have been in if there had been no alleged breach by Defendants. Solomon explained that because there is no indication the Plaintiffs would have left the assets in their preferred alternative investment after withdrawal of their assets from the Account, the Index is a better option for his damages calculation. Solomon is unable to say who suggested using the Index as the alternative investment option for his damages calculation—Plaintiffs' counsel or one of his staff members—but "ultimately, the decisions of what went into the report were [Solomon's]." *Id.* 43:8–43:11, 44:23–44:24.

 **\*12**  Although he recognizes that the investors who chose to keep their money in the Account had different desires than those who chose to make withdrawal requests after the Queue was implemented, Solomon did not see this difference in investment strategy as a "conflict" for purposes of this case. *Id.* 50:4–50:18. He opined it was simply a difference in opinion.

In his past experience with ERISA class actions, Solomon has never dealt with a case where there were more than ten plans at issue; thus, he has never dealt with a case involving anywhere near 13,000 different plans. Additionally, he cannot recall any of his past cases where the participants were denied the ability to transfer their assets or receive distributions.

When asked whether "the best-performing option ... is inconsistent with the theory of putting the participant in the position they would have been in but for the breach because you don't know that all the participants would have invested in the best-performing option," Solomon answered, "[o]f course, but there are cases that have cited on this issue that the presumption that the courts have accepted, at least in some cases, would be the best-performing return would be utilized to calculate the loss." *Id.* 60:7–60:15. Solomon then cited a case he worked on involving a defined *benefit* plan, as opposed to a self-directed, defined *contribution* plan as is present here. Solomon asserted that the rationale used in the defined benefit plan case had nonetheless been relied upon in defined contribution plan cases, but Solomon was unable to cite those cases during his deposition.

Solomon said that in a previous case he had applied the best-performing alternative investment method for multiple plans within the same lawsuit, but acknowledged that in the previous case, there were only three plans, which were all sponsored by the same employer. To calculate the best-performing alternative investment for 13,000 plans and 145,000 class members, Solomon admitted "[i]t would be

In re Principal U.S. Property Account ERISA Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 7218827, 57 Employee Benefits Cas. 1706

a monumental task. It would be a very complex and time-consuming calculation."*Id.* 63:8–63:17.

In distinguishing between out-of-pocket loss and economic loss, Solomon noted that the economic loss calculation constituted the "entire economic impact of the issue," and that "you could have an out-of-pocket loss and no economic loss."*Id.* 63:21–64:7.Solomon said he did not think he had ever before addressed the issue of whether loss in the class certification phase of an ERISA case should be measured by an out-of-pocket loss as opposed to the economic loss.

Solomon acknowledged that someone with an out-of-pocket loss but no economic loss would be in the class, but would have no damages. He opined that the Court should calculate damages for purposes of the class certification analysis using the economic loss calculation instead of the out-of-pocket loss formula. Solomon's proposed calculation would include as class members individuals who cancelled withdrawal requests after they were placed in the Queue, without regard to the reason for the cancellation, as long as they suffered an out-of-pocket loss from the day their request was made to the day they cancelled their request. Solomon said he had not looked at the Teachers Insurance and Annuity Association–Cref Real Estate Account (the TIAA Account) in considering alternative investment options.

### c. Dana Messina

**\*13** Dana Messina (Messina), is a managing partner of the investment firm, Aria Partners GP, LLC, and principal of Kirkland Messina LLC, a firm that concentrates on leveraged buyouts and financial advisory services. Plaintiffs retained Messina "to provide expert opinions regarding prudent fund management relating to the allegations that [Principal] breached [its] fiduciary duties under ERISA by failing to maintain adequate liquidity to provide for daily withdrawals from [the Account]" and to respond to Turki's expert report "regarding the effect of the Account maintaining greater liquidity."Messina Report at 2, ECF No. 194–2.

Messina opined that Turki failed to "address how the Account, if it had been managed in a manner consistent with its mandate of providing daily liquidity, could have avoided the Queue altogether."*Id.* at 3. Messina reasoned that Turki's assessment that "additional liquidity would have diluted the Account's returns," neglected to consider (1) that the Account's objectives—daily withdrawal liquidity and being a low risk/fixed income fund—"should have informed its managers' investment decisions"; (2) "the numerous prudent

non-cash options available to the Account's managers to provide daily liquidity which would have minimally impacted Account performance"; and (3) "that the Account's ability to provide daily liquidity has value in and of itself and the Account's failure to provide this liquidity deprived investors in the Account of a valuable benefit even apart from their capital losses."*Id.*

Messina next reasoned that Turki's assessment that the liquidity shortfall created two choices—impose the Queue or sell the assets at fire-sale prices—"present[ed] a false dichotomy," as "[t]he Account's managers had numerous choices for providing adequate liquidity for many years prior to the imposition of the withdrawal freeze."*Id.* Messina found Dr. Turki's conclusion that the Account managers could not have predicted the 2008 downturn flawed because (1) the Account managers were aware of and/or ignored red flags in the commercial real estate market and the overall health of the economy; and (2) "the risks inherent in the 2008 downturn were not entirely unpredictable and the Account was not prepared for any number of adverse events."*Id.* at 3–4.

Messina's report focuses on the Account's objective of providing daily liquidity and a low-risk option for investors. In the report, Messina reasoned that the alleged unpredictability of the 2008 economic downturn is a Red Herring; the investors bought into the Account because it was a low risk investment offering daily liquidity, and when the Account "was unable to provide this liquidity it failed its investors and should be held accountable on this basis alone."*Id.* at 6. The report detailed that "[a]s early as 2006, the Account's managers should have been aware of the eventual decline (or at least the likelihood of potential decline) in real estate prices and the corresponding outflows of capital that typically occur in such downturns" and that "the Account was aware or should have been aware [of] the growth of housing prices to extreme levels and the risk that this pricing 'bubble' would burst."*Id.* at 6–7.Messina notes that "as early as 2006, emails reveal that there was growing concern internally over the potential for a decline in the real estate market and a reduction in the Account's asset base" and that although Berg had mentioned ways to increase liquidity in the Account at that time, the Account did not implement any such options to increase liquidity.*Id.* at 8. Thus, Messina concluded that the Account's managers neglected the Account's "low risk, fixed income profile and ignored the daily liquidity feature, apparently in order to obtain marginally higher returns."*Id.* at 10.

1:14-cv-10427-TLL-CEB Doc # 35-11 Filed 08/10/15 Pg 24 of 46 Pg ID 1418
In re Principal U.S. Property Account ERISA Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 7218827, 57 Employee Benefits Cas. 1706

**\*14** Messina opined that "[w]hile the timing of the 'run on the bank' can be unpredictable, a prudent fund manager knows such a risk exists and customarily obtains insurance, lines of credit, or keeps available liquid assets as a feasible means to manage through a variety of financial crises."*Id.* at 13.According to Messina, risks for which an account manager must prepare include: (1) "when a style of investing loses favor among the investing public," (2) "the poor relative or absolute performance by a fund which can lead to massive withdrawals," or (3) "when a certain investment asset class loses favor among the investing public."*Id.* at 13–15.Messina concluded as follows:

> Given that these investment industry risks tend to occur more frequently than do broad-based economic declines, and can have an equally adverse effect on an investment's liquidity level, prudent fund managers prepare for these eventual dislocations in the investment and financial markets, no matter the historical success of the fund, by maintaining adequate liquidity, either directly or through insurance.

*Id.* at 15.Since the Account managers did not increase the Account's liquidity level before instituting the Queue, Messina concluded the managers acted imprudently in their management of the Account.

Messina further opined that Turki failed to consider non-cash alternatives for providing liquidity, such as (1) "[o]btaining a larger credit facility," (2) "[h]olding publicly traded REIT securities," or (3) "[o]btaining direct liquidity insurance." *Id.* at 16.Messina explained that "[a]n expanded credit facility could have provided a material amount of liquidity to weather substantial investor redemptions and in turn avoid the Queue" and while such expansion would be limited by the Account's real estate holdings, "it would not have been difficult for the Account to obtain a credit line of around 25% to 35% of the Account's assets," which "would have been sufficient to provide substantial and significant liquidity to investors."*Id.* at 17.

Another liquidity option proposed by Messina was "to hold a position in publicly traded REITs," which are "investment vehicles that trade on a public exchange and often times invest in illiquid real estate."*Id.* at 18.Unlike funds, REITs have

permanent capital and "are much more liquid as compared to the Account's real estate holdings."*Id.*

Messina's third liquidity option was to obtain insurance on the Account's funding of daily withdrawals. Using the TIAA Account as an example, Messina explained that the TIAA Account, "an open-end real estate fund[,] which also provided daily liquidity[,] purchased outright insurance for any liquidity shortfalls stemming from withdrawals."*Id.* at 19 (footnote omitted). Messina reported that the TIAA Account had a liquidity guarantee for its investors, wherein "TIAA's general account has agreed to purchase liquidity units," thus "guarantee[ing] that a participant can redeem accumulation units at their then-current daily net asset value."*Id.* at 19–20 (footnote omitted). This insurance cost TIAA Account investors "approximately $3.9 million for a fund with $14 billion in net assets or around 0.03% of the value of the fund."*Id.* at 20 (footnote omitted).

**\*15** Messina opined that "[t]here was overwhelming evidence that the Account relied on the stream of new contributions to fund investor withdrawals."*Id.* at 24."The imprudence of the Account's reliance on investor inflows as a primary source of liquidity was also heightened by the fact that investor contributions consistently made up the bulk of the Account's total cash inflows—outpacing rent and proceeds form [sic] property sales."*Id.* at 25.Messina surmised that the Account managers should have secured other forms of liquidity prior to 2008, as "[o]nce an adverse liquidity event is imminent, it can be very difficult and extraordinarily expensive to obtain liquidity."*Id.* at 26.

Messina also discredited the Account managers' decision to keep a low level of cash in the Account. According to Messina, "[t]he managers focused on performance, to the exclusion of all other considerations," and "[t]hese management decisions were diametrically opposed to the Account's guidelines which highlighted the Account's low risk and liquidity."*Id.* at 27.In financial terms, Messina equated the imposition of the Queue to "the investors having lost an option to sell their investment on a daily basis."*Id.* With his focus on liquidity as the main tenet of the Account, he maintained that "Principal was implicitly offering to investors the equivalent of a put option to sell their shares," as such an option "gives the holder the right to sell its investment at a specific price."*Id.*

In his deposition, Messina acknowledged never having managed a real estate fund, worked in real estate development

or investment, or published any articles or done any research about real estate investment or management. Messina further acknowledged that in forming the opinion that the Account managers should have been aware of the housing price bubble and predicted the crash in the commercial real estate market, he had not done "any specific research to correlate the prices of residential and commercial real estate" and instead based his conclusion on his twenty-five years of investment experience. Messina Dep. 33:14–34:20, ECF No. 193–5. Messina agreed that in 2007, there were real estate professionals and managers predicting a slowing down no worse than in 2001 or 2002 and that there was a variety of opinion and debate on the matter. *Id.* 46:14–46:20.Messina clarified, however, that managers of a real estate investment fund that buys "illiquid assets" and promises daily liquidity, who knew there would be a decline, should have prepared for an economic downturn and have accounted for the possibility of other contingencies. *Id.* 47:18–48:11.

Messina admitted that he had not analyzed the impact his liquidity measures would have had on the individual plan participants and that although he had predicted that some of the financial harm would occur in late 2007, he had not predicted the extent of the economic crash that occurred in 2008 and 2009. Messina said he predicted that due to the extent of the leveraging, some investment banks would have problems, but that he did not foresee "it would sort of cascade into sort of every asset class, every industry, every country."*Id.* 51:16–52:24.Based on these predictions, Messina's investment firm bought "put" options, hedged where possible, and moved investments into cash during the third quarter of 2008, as it was clear by then that there were problems. *Id.* 52:25–54:2.Messina conceded that he did not "conduct any research in forming [his] opinions into whether managers of open end real estate funds foresaw the economic downturn and took action in advance to avoid it."*Id.* 55:8–55:12.

 **\*16** Messina stated that in forming his opinion that the Account should have maintained 15% to 25% liquidity, he looked at a number of comparable funds focusing on publicly traded, real estate mutual funds with daily liquidity. Messina confirmed that he also studied open-end, non-publicly traded, non-mutual, direct-owned commercial real estate funds looking for daily liquidity, and that of those funds, recalled that only the TIAA Account offered daily liquidity. Messina said that he did not have a record of the particular funds he analyzed, explaining that after making the initial determination that a fund did not have daily liquidity,

he did not look any further at the fund because it was not relevant to his analysis.

Messina was asked about stated investment objectives, and he agreed that "in the fund world when you have stated fund objectives, that's not a guarantee that those objectives will in all events be met," including liquidity goals.*Id.* 60:4–60:25.Messina acknowledged that the documents governing the Account provided investors with notice that the Account managers reserved the right to impose withdrawal limitations if they deemed such action necessary but found it "very close to being irrelevant" because "almost every fund has ... language ... the lawyers write up to cover any and all sort of ... events that can go on."*Id.* 61:1–62:5.

With regard to the Account managers' actions in 2008 to increase liquidity, Messina stated that by then the Account already had liquidity trouble, so what Account managers did to increase liquidity at that point did not matter because it was already too late. Messina opined that 15% to 25% liquidity would have been reasonable for the Account, but he has no idea if it would "have been sufficient to redeem all of the redemption requests in connection with the 2008, 2009, 2010 time frame."*Id.* 70:7–70:24.Messina acknowledged that in late 2008, "as the credit crisis unfolded and got worse, ... a number of banks curtailed lines of credit and dramatically increased the costs of lines of credit."*Id.* 92:24–93:3.Messina clarified that in his opinion, the Account managers "should have had these lines of credit in place as sort of a general business matter for [a] long time" because "in 2008, once you've driven off the cliff, ... it was sort of too late to try and put a credit facility in place...."*Id.* 93:3–93:11.

In order to keep liquidity as the top priority in the Account, Messina opined that the Account managers should have invested in REIT securities to ensure they could satisfy withdrawal requests, even if such investments increased risk and volatility in the Account. When it was pointed out that the Account guidelines prohibit REIT investments in excess of 2% of the Account's total assets, Messina conceded that his alternative investment strategy of having 10% of the fund's assets in REIT securities would have violated the Account's guidelines.

 **\*17** With regard to his proposition that the Account could have obtained liquidity insurance, Messina could not verify whether liquidity insurance for open-ended funds like the Account was even available in the marketplace, and he acknowledged that the TIAA Account was the only example

1:14-cv-10427-TLL-CEB Doc # 35-11 Filed 08/10/15 Pg 26 of 46    Pg ID 1420
In re Principal U.S. Property Account ERISA Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 7218827, 57 Employee Benefits Cas. 1706

of liquidity insurance he knew. Messina also acknowledged that even if the Account managers had maintained Messina's suggested 25% liquidity, they likely still would have been forced to sell Account real estate properties during the economic crisis to satisfy all of the withdrawal requests during that period of time.

**d. Supplemental Report of Lassaad Turki**

Turki submitted a supplemental report on behalf of Defendants in response to Solomon and Messina's expert reports. Therein, Turki summarized his findings, stating that "Plaintiffs (through their expert, Solomon) attempt to define the class using out-of-pocket losses rather than economic losses," and that "[t]his class definition yields a proposed class that is inconsistent with the set of participants who would have economic losses under Solomon's 'alternative' investment damages approach." Turki Suppl. Report at 1, ECF No. 194–1. Turki further stated that "Solomon's 'alternative' investment damages approach fails to return participants to the position in which they would have been but-for the alleged breach," and also that "Solomon fails to address any of the participant-level impediments to calculating damages on a class-wide basis." *Id.* at 1–2.In Turki's opinion, Solomon's damages model "does not result in the calculation of damages necessary to make putative class members whole for the losses they allegedly incurred." *Id.* at 2.

Turki noted that while both Solomon and Messina found that the additional liquidity that Plaintiffs promote would have had an impact on Account returns, "Solomon's flawed damages approach does not even attempt to address the impact of additional liquidity on the damages of putative class members." *Id.* According to Turki, even if the damages approach used by Solomon was valid, Solomon's use of the Index as the "alternative" investment is flawed. *Id.* Rather, the TIAA Account, which is the alternative investment option discussed in Messina's report, is exactly the type of open-end, commercial real estate fund with a daily liquidity guarantee that Solomon planned to use. Turki then noted that the Account returns from 1999 through the end of the Queue period exceeded those of the TIAA Account, and therefore the "outperformance of the Account from 1999 through the end of the Queue period is consistent with the conclusion that an investor in the account would have been better off than an investor in the TIAA Account," and it is also "consistent with the conclusion that using the TIAA Account as the 'alternative' investment would result in negative damages." *Id.*

Turki pointed out that Solomon's report has three main conclusions: (1) "the proposed class only includes those participants with an out-of-pocket loss while in the Queue," (2) "damages can be calculated on a class-wide basis using a single 'alternative' investment," and (3) "damages should be calculated using the MSCI U.S. REIT Index as the 'alternative' investment." *Id.* at 4 (footnote omitted). Using Solomon's proposed class, which only includes individuals with an out-of-pocket loss while in the Queue, Turki calculated that it would result in a putative class of only 88,747 out of the possible 145,797 investors and would result in the exclusion of two of the named proposed class members because one of them "had an out-of-pocket gain of $1,902" and the other "had an out-of-pocket gain of $214." *Id.* at 5.

**\*18** Expounding on his contention that "the use of out-of-pocket losses as the determining factor for class inclusion is inconsistent with Solomon's flawed 'alternative' investment damages approach," Turki identified that "36,368 of the 57,050 putative class members who are excluded from the proposed class [because they broke even or had an out-of-pocket gain while in the Queue] incurred damages under Solomon's flawed damages approach." *Id.* at 5–6 (footnotes omitted). Additionally, "604 of the 88,747 members of the proposed class did not experience any economic losses under Solomon's flawed damages approach" and "this disconnect will occur regardless of the 'alternative' investment that is utilized." *Id.* at 6 (footnote omitted).

Turki opined that "Solomon's proposed damages approach completely fails to address any of the participant-level impediments to calculating damages on a class-wide basis," and that Solomon instead "characterizes these impediments as 'onerous,' 'time-consuming,' overwhelming,' and 'a monumental task' and then simply disregards them without performing any economic analysis." *Id.* (footnote omitted). According to Turki, Solomon disregards individual-level factors and promotes the alternative investment approach because Solomon "has utilized an aggregate 'alternative' investment approach in other ERISA matters (typically, so-called ERISA 'stock drop' matters)" and that in doing so, Solomon "fails to consider critical differences between ERISA 'stock-drop' matters and this matter." *Id.* at 6–7 (footnotes omitted). Turki explained that in stock-drop cases, "the theory of the case is that company stock became an imprudent investment and should have been removed as a plan investment option on the date of imprudence." *Id.* at 7. Thus, "plaintiff-style damages calculations typically assume that the company stock investment option is liquidated on

2013 WL 7218827, 57 Employee Benefits Cas. 1706

the date it became imprudent to hold and the proceeds are invested in an alternative investment ... from the same plan ." *Id.* (footnote omitted).

However, in this matter, "the theory of the case is that the Account was imprudently managed and therefore participants were not able to exit the investment." *Id.* Here, "putative class members all actively submitted instructions regarding the desired destination of their Account assets (when they requested to transfer assets out of the Account)." *Id.* Detailing the disparate destination to which two Plaintiffs sent their Account holdings, Turki asserted, contrary to Solomon's assertion that it is unknown where the money would have gone, it is known where these investors sent their funds, and it was not the Index. *Id.* at 7–8. Accordingly, Turki concluded that "[c]orrectly determining and tracking the appropriate destination of these assets requires a participant-by-participant investigation." *Id.* at 8.

Turki additionally noted that "Solomon does not even attempt to determine a class-wide alternative investment that would have been commonly available to all proposed class members across all 13,000+ plans," but instead "selected as an alternative investment an *index* ... that is not available as an investment option in any of the putative class members' 13,000+ plans." *Id.* (footnote omitted). Further, "Solomon concedes that he is unable to apply a class-wide alternative investment that was available to all proposed class members." *Id.* Turki contended that "it is illogical to assume that the appropriate alternative investment for a cohort of people who no longer wished to invest in a real estate fund is a different type of real estate fund," making the Index an even less plausible alternative given that assumption. *Id.* at 11. Turki noted that "less than 2% of the putative class members' requests that were placed in the Queue were transfers from the Account to REIT or other real estate funds." *Id.*

 **\*19** Turki also discounted Messina's report, stating that "Messina's speculation that the additional liquidity necessary to avoid the implementation of the withdrawal limitation would have allowed the Account to honor its liquidity mandate with relatively little or no expense is incorrect." *Id.* at 3 (quotation marks omitted). Turki opined that "[t]o the extent they were feasible, all of the liquidity strategies outlined by Messina—cash, credit facility, REIT securities, and liquidity insurance—would have negatively impacted the Account's returns prior to the implementation of the withdrawal limitation." *Id.* Turki reasoned it was

problematic that Messina did not "perform any analysis of the participant-by-participant impact of additional liquidity on the participants' Account returns to determine whether a participant would have been better off under his speculative conclusion that additional liquidity would have avoided the implementation of the withdrawal limitation." *Id.* Turki reiterated that "Plaintiffs' opportunity cost-based damage theory cannot be applied on a class-wide basis," and that Account investors were not impacted identically by the management of the Account and the implementation of the Queue. *Id.*

Turki explained that "Messina's report focuses on issues related to merits, not class certification," as Messina "asserts that the Account was imprudently managed, that the managers took on too much risk, and that the Account should have been managed with greater levels of liquidity." *Id.* at 4 (footnote omitted). Additionally, "Messina's conclusions are based on the speculative premise that the Account's portfolio managers had a 'mandate' to provide sufficient liquidity in order to avoid the need to implement a withdrawal limitation." *Id.* at 13 (footnote omitted). Turki expressed his concern with the fact that Messina failed "to perform any analysis of the participant-by-participant impact of additional liquidity on Account returns." *Id.* at 24.

**B. Procedural Background**
On December 2, 2009, and December 4, 2009, in the Southern District of New York, Plaintiffs and Putative Class Representatives filed two Class Action Complaints alleging breaches of fiduciary duty in violation of ERISA against Defendants Principal Global Investors, LLC (PGI), Principal Financial Group, Inc., Principal Life Insurance Co., and Principal Real Estate Investors, LLC; one of the complaints included Defendants John Doe 1–20. On January 4, 2010, the court consolidated the cases and appointed interim co-lead plaintiffs and ordered any pending or subsequently filed actions arising out of the same operative facts to be consolidated with the case. The case was transferred on Defendants' motion to the Southern District of Iowa on April 22, 2010. On June 2, 2010, a second order of consolidation was filed, establishing a master docket for the Consolidated Action, including subsequently filed actions, and ordered the action recaptioned as: In re Principal U.S. Property Account ERISA Litigation. On August 6, 2010, Plaintiffs filed a Consolidated Complaint adding Defendant Principal Management Corporation (PMC), listing several putative class representatives, and consolidating the claims against the Defendants. Plaintiffs filed an Amended

2013 WL 7218827, 57 Employee Benefits Cas. 1706

Consolidated Complaint on October 22, 2010. On January 31, 2011, Plaintiffs' claims against Defendant Principal Financial Group, Inc., were dismissed without prejudice pursuant to the parties' stipulation. On May 17, 2011, the Court denied Defendants' Motion to Dismiss Plaintiffs' claims against the remaining Defendants.

**\*20** On December 1, 2011, Plaintiffs filed this CORRECTED Motion for Class Certification. Defendants filed their resistance on September 14, 2012, and requested oral argument on the Motion. On March 18, 2013, Defendants filed a Motion to Strike Messina Expert Report, which Plaintiffs resist. Both Plaintiffs and Defendants filed several Notices of Supplemental Authority before and after the June 25, 2013, hearing.

## II. DISCUSSION

### A. Jurisdiction

Plaintiffs were participants in benefit plans defined under ERISA, 29 U.S.C. § 1002(2). Plaintiffs allege Defendants breached fiduciaries duties owed to them under 29 U.S.C. §§ 1131, 1132(a)(3). This Court has exclusive jurisdiction of claims arising under ERISA. See § 1132(e).

### B. Motion to Strike Messina's Expert Report

Defendants request that this Court strike Messina's expert report under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), asserting that Messina's findings are irrelevant for purposes of this Court's class certification determination. Plaintiffs resist, arguing Defendants' motion should be denied, or in the alternative, the Court must strike portions of Defendants' briefing and exhibits, including portions of Turki's report.

District courts enjoy considerable discretion when ruling on a motion to strike. *See Nationwide Ins. Co. v. Cent. Mo. Elec. Coop ., Inc.,* 278 F.3d 742, 748 (8th Cir.2001). However, a motion to strike is not the proper vehicle to challenge affidavits and exhibits provided in support of a motion. The contested report does not constitute a pleading as anticipated by Rule 37. *See* Fed.R.Civ.P. 7(a) (defining a pleading as including a complaint, an answer to a complaint, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer when ordered by the court).

As set forth by the Eighth Circuit, "[e]xpert disputes 'concerning the factual setting of the case' should be resolved at the class certification stage only to the extent 'necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class.' " *In re Zurn Pex Plumbing Prods. Liab. Litig.,* 644 F.3d 604, 611 (8th Cir.2011) (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 567 (8th Cir.2005)). "The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker." *Id.* at 613.Rather, "[t]he district court's 'gatekeeping function' under *Daubert* ensures that expert evidence 'submitted *to the jury* " is sufficiently relevant and reliable, but '[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Id.* (second alteration in original) (internal citation omitted) (quoting *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929 (8th Cir.2001), and *United States v. Brown,* 415 F.3d 1257, 1269 (11th Cir.2005), respectively). That said, it is appropriate for this Court to conduct a " 'rigorous analysis' of the parties' claims to determine 'whether the defendant's liability to all plaintiffs may be established with common evidence.' " *Id.* at 614 (quoting *Avritt v. Reliastar Life Ins. Co.,* 615 F.3d 1023, 1029 (8th Cir.2010)).

**\*21** The Supreme Court in *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,* 133 S.Ct. 1184, 1194–95 (2013), held that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."*Id.*

Defendants argue that Messina's report improperly focuses on the merits of the case—whether Defendants breached their fiduciary duty—and not on the class certification factors under Rule 23. Defendants contend that Messina fails to provide discussion that is helpful at the class certification stage because Messina "opines that, in effect, none of the impediments to class certification cited by Defendants would exist if the Defendants had not allegedly breached their fiduciary duties by 'imprudently' managing the Account."Defs' Reply to Defs.' Mot. to Strike 1, ECF No. 203. Plaintiffs contend that they "have demonstrated just what the Supreme Court requires—a *prima facie* showing that common questions predominate over individual

questions," while "Defendants present a merits-based attack on the claims," and that Messina's report "directly **rebuts** arguments and factual assertions proffered by Defendants and their expert report, Dr. Lassaad Turki."Pl. Resp. to Defs.' Mot. to Strike 1–2, ECF No. 199. Plaintiffs claim that because Messina's report responds directly to Turki's report, Defendants' relevancy challenge must fail.

As set forth recently by the Supreme Court in *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1433 (2013), courts must go beyond the pleadings to determine whether the Rule 23 requirements have been satisfied, including whether damages can be provided for on a classwide basis and whether classwide damages theories are tied to the theory of liability. The Court rejected the lower court's rationale that the putative class had satisfied Rule 23 by providing "a method to measure and quantify damages on a classwide basis," and therefore it was "unnecessary [for the court] to decide whether the methodology [was] a just and reasonable inference or speculative ."*Id.* (second alteration in original) (citation and internal quotation marks omitted).

In the present case, the parties concede that in analyzing the requirements for class certification, the Court must consider merits-related issues to the extent they are relevant to this Court's Rule 23 analysis. Although it is apparent that most—if not all—of Messina's expert report focused on the underlying merits of the case, the report meets the minimum relevancy requirement for this Court to consider portions of that report in making the class certification determination. The Court will disregard statements contained therein that might be interpreted as legal conclusions on the merits of Plaintiffs' breach of fiduciary duty claims. Accordingly, Defendants' Motion to Strike Messina's Report must be **denied.**

## C. Plaintiffs' Corrected Motion for Class Certification

### 1. Standard for the Motion

**\*22** "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *Comcast,* 133 S.Ct. at 1432 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979)). "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011)). The party seeking certification "must not only 'prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy

of representation, as required by Rule 23(a)," it "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.*(quoting *Dukes,* 131 S.Ct. at 2551).

District courts have broad discretion in determining whether a class should be certified under Federal Rule of Civil Procedure 23. *Rattray v. Woodbury Cnty., IA,* 614 F.3d 831, 835 (8th Cir.2010) ("The district court is accorded broad discretion to decide whether certification is appropriate, and [its determination] will [be] reverse[d] only for abuse of discretion."). A class action is "peculiarly appropriate" when a case raises legal issues that are "common to the class as a whole," as Rule 23 then provides an economical vehicle for resolution of the claims before it. *Califano,* 442 U.S. at 700–01. "To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)."*In re St. Jude Med., Inc.,* 425 F.3d 1116, 1119 (8th Cir.2005) (footnote omitted) (citing *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 613–14 (1997)). Courts have also recognized, in addition to the requirements of Rule 23(a) and (b), two "implicit" prerequisites for class certification: "1) that the class definition is drafted to ensure that membership is capable of ascertainment under some objective standard; and 2) that all class representatives are in fact members of the proposed class."*In re Teflon Prods. Liab. Litig.,* 254 F.R.D. 354, 360 (S.D.Iowa 2008); *see also Liles v. Am. Corrective Counseling Servs. Inc.,* 231 F.R.D. 565, 571 (S.D.Iowa 2005).

### 2. Parties and Claims

#### a. Management Defendants

Plaintiffs identify three Defendants as management fiduciaries of the Property Account: (1) Principal Real Estate, a portfolio manager for the Property Account; (2) Principal Global Investors, LLC (PGI), a diversified asset management organization that provided investment and reinvestment advisory services and produced reports regarding the Property Account; and (3) Principal Life, an insurance company that established the Property Account. Defendants Principal Real Estate, PGI, and Principal Life admit they are ERISA fiduciaries only with respect to the investment and reinvestment of the Property Account assests.

#### b. Monitoring Defendants

**\*23** Plaintiffs identify Principal Management Corporation (PMC) as a subsidiary of PGI and a fiduciary with respect to the Plans that provided investment advisory services to the

2013 WL 7218827, 57 Employee Benefits Cas. 1706

Property Account. In answer to the Amended Consolidated Complaint, Defendants deny this allegation.

### c. Plaintiffs' Claims

Plaintiffs assert two causes of action against Defendants arising under ERISA § 502(a)(2) and (a)(3). [3] Count One alleges Management Defendants violated ERISA § 404(a)(1)(B) [4] by imprudently failing "to manage the assets of the Property Account consistent with the Property Account's investment objective to maintain a strong focus on liquidity sufficient to permit daily withdrawals, at a low-to-moderate risk level appropriate for a fixed income retirement savings fund."Cor. Mot. Class Cert. 8, ECF No. 111. Count Two alleges Monitoring Defendants violated ERISA § 404(a)(1)(B), by imprudently failing "to monitor the conduct of the management fiduciaries, thereby allowing the management fiduciaries to deviate from the Property Account's investment objective to maintain a strong focus on liquidity sufficient to permit daily withdrawals, at a low-to-moderate risk level appropriate for a fixed income retirement savings fund."*Id.* Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), Plaintiffs assert that Defendants are liable to restore the Plaintiffs' losses caused by Defendants' breaches of fiduciary duties and ask the Court to provide other equitable relief as appropriate. [5]

[3] Under ERISA § 502(a)(2) and (3), "[a] civil action may be brought—... (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or] (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plans."29 U.S.C. § 1132(a)(2) and (3).

[4] As set forth in ERISA § 404(a)(1)(B), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—... (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."29 U.S.C. § 1104(a)(1)(B).

[5] As set forth in 29 U.S.C. § 1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable

to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

Plaintiffs essentially claim that Defendants have breached their statutory duty of care under ERISA. *See Christensen v. Qwest Pension Plan,* 462 F.3d 913, 917 (8th Cir.2006) (articulating that a claim under 29 U.S.C. § 1104(a)(1)(B) asserts a fiduciary violated their duty of care to ERISA beneficiaries). To recover under a duty of care claim for purposes of ERISA, the Plaintiffs "must prove a breach of this fiduciary duty and loss to the Plan."*Harley v. Minn. Min.and Mfg. Co.,* 284 F.3d 901, 905 (8th Cir.2002)."[T]he basic remedy for a breach of fiduciary duty is 'to restor[e] plan participants to the position in which they would have occupied but for the breach of trust.' " *Id.* at 907 (quoting *Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992)).

Thus, to prove their claim under ERISA, Plaintiffs will need to prove Defendants have breached a fiduciary duty owed to the class, and further demonstrate that this alleged breach resulted in a loss to the class.

### d. Proposed Class Representatives

The Corrected Motion to Certify Class identifies the Proposed Class Representatives as Plaintiffs David G. Engelbert, Eric Cruise, Michael E. Zall, and Greta M. De Kock. In the Amended Consolidated Complaint, Plaintiffs allege that each of the proposed class representatives, through various employee pension benefit plans within the meaning of 29 U.S.C. § 1002(2), invested in the Property Account. Defendants admit the Proposed Class Representatives each invested in the Property Account.

### e. Putative Class

**\*24** Plaintiffs define the putative class as follows:

> All qualified ERISA defined contribution plan participants and beneficiaries that, between September 26, 2008 and the present (the "Class Period"), were invested directly or indirectly in the Principal U.S. Property Account through their ERISA plan, were placed in the

2013 WL 7218827, 57 Employee Benefits Cas. 1706

Withdrawal Queue, and suffered a loss during the Class Period as a result of the Defendants' mismanagement of the Property Account. Specifically excluded from the Class are the Individual Defendants herein, officers and/or directors of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party, other than the participants or beneficiaries or qualified ERISA defined contribution plans offered by Principal or any of its affiliates to its employees and which suffered losses due to investment in the Principal U.S. Property Account.

Pl. Mot. for Class Cert. 5, ECF No. 111. Based on this definition, Defendants contend that there are two threshold inquiries before an individual can be included in the class: (1) determine whether the individual requested to withdraw or transfer funds in the Account that was then placed in the Queue, and (2) determine whether the individual incurred a loss that can be calculated on a class-wide basis.

### 3. Rule 23(a)

To be eligible for class certification, Rule 23(a) requires that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). A district court "must conduct a 'rigorous analysis' to determine whether the prerequisites for a class action under Rule 23(a) are satisfied." *Rattray,* 614 F.3d at 835 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147,

161 (1982)). "Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove." *Elizabeth M. v. Monenez,* 458 F.3d 779, 786 (8th Cir.2006). Therefore, this analysis "will frequently entail 'overlap with the merits of the plaintiff's underlying claim.' " *Comcast,* 133 S.Ct. at 1432 (quoting *Dukes,* 131 S.Ct. at 2551); *see also Blades,* 400 F.3d at 567 ("The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case."). This is because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast,* 133 S.Ct. at 1432 (quoting *Dukes,* 131 S.Ct. at 2551). However, while dispute between the parties "going to the factual setting of the case ... may overlap the merits of the case," those "disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Blades,* 400 F.3d at 567.

**\*25** Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano,* 442 U.S. at 700–01. To serve as a class representative, an individual must show that they " 'possess the same interest and suffer the same injury' as the other class members." *Dukes,* 131 S.Ct. at 2550 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)). The claims of the putative class must depend upon a common contention "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551.

### a. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." "[N]o arbitrary rules regarding the necessary size of classes have been established." *Belles v. Schweiker,* 720 F.2d 509, 515 (8th Cir.1983). However, courts may consider the number of persons involved in the class, the nature of the action, the value of each individual claim, and the inconvenience of trying individual suits. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 559–60 (8th Cir.1982).

Defendants concede that the putative class includes approximately 140,000 individuals in over 13,000 different

benefit plans. Cases with far fewer putative class members have been found to satisfy the numerosity requirement. *See, e.g., Paxton v. Union Nat'l Bank,* 688 F.2d 552, 560–61 (8th Cir.1982) (finding 74 individuals to be sufficient to satisfy the numerosity requirement, when all relevant factors were considered); *Arkansas Educ. Ass'n. v. Bd. of Educ., Portland Ark. Sch. Dist.,* 446 F.2d 763, 765–66 (8th Cir.1971) (after considering the relevant factors, the court found that 20 putative class members was sufficiently numerous for class certification purposes). Thousands, if not over one hundred thousand putative class members, is sufficiently numerous to satisfy the numerosity requirement under Rule 23(a) after considering all relevant factors.

### b. Commonality

Plaintiffs contend that because there was central management of the funds in the Account by Defendants, all investors were affected in precisely the same way by the Queue. Plaintiffs provide two questions this Court must answer that they believe are common to all class members: (1) "whether the Property Account was properly managed for liquidity," and (2) "whether the lockdown and consequent losses were the result of Defendants' imprudent management of the Property Account."Pls.' Mot. Class Cert. 10, ECF No. 111. Plaintiffs argue that because these two common questions apply to all class members—the claims and alleged injuries arise from the same alleged conduct by the same Defendants—all putative class members' claims stem from the same source.

Defendants argue that Plaintiffs have not carried their burden as to either liability or damages, because Plaintiffs fail to demonstrate that liability and damages can be proven on a classwide basis. First, with regard to liability, Defendants contend that even if Defendants' actions were the same as to each putative class member, the individual investors' decisions were all different, so there cannot be commonality among the putative class members. *Blades,* 400 F.3d at 570 (affirming the district court's denial of class certification where "plaintiffs *presume* class-wide impact without any consideration of whether [independent factors or the defendants' alleged misconduct] operated in such a manner so as to justify that presumption"); *see also Bolden v. Walsh Constr. Co.,* 688 F.3d 893, 898 (7th Cir.2012) (finding no commonality based on "the fact that plaintiffs' experiences differ"). Defendants allege that many putative class members invested in the Account after implementation of the Queue, so causation issues preclude a finding that Defendants are liable for any loss realized. Defendants thus ask this Court to find that the individualized decisions by the putative class

members necessitate a finding that Plaintiffs have failed to satisfy the commonality test under Rule 23.

**\*26** Second, with regard to damages, Defendants assert that there must be two individualized damages determinations in this case: first to determine who is in the class, and second to determine the damages each class member should receive. Defendants direct the Court to evidence that indicates 38% of the putative class members actually had an out-of-pocket *gain* during the time their assets were frozen in the Queue. Defendants assert that there are several variables that will impact the determination of whether an individual suffered a loss and may therefore be included in the class: (1) how long the individual had invested in the Account before the Queue was implemented; (2) when the individual made their withdrawal that was placed in the Queue; (3) whether the individual withdrew their requested funds completely, in part, and when such withdrawal occurred; and (4) how the individual eventually invested their Account withdrawals and when their reinvestment occurred.

Commonality requires that there be "questions of law or fact common to the class."*Bennett v. Nucor Corp.,* 656 F.3d 802, 814 (8th Cir.2011) (quoting Fed.R.Civ.P. 23(a))."[A] proponent of certification must satisfy the commonality requirement by showing that a classwide proceeding will 'generate common *answers* apt to drive the resolution of the litigation.' " *Id.* (quoting *Dukes,* 131 S.Ct. at 2551). "This does not mean merely that they have all suffered a violation of the same provision of law," but rather that their claims "depend upon a common contention." *Dukes,* 131 S.Ct. at 2551. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Class members are not required to be "identically situated," nor must "every question of law or fact be common to every member of the class." *Paxton,* 688 F.2d at 561. The requirement that there be common questions of law or fact can easily be misread as "[a]ny competently crafted class complaint literally raises common questions." *Dukes,* 131 S.Ct. at 2551 (citation and internal quotation marks omitted). "What matters to class certification ... is not the raising of common 'questions'—even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 2551 (alteration in original) (citation and internal quotation marks omitted).

In *Dukes,* the Supreme Court reversed the lower court's certification of a plaintiff class comprised of approximately one and one-half million current and former female Wal–Mart employees who alleged that their supervisors had denied them discretionary pay increases and promotions on the basis of gender in violation of Title VII. *Id.* at 2547, 2561. The Court, noting that the "crux of the inquiry" under a Title VII claim is "the reason for a particular employment decision," held that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Id.* at 2552 (internal quotation marks omitted). The commonality inquiry is satisfied if "the legal question 'linking the class members is substantially related to the resolution of the litigation.' " *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1174 (8th Cir.1995) (quoting *Paxton,* 688 F.2d at 561).

**\*27** Plaintiffs allege that Defendants violated their fiduciary duties under section 404(a)(1)(B) of ERISA, so Plaintiffs must prove Defendants breached a fiduciary duty that resulted in a loss to Plaintiffs. *See Harley,* 284 F.3d at 905 (In order for Plaintiffs to recover under a breach of a fiduciary duty of care claim for purposes of ERISA, Plaintiffs "must prove a breach of this fiduciary duty and loss to the Plan."). As set forth above, Defendants Principal Real Estate, PGI, and Principal Life admit they are ERISA fiduciaries only with respect to the investment and reinvestment of the Property Account assets. Putative class members must belong to an ERISA-protected benefit plan to state a claim for relief under ERISA § 404(a)(1)(B), and they must present an injury that allows for damages under ERISA, such as those set forth in 29 U .S.C. § 1109(a).

Plaintiffs allege that Defendants breached their fiduciary duty of care by implementing the Queue and thereby halting the transfer of Plaintiffs' assets out of the Account. Plaintiffs contend that this alleged breach is common to all putative class members, as all such individuals were investors in the Account who attempted to transfer funds out of the Account during the time period the Queue was in place. At first glance, this claim appears to be common to all class members; the problem arises when this Court must determine who is included in the class. There are thousands of putative class members enrolled in one of thousands of benefit plans, all of which had different investment options available.

Individualized investment decisions made by putative class members raises issues with the liability element of Plaintiffs' fiduciary duty claim. Plaintiffs concede that approximately 10,000 individuals who placed assets in the Account after the Queue was in place had notice of the withdrawal limitation—including several named Plaintiffs. This means that many putative class members—including named class representatives—may have contributed to their alleged damages by placing assets into the Account after the implementation of the Queue.

Plaintiffs counter that there are no individualized determinations as to causation because the burden of proof for causation issues rests with the Defendants once Plaintiffs have proved that Defendants breached a fiduciary duty and present a prima facie case of loss. *See Martin,* 965 F.2d at 671 ("[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty."); *Harley v. Minn. Mining & Mfg. Co.,* 42 F.Supp.2d 898, 905 (D.Minn.1999) ( "[I]n an ERISA breach of fiduciary duty case, the defendant bears the burden on the issue of causation once the plaintiff proves a breach and provides evidence of a loss to the plan.").

**\*28** This argument ignores that under the commonality prong of the class certification test, the Court must determine whether the common questions of law and fact in this case predominate over any individualized issues, and therefore must consider issues like causation, even if it will be the Defendants' ultimate burden to prove that intervening causes prevent their liability. *See, e.g., Martin v. Shell Oil Co.,* 198 F.R.D. 580, 592–93 (D.Conn.2000) (denying class certification reasoning that although the putative class presented issues supported by common evidence, those issues were not enough "to overcome the extensive individualized proof of ... breach [and] causation ... likely to be required").

Regarding damages for breaches of fiduciary duty in ERISA cases, the Supreme Court has reasoned, "[u]nder the common law of trusts, which informs our interpretation of ERISA's fiduciary duties, trustees are 'chargeable with ... any profit which would have accrued to the trust estate if there had been no breach of trust,' including profits forgone because the trustee 'fails to purchase specific property which it is his duty to purchase.' " *See LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 253 n. 4 (2008) (quoting Restatement (Second) of Trusts § 205 & cmt. I (1957)). Under Restatement

2013 WL 7218827, 57 Employee Benefits Cas. 1706

§ 205, there are three measures of damages for breach of trust: (1) "any loss or depreciation in value of the trust estate resulting from the breach of trust"; (2) "any profit made by [the fiduciary] through the breach of trust"; or (3) "any profit which would have accrued to the trust estate if there had been no breach of trust."

One decision by Account managers is at issue, the decision to implement the Queue on September 26, 2008; however, the putative class members responded in a variety ways to that decision, thereby creating the same dilemma addressed in *Dukes.* Further, according to Plaintiffs' expert, Messina, Defendants made *numerous* faulty decisions regarding the liquidity of the Account prior to 2008. Plaintiffs must have suffered the same injury to satisfy the commonality inquiry, which requires more than a violation of the same area of law, or as here, a singular management decision. *Dukes,* 131 S.Ct. at 2551. The mere fact that all Plaintiffs allege a breach of fiduciary duties by Defendants "gives no cause to believe that all their claims can productively be litigated at once." *Id.; see also Elizabeth M.,* 458 F.3d at 786–87 ("The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry .").

In *Dukes,* the Court held that the claims at issue involved "literally millions of employment decisions at once"; the present case similarly contemplates thousands of putative class members who made different decisions regarding their assets in the Account. *Dukes,* 131 S.Ct. at 2252. Just as the Court reasoned in *Dukes* that each employee's qualification and each manager's motivation for denying promotion had to be considered individually, in the present case, several individualized inquiries must be made, including the timing of each investor's placement in the Queue, whether the investor cancelled his or her withdrawal request, what notice the investor received before his or her assets were placed in the Queue, and what alternative investment was designated by each investor.

 **\*29** At the hearing, Plaintiffs explained that they only seek to include in the class those individuals who experienced an out-of-pocket loss after attempting to withdraw or transfer funds from the Account unsuccessfully due to the implementation of the Queue. Plaintiffs provide the Court with a methodology for calculating damages based on economic loss using the Index as the alternative investment benchmark. As Defendants argued at the hearing, an individual could experience an out-of-pocket loss and thus be included in the class, but have an overall gain from having

their assets frozen in the Queue because their actual preferred investment at that time performed worse than the Account in 2008 and 2009. Additionally, there may be individuals who experienced an out-of-pocket gain while in the Queue yet experienced an economic loss, who would not be in the class, even though they lost money overall from the implementation of the Queue.

Additionally, Plaintiffs proffer the Index as the "alternative investment" option for their damages methodology. However, this ignores the fact that the Index was not available to any of the putative class members enrolled in Defendants' numerous plans and therefore is an "alternative investment" that could not actually have been used during the imposition of the Queue. Defendants point to the TIAA Account, which was a feasible alternative because it was available to many of the putative class members at the relevant time and it provided greater liquidity, which Plaintiffs insist should have been provided by Defendants, yet the TIAA Account performed worse than the Account during the time in question. Turki stated in his supplemental report that the Account returns from 1999 through the end of the Queue period exceeded the returns in the TIAA Account, which supports his conclusion that using the TIAA Account as the "alternative investment" for purposes of determining damages would result in negative damages. He provides an example, opining that "[i]f a participant had invested $1,000 at the beginning of 1999 in the Account, it would have been worth $1,885 at the end of the Queue. The same investment in the TIAA Account would have been worth $1,700." Turki Suppl. Report 2–3, ECF No. 194–1.

Defendants also point out that many members attempted to transfer their funds from the Account to alternative investment options when their request was placed in the Queue. Turki stated that

> On a Queue-wide basis, 47% of Queue transactions involved a redemption that intended to transfer the participant's Account assets outside of a Principal-administered plan (i.e., a distribution). The ultimate destinations of these distributions were rollover IRAs, personal brokerage accounts, other 401(k) plans administered by other recordkeepers, bank accounts, and an

2013 WL 7218827, 57 Employee Benefits Cas. 1706

indeterminately large number of other possible investments.

Turki Report 26, ECF No. 160–7 (footnote omitted). Turki noted that four out of the nine named Plaintiffs "had Queue transactions that resulted in the transfer of their Account assets out of their 401(k) plans," and he opines that "[t]he destination fund (or other investment), if any, for the four participants who exited their Principal-administered plans must be investigated on an individual basis to determine whether the participant has been damaged."*Id.*

**\*30** If any requested transfers would have resulted in an overall loss by the investor because the alternative investment option selected by the investor performed worse than the Account during the relevant period of time, that person actually experienced an overall gain by being stuck in the Queue. These individualized differences between putative class members is problematic for producing a reliable, classwide damages calculation. *See, e.g., Duchardt v. Midland Nat'l Life Ins. Co.,* 265 F.R.D. 436, 444 (S.D.Iowa 2009) (finding it problematic if there are thousands of individuals with differing investment decisions that affect account values, as any damages model fails to incorporate the reasons behind past investment decisions and therefore fails to produce a reliable calculation of damages on a classwide basis).

Solomon defined "loss" for purposes of class membership determination as out-of-pocket loss, as opposed to economic loss. Solomon Report 9–10, ECF No. 193–1. Solomon opined that for calculation of damages at the class certification stage, once it has been determined which individuals suffered an out-of-pocket loss while waiting in the Queue, the "best performing" alternative investment test should be used to calculate damages. *Id.* at 10.Solomon admitted that using out-of-pocket loss to define class membership excludes any putative class members who, under his alternative investment theory, had damages but did not suffer an out-of-pocket loss during their time in the Queue. He also admitted that 57,000 individuals who requested withdrawals and were forced to wait in the Queue had no out-of-pocket loss, but he had no idea if they suffered economic losses. Finally, Solomon conceded that his class definition included individuals who suffered no compensable economic losses but did have an out-of-pocket loss while in the Queue, so they would be included in the class but have no calculable damages.

Although Plaintiffs argue that out-of-pocket loss simply establishes standing for class members, and economic loss establishes each class members' damages, this simplifies and disregards a far more complex issue involving the individual investment decisions of putative class members at the time the Queue was implemented. [6] Solomon's calculation to determine class membership presents as inconsistent with the definition proposed by Plaintiffs, which is problematic at the certification stage.

[6]   Plaintiffs cite *Brown v. Medtronic, Inc.,* 628 F.3d 451, 456–57 (8th Cir.2010), for the proposition that damages should be considered as a separate inquiry from the question of injury—or out-of-pocket loss—for purposes of standing at the class certification stage. However, *Brown* is a case decided on standing issues, and the parties do not contest standing for purposes of the determination of whether the class should be certified at this time; it is therefore distinguishable from the present case. Plaintiffs also cite *Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992), which held that "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty ."*Martin* is distinguishable from the present case, as the court in that case was not dealing with either a class action or class certification standards.

Plaintiffs additionally contend that because a class member must have standing to be included in the class at the certification stage, anyone with an out-of-pocket gain that has experienced economic loss cannot be included in the class.*See, e.g., In re Zurn,* 644 F.3d at 616 (noting that a class is not certifiable "if it contains members who lack standing"). The determination of which investors are in the class, as compared with which investors experienced an actual economic loss in this case, is incongruent and depends on the facts surrounding each investor's individual decisions. Someone may lack standing for purposes of the class yet may have suffered great loss due to the implementation of the Queue; conversely, someone may have standing under Plaintiffs' class definition yet may have actually benefited from their placement in the Queue. The fact that individual decisions made by investors impacts the claim and potential damages available to each putative class member is relevant under the commonality prong, regardless of whether an individual actually does or does not have standing under Plaintiffs' class definition.

Finally, Plaintiffs contend that "the measure of ... damages need not be exact—it will be enough if the evidence show the extent of the damages as a matter

2013 WL 7218827, 57 Employee Benefits Cas. 1706

of just and reasonable inference, although the result be only approximate."*Martin,* 965 F.2d at 672. Again, *Martin* was not dealing with class certification issues, so although damages under an individually litigated ERISA case may be determined in accordance with the aforementioned test set forth in *Martin,* that test does not apply to the determination of whether damages can be calculated on a class-wide basis for purposes of analyzing whether the commonality prong has been met for class certification to be appropriate.

Additionally, Solomon's class membership calculation would include individuals who attempted to transfer assets to options that performed worse than did the Account—individuals who would have suffered losses during the relevant time. Such individuals would therefore end up with a windfall due to Solomon's use of the Index, which is in contravention of the aims of ERISA. See *Henry v. Champlain Enters., Inc.,* 445 F.3d 610, 624 (2d Cir.2006)* ("The aim of ERISA is to make the plaintiffs whole, but not give them a windfall."(citation and internal quotation marks omitted)); *Leister v. Dovetail,* 546 F.3d 875, 881 (7th Cir.2008)* (reasoning that in making a valuation calculation, the court is not expected to "look back and decide which of [the] investment strategies has proved most profitable" because that "methodology would yield a windfall, given the uncertainty of investments"); *Harms v. Cavenham Forest Indus., Inc.,* 984 F.2d 686, 693 (5th Cir.1993)* (noting that windfall recoveries are "abhorred by ERISA").

**\*31** To satisfy commonality, Plaintiffs' claim must be based upon a common contention that is subject to classwide resolution. If the damages determination for each putative class member requires individualized analysis, Plaintiffs' motion cannot survive the commonality inquiry. See *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.,* 339 F.3d 1001, 1012 (8th Cir.2003)* (holding that denial of class certification was appropriate because "questions affecting individual class members would predominate over common questions of law or fact"). In *Dukes,* that operative question underlying the plaintiffs' claim was "*why was I disfavored.*" *Dukes,* 131 S.Ct. at 2552. In the present case, the crucial questions are "*did Defendants breach their fiduciary duties*" and "*what effect did this alleged breach have on each class member.*" It is the second question that is problematic for purposes of class certification, as it requires individualized analysis to even determine who should be included in the class, and also to determine the effect of Defendants' alleged breach on each putative class member. *See, e.g., Turner v. Talbert,* Civil Action No. 04–450–JJB, 2009 WL 1683297, at \*3, \*7 (M.D. La. June 15, 2009)* ("While plaintiffs

assert that the damage calculations in this case will not be unduly troublesome, they do not propose a simple method of calculating damages," and it therefore "seems to this Court that in order to determine a particular class member's damages, individualized proof of what type of fund that class member would have invested in during the freeze would be necessary ... [which] does not lend itself to a mathematical or formulaic damages calculation."(footnote, citation, and internal quotation marks omitted)); *see also Groussman v. Motorola,* No. 10 C 911, 2011 WL 5554030, at \*4 (N.D.Ill. Nov. 15, 2011)* ("This case will, in essence, after resolving some of [the] general issues in common, become a massive series of individualized analyses. Judicial economy is not best served by using a class action in order to engage in such individualized analyses.").

Without setting forth a workable methodology for calculating damages on a classwide basis, Plaintiffs cannot adequately support their certification motion as to commonality. This Court must ensure that the certified class is defined clearly enough to allow for proper notice to all class members. The unavoidable individualized calculations necessary to determine class membership in this case defeats the purpose of moving forward as a class action. *See, e.g., Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 592–93 (3d Cir.2012)* ( "Clearly delineating the contours of the class along with the issues, claims, and defenses to be given class treatment serves several important purposes, such as providing the parties with clarity and assisting class members in understanding their rights and making informed opt-out decisions.").

The determination of Defendants' liability to individual class members depends upon whether the class member was damaged by something Defendants did or failed to do, and it also involves individualized inquiry as to causation with regard to those investors who placed assets into the Account after the Queue was in place. These inquiries at the class certification stage necessarily intertwine the issues of liability and damages. Plaintiffs have failed to demonstrate that causation or damages can be determined on a classwide basis, and therefore have not met the commonality prerequisite.

**c. Typicality**

**\*32** Typicality, the third factor under Rule 23(a), tends to merge with the commonality requirement as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will

2013 WL 7218827, 57 Employee Benefits Cas. 1706

be fairly and adequately protected in their absence."*Dukes,* 131 S.Ct. at 2551 n. 5 (quoting *Gen. Tel. Co.,* 457 U.S. at 157 n. 13). Typicality requires that there are "other members of the class who have the same or similar grievances as the plaintiff."*Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996) (citation and internal quotation marks omitted); *see also Paxton,* 688 F.2d at 561–62 ("This [typicality] requirement is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory."(citation and internal quotation marks omitted))."The burden is 'fairly easily met so long as other class members have claims similar to the named plaintiff.' " *Alpern,* 84 F.3d 1540 (quoting *DeBoer,* 64 F.3d at 1174). This is true even if there are factual variations present. *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 831 (8th Cir.1977).

However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."*Elizabeth M.,* 458 F.3d at 787. The focus under Rule 23(a)(3) is on the named Plaintiffs' situation and their typicality with the members of the putative Plaintiff class. The typicality of Plaintiffs' claims is undermined by the inherent case-by-case nature of relief sought here. Despite Plaintiffs' contention to the contrary, the Court is convinced determination of class membership and damages considerations require an individualized analysis of how much each investor has been damaged, which in the present case is premised upon the timing of entrance into the Queue as well as alternative investments available to and selected by putative class members. Due to the individualized inquiries necessary to determine both class membership and damages, Plaintiffs cannot satisfy the typicality requirement of Rule 23(a)(3).

**d. Adequacy**

The Rule 23(a)(4) adequacy requirement focuses on whether "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel."*Paxton,* 688 F.2d at 562–63. This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."*Amchem,* 521 U.S. at 625. Class representatives cannot have interests that are in conflict with other class members. *See U.S. Fid. & Guar. Co. v. Lord,* 585 F.2d 860, 873 (8th Cir.1978) (stating that Rule 23(a)(4) requires that "the plaintiff must not have interests antagonistic to those of the class."(citation and quotation marks omitted)); *Langbecker v. Elec. Data*

*Sys. Corp.,* 476 F.3d 299, 315–16 (5th Cir.2007) (noting that "intraclass conflicts may negate adequacy under Rule 23(a)(4)").

**\*33** Plaintiffs are unable to demonstrate their ability to adequately protect the interests of the putative class, as their interests are in conflict with those of both class and non-class investors in the Account. Both parties' experts agree that increased liquidity would have an effect on the Account returns. Messina advocates a level of liquidity that would likely have required Account managers to sell real property during the height of the economic crisis in 2008 and 2009. It is undisputed that when the Queue was implemented, some investors chose to keep their assets in the Account and other investors who initially placed their assets in the Queue cancelled their withdrawal requests. Plaintiffs' interests, at their core, are therefore in opposition to the interests of those putative class members whose assets remained in the Queue. Additionally, for any investors who had assets in the Account for years prior to implementation of the Queue, their returns would have been negatively affected if the Account had always ensured 25% to 35% liquidity. When there is an economic conflict between putative class members, or even class and non-class members, there is a concern that the class representatives cannot adequately represent the interests of those not directly involved in the litigation process but who have a stake in the outcome nonetheless. *See, e.g .,* *George v. Kraft Foods Global, Inc.,* No.08 C 3799, 2011 WL 5118815, at \*9 (N.D.Ill. Oct. 25, 2011) ("[C]oncerns about conflicts arising from the different ways in which a fiduciary breach impacted plan participants cannot be so easily brushed aside."); *Bayshore Ford Truck v. Ford Motor Co.,* Civil Action No. 99–741(JLL), 2010 WL 415329, at \*9 (D.N.J. Jan. 29, 2010) ("[T]he incentives of the named class members ... [were] not aligned with the entire class" where plaintiffs' "damage theory and approach ... produce[d] a possible claim of actual damages for the named plaintiffs and not for some absent class members").

It is noteworthy that named Plaintiffs are likely in conflict with each other, as some of them had invested in the Account before the Queue was implemented and never invested additional assets in the Account after the Queue was in place, while others transferred assets into the Account even though they had notice of the Queue. Additionally, some named Plaintiffs experienced actual economic gains while in the Queue, and others experienced actual economic losses. These conditions would result in some named Plaintiffs falling outside of the class, while others would be in the class

In re Principal U.S. Property Account ERISA Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 7218827, 57 Employee Benefits Cas. 1706

but would not have damages. Because the named Plaintiffs' claims cannot adequately protect the interests of the putative class, Plaintiffs have failed to demonstrate typicality.

### 4. Rule 23(a) Implicit Factors

In addition to the Rule 23(a) factors, courts consider two implicit factors: (1) whether the class is ascertainable, and (2) whether the proposed class representatives actually satisfy the proffered class definitions. *Liles,* 231 F.R.D. at 571.

#### a. Ascertainability

**\*34** Under Rule 23, an order certifying the class must set forth a definition for the class. Fed.R.Civ.P. 23(c). "Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable." *Manual for Complex Litigation* (Fourth) § 21.222 (2004). To ascertain the class, "[t]he Court should not be required to resort to speculation, or engage in lengthy, individualized inquiries in order to identify class members." *In re Teflon,* 254 F.R.D. at 361 (internal citation omitted); *see Duchardt,* 265 F.R.D. at 444 (denying class certification for a proposed subclass finding that the relief sought required extensive individualized inquiry to ascertain the class).

Plaintiffs argue that the class is ascertainable because both parties' experts have reviewed the data and determined who has suffered out-of-pocket losses or gains. However, ascertain-ability remains a concern here because there are several individualized variables that make it difficult to determine class membership. As discussed in the Commonality section of the Order, actions taken by individual investors impact the determinations as to class membership, liability, and damages. Due to the lengthy, individualized inquiry necessary to determine which investors satisfy the class definition, the Plaintiffs have not met their burden in showing that the class is ascertainable under Rule 23.

#### b. Whether the Proposed Representatives Satisfy the Definition

"The second 'implicit requirement' of Rule 23 is that each proposed representative is in fact a member of the proposed class...." *In re Teflon,* 254 F.R.D. at 363. Although some named Plaintiffs may meet their own definition, Fischer and others who transferred assets into the Account after receiving notice of the Queue may not appropriately be members of the

class, as such notice potentially creates a problem with regard to causation and Defendants' purported liability. As in *Teflon,* the Court cannot "in good conscience grant certification" when it is unable to "establish membership with objective certainty." *Id.* The second implicit requirement is not met as to all proposed class representatives here.

### 5. Rule 23(b) Considerations

Even if Plaintiffs could overcome the pervasive shortfalls under Rule 23(a), they must also satisfy Rule 23(b), which requires Plaintiffs to demonstrate that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### a. Predominance

"Rule 23(b)(3)'s requirement that common issues of fact or law must predominate over individual questions," *In re Zurn,* 644 F.3d at 618, "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. The Supreme Court has stated that, "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast,* 133 S.Ct. at 1432. "The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions." *In re Zurn,* 644 F.3d at 619. "Common questions are those for which a prima facie case can be established through common evidence." *Id* . ("Individual issues are those which require evidence that varies from member to member to make a prima facie showing."). "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Avritt,* 615 F.3d at 1029 (quoting *Blades,* 400 F.3d at 566).

**\*35** Defendants contend that this case necessitates individualized inquiries for Plaintiffs to prove their prima facie case, thus failing the test under Rule 23(b)(3). *See Blades,* 400 F.3d at 566; *Owner–Operator Indep. Drivers Ass'n,* 339 F.3d at 1012 (affirming the denial of class certification under 23(b)(3), agreeing that "questions affecting individual class members [right to recover] would predominate over common questions of law or fact"); *see also Windham v. Am. Brands, Inc.,* 565 F.2d 59, 66–67, 72 (4th

Cir.1977) (en banc) (affirming denial of class certification because "the overwhelming nature of the individual claims and their complexity, ... the issue of violation did not predominate"); *Walsh v. Principal Life Ins. Co.,* 266 F.R.D. 232, 260 (S.D.Iowa 2010) (concluding that due to "extensive individualized information regarding detrimental reliance, ... Plaintiff [had] not met her burden to show that common issue[s] predominate over individual ones in the requisite causation inquiry.").

"Questions of individual damage calculations will inevitably overwhelm questions common to the class."*Comcast,* 133 S.Ct. at 1433;*see also Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 307 (5th Cir.2003) ("[W]here the issue of damages does not lend itself to ... mechanical calculation, but requires separate 'mini-trial[s]' of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance."(alterations in original) (quoting *Windham,* 565 F.2d at 68))."[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case...."*Comcast,* 133 S.Ct. at 1433 (citation and internal quotation marks omitted). The damages methodology must identify damages that are a result of the wrong committed by Defendants. *See id.* at 1434.This is because "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event.*" *Id.* at 1435 (citation and internal quotation marks omitted).

Plaintiffs urge this Court to look for guidance from a post-*Comcast* Ninth Circuit panel opinion that held "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," because "damages could feasibly and efficiently be calculated once the common liability questions [were] adjudicated."*Leyva v. Medline Indus., Inc.,* 716 F.3d 510, 514 (9th Cir.2013). However, a panel of the Eighth Circuit post-*Comcast* held that "[t]he predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member."*Halvorson v. Auto–Owners Ins. Co.,* 718 F.3d 773, 778 (8th Cir.2013). When liability and damages issues are intertwined, as they appear to be in this case, the predominance factor may not be satisfied.

**\*36**  Plaintiffs also encourage this Court to follow the Sixth Circuit's reasoning in *Glazer v. Whirlpool (In re Whirlpool Corp Front–Loading Washer Products Liability Litigation),* 722 F.3d 838, 860 (6th Cir.2013), which found the damages

calculation concerns in *Comcast* did not apply to a liability-only class certification. *In re Whirlpool* is distinguishable due to one crucial factual difference: the *In re Whirlpool* court was only certifying the class as to liability and reserving damages issues for individualized determination in a bifurcated proceeding. *Id.* In the present case, the Court is asked to certify a class as to both liability and damages issues, so *Comcast* applies and *In re Whirlpool* is inapplicable as to the predominance inquiry.

The individualized questions of loss, damages, and causation for each putative class member predominate over the common questions Plaintiffs provide for this Court to answer, as there are simply too many variables to control at both the class certification and the damages stages of litigation. As discussed by the Seventh Circuit, the Supreme Court in *Comcast* confirmed that class certification was improper if the plaintiffs failed to base the damages they sought on the injury for which they were complaining. *Butler v. Sears, Roebuck & Co.,* —— F.3d ——, Nos. 11–8029, 12–8030, 2013 WL 4478200, at \*4 (7th Cir. Aug. 22, 2013) (noting the emphasis *Comcast*"places on the requirement of predominance and on its having to be satisfied by proof presented at the class certification stage rather than deferred to later stages in the litigation"). This is precisely the problem facing this Court with regard to Plaintiffs' class certification request. Under the predominance inquiry, this Court must determine whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."*Amchem,* 521 U.S. at 623. Although class members' damages need not be identical for a class to be certified, and there are options for individualized determination of damages while liability is determined on a classwide basis, this case involves a certification request as to both liability *and* damages, and the damages inquiry is so tied to the liability question that individualized analyses permeate this case. The individual questions before this Court predominate over the common questions as to the merits of the case; therefore, the Rule 23(b)(3) predominance requirement is not met.

**b. Superiority**

Class certification is proper where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."Fed.R.Civ.P. 23(b) (3). Relevant factors to be considered in making this determination include:

(A) the class members' interests in individually controlling the

2013 WL 7218827, 57 Employee Benefits Cas. 1706

prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

**\*37** Fed.R.Civ.P. 23(b)(3)(A)-(D). Although the thousands of potentially similar claims by investors in the Account make a class action a desirable avenue for relief, "[t]he individualized determinations necessary to decide whether any individual would even belong in the class or could establish liability or [the amount of] damages demonstrate that individuals have a strong interest in controlling the prosecution of separate actions."*Rattray v. Woodbury Cnty., IA,* 253 F.R.D. 444, 464 (N.D.Iowa 2008), *aff'd,*614 F.3d 831 (8th Cir.2010).

Additionally, supremacy is undermined by the individualized nature of even the named Plaintiffs' circumstances, as they are not similarly situated once the timing of their withdrawal requests, out-of-pocket losses and gains, and economic losses and gains are examined. Accordingly, the supremacy element is not met. *Id.* at 465 ("Thus, while the logistics of a

multiplicity of similar actions is daunting, the logistics of attempting to create a class action out of what are, in reality, a myriad of individualized claims is even more daunting.").

As the discussion demonstrates, Plaintiffs have failed to meet the requirements of Rule 23(a) and (b) due to the individualized issues pervasive among putative class members' liability and damages claims. [7] Therefore, the Court concludes class certification is not appropriate in this case.

[7]    As this Court is denying Plaintiffs' class certification motion, it need not address the qualifications of Plaintiffs' preferred class counsel under Rule 23(g).

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike Messina's Expert Report, ECF No. 195, must be **denied,** and Plaintiffs' Corrected Motion for Class Certification, ECF No. 111, must be **denied.**

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 7218827, 57 Employee Benefits Cas. 1706

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Leroy v. Paytel III Management Associates, Inc., Not Reported in F.Supp. (1992)

1:14-cv-10427-TLL-CEB   Doc # 35-11   Filed 08/10/15   Pg 41 of 46   Pg ID 1435

1992 WL 367090, Fed. Sec. L. Rep. P 97,352, RICO Bus.Disp.Guide 8167

1992 WL 367090
United States District Court, S.D. New York.

L. Neil LEROY, individually and on behalf of
all other persons similarly situated, Plaintiff,
v.
PAYTEL III MANAGEMENT ASSOCIATES, INC.,
Barry Berman, and Tele–Comm, Ltd., Defendants.

No. 91 Civ. 1933 (JFK).  |  Nov. 24, 1992.

**Attorneys and Law Firms**

Sullivan & Damen, White Plains, N.Y. (Lori A. Sullivan, Amy K. Damen, of counsel), Kohn, Savett, Klein & Graf, PC, Philadelphia, Pa., (Harold E. Kohn, Joseph C. Kohn, George W. Croner, of counsel), Beigel & Sandler, Ltd., New York City, (Herbert Beigel, Lewis S. Sandler, Marilyn Neiman, of counsel), for plaintiff.

Eric H. Moss, Great Neck, N.Y., for defendants.

**OPINION AND ORDER**

KEENAN, District Judge.

**INTRODUCTION**

 **\*1**  Before the Court are two motions: 1) plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), for an order certifying plaintiff's class for class action purposes; and 2) defendants' cross-motion, pursuant to FRCP 56(b), for partial summary judgment. For the reasons set forth below, both plaintiff's and defendants' motions are denied.

**BACKGROUND**

Plaintiff seeks to represent a class of 94 investors who are limited partners in National Intelligent Pay Phone Systems Limited Partnership ("NIPPS"). This limited partnership sought to profit from the purchasing and installing of coin-operated telephones and "message centers," which are electronic advertising displays. Plaintiff was one of 94 investors in a total of 74.5 NIPPS partnership units. The average investment was $50,000; plaintiff's investment of

$29,500 was the smallest. The defendants are: 1) Paytel III Management Associates, Inc. ("Paytel"), the general partner of NIPPS; 2) TELE–COMM, Ltd., the management company for NIPPS; and 3) Barry Berman, the controlling person of Paytel.

Plaintiff alleges that defendants defrauded him and the other members of the proposed class by making false representations and failing to disclose material facts in the offering memorandum for NIPPS. In particular, Mr. Leroy alleges that the offering memorandum represented that NIPPS intended to profit from the purchasing and installing of payphones and "message centers," when defendants never intended to acquire message centers and never did acquire such centers. Furthermore, plaintiff accuses defendants of marking up the acquisition price of the payphones to divert the offering proceeds to themselves and their affiliates. Plaintiff has alleged that he relied exclusively upon this memorandum before investing in NIPPS. The offering memorandum, according to its terms, contained the sole information upon which the defendants expected the potential investors to rely before making their investments. [1]

Plaintiff now moves for class certification, claiming that the requirements of FRCP 23 have been met. Defendants, on the other hand, assert that three of the FRCP 23(a)'s four prongs have not been satisfied, thus precluding class certification. Furthermore, defendants cross-move for summary judgment on plaintiff's claims pursuant to § 10(b) of the Securities Exchange Act of 1934 (" '34 Act"), § 12(2) of the Securities Act of 1933 (" '33 Act"), RICO, and the common law of fiduciaries and negligence.

**DISCUSSION**

**A. *Class Certification***

**1. *Applicable Legal Standard***

FRCP 23 contains a two-tier test for class certification. First, plaintiff must show that he has met FRCP 23(a)'s four threshold requirements: 1) the class is so numerous that joinder is impracticable; 2) there are questions of law or fact common to the class; 3) the named parties' interests are typical of the class; 4) the named representatives will insure the fair and adequate representation of absent members of the class. Plaintiff must then demonstrate that the case falls within one of FRCP 23(b)'s three categories. The Court need not reach FRCP 23(b)'s requirements because plaintiff has failed the

Leroy v. System Management Associates, Inc., Not Reported in F.Supp. (1992)

1:14-cv-10427-TLL-CEB   Doc. # 35-11   Filed 08/10/15   Pg 42 of 46   Pg ID 1436

1992 WL 367090, Fed. Sec. L. Rep. P 97,352, RICO Bus.Disp.Guide 8167

typicality and adequacy of representation requirements of FRCP 23(a).

## 2. *Typicality and Adequacy of Representation*

 **\*2**  "Plaintiff's claims meet the typicality requirement if they arise from the same course of conduct as do those of the other proposed members of the class and are premised on the same legal bases." *Krome v. Merrill Lynch & Co., Inc.,* 637 F.Supp. 910, 921,*vacated, in part, on other grounds,*110 F.R.D. 693 (S.D.N.Y.1986). Nevertheless, if the putative class representative is subject to unique defenses that threaten to become the focus of the action, then class certification is inappropriate. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990), *cert. denied,*111 S.Ct. 675 (1991); *Kovaleff v. Piano,* 142 F.R.D. 406, 408 (S.D.N.Y.1992). Here, defendants may have a statute of limitations defense to Mr. Leroy's claim. Mr. Leroy claims that he was unaware of the fraud until early 1991. Yet his letter of March 31, 1989 to defendants, written a full two years before the filing of his suit, states:

> As I advised you, I felt it appropriate to discuss the matter with you and, as you suggested, with Mr. Berman, prior to taking any legal action with respect to your failure fully to make disclosures in the Private Placement Memorandum and the general partner's failure to comply with his undertakings therein contained.

Defendants' Brief, Exhibit B to Gordon Declaration. Defendants argue that this statement proves that plaintiff was aware of the alleged fraud in March 1989. If this is the case, the defendants would have statute of limitation defenses to Mr. Leroy's claims for relief under § 10(b) of the Securities Exchange Act of 1934 (" '34 Act"), *see*15 U.S.C. § 78j(b), and § 12(2) of the Securities Act of 1933 (" '33 Act"). *See id.* § 771(2). [2]

Mr. Leroy, on the other hand, distinguishes his allegations in the March 1989 letter from his allegations in the complaint. He asserts that this letter was responding to defendants' letter to him of March 15, 1989, wherein defendants attribute their losses for that quarter to extensive vandalism and theft. In particular, he asserts that his March 31, 1989 statement—"your failure fully to make disclosures in the

Private Placement Memorandum...."—refers to defendants' failure to disclose (1) the poor design of these telephones making them particularly prone to theft and (2) the general partner's failure to investigate the quality of these telephones before purchasing or leasing them on behalf of the Limited Partnership. *See* Leroy Affidavit, ¶¶ 8–9. He notes that the fraud alleged in the complaint, however, concerns: (1) the misrepresentation by defendants that the partnership intended to purchase telephones and message machines when, in fact, they never intended to purchase any message centers and (2) the substantial mark-up that defendants took on the sale of each phone. *See id.* ¶ 10. Therefore, Mr. Leroy posits, this correspondence to defendants does not show he knew of the fraud alleged in the complaint in March 1989.

 **\*3**  Although Mr. Leroy may ultimately prevail in his argument, at this time a material issue of fact exists as to whether he was aware of the fraud as early as March 1989. This factual dispute subjects him to statute of limitations defenses that prevent him from having claims typical of the other class members or adequately representing the class. Because plaintiff's failure to meet the third and fourth prongs of the FRCP 23(a) test is dispositive of his motion, the Court need not address the numerosity issue. Therefore, plaintiff's motion for certification is denied.

## B. *Summary Judgment*

### 1. *Applicable Legal Standard*

FRCP 56"mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett,* 477 U.S. 317, 323 (1986). A motion for summary judgment may be granted under FRCP 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250 (1986). When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990); *see Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). In making this determination, the district court may not resolve issues of fact; it may only ascertain whether such issues are present. *See Donahue v. Windsor Locks Bd. of Fire Cm'rs,* 834 F.2d 54, 58 (2d Cir.1987). The non-movant, in response to a properly

1:14-cv-10427-TLL-CEB   Doc # 35-11   Filed 08/10/15   Pg 43 of 46   Pg ID 1437

Leroy v. System Management Associates, Inc., Not Reported in F.Supp. (1992)

1992 WL 367090, Fed. Sec. L. Rep. P 97,352, RICO Bus.Disp.Guide 8167

supported motion for summary judgment, may not rest on the allegations in its pleadings, but must adduce "significant probative supporting evidence" demonstrating that a factual dispute exists. *Anderson,* 477 U.S. at 249.

### 2. *Analysis*

Defendants argue that plaintiff's first, second, fourth, fifth, and sixth claims for relief should be dismissed. For the reasons explained below, the Court finds summary judgment on these claims inappropriate at this time.

#### a. *Securities Law Violations*

The first and second causes of action involve Mr. Leroy's claims for relief under § 10(b) of the '34 Act and § 12(2) of the '33 Act. As noted above, the Court finds that a material issue of fact exists as to whether plaintiff knew of the alleged fraud in March of 1989. For this reason, defendants' motion for summary judgment on plaintiff's first two causes of action is denied.

#### b. *Breach of Fiduciary Duty*

Defendants also seek summary judgment on plaintiff's fourth cause of action, which alleges that defendants breached their fiduciary duty to the plaintiff. Defendants assert that the fiduciary relationship of a partnership only arises upon the creation of an estate of jointly held property. Thus, defendants conclude, no fiduciary relationship existed at the time that the misrepresentations were allegedly made to those who would later invest in NIPPS as limited partners. Plaintiff, on the other hand, argues that a fiduciary duty may arise prior to the formal formation of a partnership. The Court agrees with the plaintiff. When a plaintiff becomes a member of a partnership and a general partner takes or fails to take actions during the partnership's existence that violate representations made prior to the purchase of the limited partnership units, then a fiduciary relationship arises prior to the formation of a partnership. *See Tobias v. First City Nat'l Bank and Trust Co.,* 709 F.Supp. 1266, 1278 (S.D.N.Y.1989). There is no reason to conclude in this case that the prospective partners were negotiating at arms length in a struggle for competitive advantage prior to the formation of the limited partnership. Unless it is shown to be otherwise, the limited partnership relationship should presume that, when making their investment decisions, passive limited

partners are dependent upon the information held by the general partners.

***4** Of course, a fiduciary relationship also arises after the parties execute a partnership agreement, as New York law binds a general partner to a rule of fair-dealing with limited partners, who must rely on the integrity of the general partner to manage the business into which they, as passive investors, have placed their funds. *See Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 973 (2d Cir.1989). Therefore, plaintiff's claim that defendants took secret profits during the course of the partnership by fraudulently marking up the price of the pay telephones is also legally sufficient. Because material issues of fact remain in dispute as to these claims, defendants' motion for summary judgment is denied.

#### c. *RICO Violations*

Defendants also challenge plaintiff's fifth cause of action, which charges defendants with RICO violations under 18 U.S.C. § 1962(a), (c), and (d). Defendants assert that plaintiff has failed to plead the necessary predicate acts of racketeering activity. They contend that the alleged securities law violations are time barred and that all accusations of fraud are not pleaded with the particularity required by FRCP 9(b). With regard to defendants' statute of limitations argument, a material issue of fact exists as to whether or not the plaintiff's securities claims would survive a statute of limitations challenge. *See supra,* at 5–6. In any event, however, time-barred securities fraud violations suffice as predicate acts under RICO, as long as the statute of limitations has not yet run on the RICO claim. *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1105 (2d Cir.1988), *cert. denied sub nom.Soifer v. Bankers Trust Co.,* 490 U.S. 1007 (1989) (four-year statute of limitations begins to run when plaintiff discovers or should have discovered his RICO injury "regardless of when the actual violation occurred"); *see also Phelps v. Wichita–Eagle Beacon,* 886 F.2d 1262, 1273 n. 12 (10th Cir.1989) (expiration of statute of limitations for predicate fraud acts moot because RICO limitations is four years); *Jensen v. Smellings,* 841 F.2d 600, 605 (5th Cir.1988) (same).

In addition, defendants attack the plaintiff's RICO claim on the basis of FRCP 9(b), which requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Defendants contend that plaintiff's complaint is too general

Leroy v. System Management Associates, Inc., Not Reported in F.Supp. (1992)

1:14-cv-10427-TLL-CEB   Doc. # 35-11   Filed 08/10/15   Pg 44 of 46   Pg ID 1438

1992 WL 367090, Fed. Sec. L. Rep. P 97,352, RICO Bus.Disp.Guide 8167

in its averments of securities, mail, and wire fraud. As to his allegations of securities fraud, plaintiff's reference to the offering memorandum satisfies FRCP 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations. *See Luce v. Edelstein,* 802 F.2d 49, 59 (2d Cir.1986); *Stevens v. Equidyne Extractive Indus.,* 694 F.Supp. 1057, 1061 (S.D.N.Y.1988). "Furthermore, no specific connection between fraudulent misrepresentations in the offering memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question." *Luce,* 802 F.2d at 59; *Divitorrio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Furthermore, plaintiff's citing to defendants' use of the mail to disseminate the offering memorandum is sufficient particularity with regard to plaintiff's allegation of mail fraud, because there is no dispute as to who sent the offering materials and as to how these materials were sent. Of course, whether or not the offering memorandum actually contains fraudulent statements is a material issue of fact in dispute, which the Court may not resolve on a summary judgment motion. For these reasons, plaintiff's fifth cause of action also survives defendants' FRCP 56 motion.

### d. *Common Law Negligence*

**\*5** Finally, plaintiff's sixth cause of action seeks recovery for defendants' alleged common law negligence. Defendants argue that the agreement circumscribed the general partner's liability for acts other than those involving "fraud, bad faith, gross negligence, or willful misconduct." Defendants' Brief at 26. Nevertheless, plaintiff's negligence claim only addresses defendants' acts prior to any agreement that may have limited the their liability for negligence. Thus, because no agreement existed before the plaintiff became a limited partner, the defendants may still be liable for negligent acts perpetrated during the time prior to the plaintiff's signing the agreement.

### CONCLUSION

For the reasons set forth above, plaintiff's and defendants' motions are denied. The Court directs the parties to complete discovery by January 22, 1993 and sets a ready-for-trial date of February 23, 1993. The Court's ready-for-trial rules are enclosed.

SO ORDERED.

1    The offering memorandum cautions that "[n]o person has been authorized to make any representation or give any information with respect to this offering which is inconsistent with the information set forth herein.... No prospective limited partner may rely upon information or representation which may be made or given in violation of this paragraph." Defendants' Brief, Exhibit B to Gordon Declaration, at iv.
     Prior to the disbursement of the offering memorandum to a prospective partner, an independent sales representative initially approached each prospective investor, one-on-one, to explain the investment in accordance with Regulation D.

2    Mr. Leroy's § 10(b) claim would be precluded by *Ceres Partners v. GEL Associates,* 918 F.2d 349 (2d Cir.1990), which was the prevailing law in this Circuit at the time of plaintiff's filing in March of 1991. Under *Ceres,* Mr. Leroy would have had only one year to file a § 10(b) action upon his learning of the fraud. *See id.* at 364. His claim under § 12(2) of the '33 Act would be subject to the same limitation period, as expressed in § 13 of the '33 Act. *See* 15 U.S.C. § 77m.

**All Citations**

Not Reported in F.Supp., 1992 WL 367090, Fed. Sec. L. Rep. P 97,352, RICO Bus.Disp.Guide 8167

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 544937
Only the Westlaw citation is currently available.
United States District Court,
D. Kansas.

Inderjeet SINGH, and Kiranjeet Kaur, Plaintiffs,

v.

Peter D. KEISLER, Michael Chertoff,
Gerard Heinauer, Emilio T. Gonzalez,
and Robert S. Mueller, III, Defendants.

No. 07–2449–CM.   |   Feb. 27, 2008.

**Attorneys and Law Firms**

Rekha Sharma–Crawford, Sharma–Crawford Attorneys at Law LLC, Overland Park, KS, for Plaintiffs.

Christina L. Medeiros, Office of United States Attorney, Kansas City, KS, for Defendants.

***MEMORANDUM AND ORDER***

CARLOS MURGUIA, District Judge.

 **\*1** Plaintiffs Inderjeet Singh and Kiranjeet Kaur bring this action against defendants Peter Keisler,[1] Michael Chertoff,[2] Gerard Heinauer,[3] Emilio T. Gonzalez,[4] and Robert S. Mueller III.[5] Plaintiffs request that this court compel defendants to take action on their Applications to Adjust Status for plaintiffs to become permanent residents of the United States. The case is before the court on the filings related to defendants' "Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the Alternative, for Failure to State a Claim upon which Relief can be Granted" (Doc. 8).

[1]   Acting Attorney General of the United States at the time of filing

[2]   Secretary, Department of Homeland Security

[3]   Director, Nebraska Service Center, U.S. Citizenship and Immigration Services ("USCIS")

[4]   Director, USCIS

[5]   Director, Federal Bureau of Investigation

Without leave from this court, plaintiffs filed a second surreply regarding defendants' motion (Doc. 19). In this surreply, plaintiffs advise the court that defendants have revised their policy for cases similar to plaintiffs—"The policy now mandates that USCIS grant, otherwise approvable adjustment applications, that have been pending, for name checks, for 180 days or more."Consequently, plaintiffs state that "this Court should remand the matter to the agency with instructions that the case be adjudicated forthwith."

Remanding the case under this policy was not part of the requested relief in plaintiffs' complaint. Adding new requests for relief in a surreply to a motion to dismiss is inappropriate. D. Kan. R. 15.1. If plaintiffs wish to amend their complaint in light of the change in policy, they must file an appropriate motion within thirty days of this order.

Additionally, it appears that the inclusion of a new policy could affect the court's analysis of the pending motion to dismiss. As a component of their argument for why this court lacks jurisdiction to hear plaintiffs' complaint, defendants argue that there are no binding time frames within which defendants must act. The new policy may challenge that argument. As a result, the court finds that it would be presently imprudent to make substantive rulings on defendants' motion to dismiss. The court denies the motion without prejudice. However, if plaintiffs fail to file a motion to amend their complaint within thirty days of this order, defendants will be granted leave to refile their motion to dismiss.

**IT IS THEREFORE ORDERED** that defendants' "Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the Alternative, for Failure to State a Claim upon which Relief can be Granted" (Doc. 8) is denied without prejudice.

**IT IS FURTHER ORDERED** that if plaintiffs want this court to consider any USCIS policy change, they must file a motion to amend their complaint within thirty days of this order.

**IT IS FURTHER ORDERED** that if plaintiffs do not file a motion to amend their complaint within thirty days of this order, defendants will be granted leave to refile their motion to dismiss.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 544937

2008 WL 544937

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---