UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT JOHNSTON, individually and on behalf
of a class of all other persons similarly situated,

                Plaintiff,                Case No. 14-cv-10427

v.                                              Honorable Thomas L. Ludington

DOW EMPLOYEES' PENSION PLAN and
DOW CHEMICAL COMPANY RETIREMENT
BOARD,

                Defendants.

_____/

**ORDER GRANTING IN PART PLAINTIFF'S MOTION TO COMPEL, DIRECTING PRODUCTION OF PLAN BENEFIT CALCULATIONS, GRANTING DEFENDANTS' MOTION TO COMPEL, DIRECTING CONTINUED DEPOSITION, DIRECTING PRODUCTION OF DOCUMENTS, CANCELLING FINAL PRETRIAL CONFERENCE AND TRIAL DATES, ADJOURNING HEARING ON CERTAIN MOTIONS, AND DIRECTING SUPPLEMENTAL BRIEFING**

This case is a class action brought by Plaintiff Robert Johnston, on behalf of himself and a class of similarly situated individuals, against Defendants Dow Employees' Pension Plan ("Plan") and Dow Chemical Company Retirement Board ("Board"). Johnston's purported class consists of employees initially employed by the Dow Chemical Company, transferred to a joint venture between Dow and E. I. du Pont de Nemours and Company ("DuPont"), and then transferred back to Dow after the joint venture concluded. The crux of Johnston's claims is that the Board improperly introduced a new method of calculating the retirement benefit into the Plan for employees that were transferred from Dow to the joint venture—DuPont Dow Elastomers ("DDE")—and then back to Dow. Johnston filed a motion to certify this class of individuals so that the class can seek collective relief.

Currently two motions to compel, filed by each of the parties, seeking information related to Johnston's claims are pending. Johnston seeks to compel information from Defendants related to the manner in which it calculated benefits for similarly situated non-class plan participants. Specifically, Johnston seeks calculations performed for individuals who meet two criteria: first, participants whose pension assets were transferred between Dow and another Dow-affiliated entity (like Johnston); and second, who were subject to the Plan's general credited-service proration factor (unlike Johnston, who was subject to a specific proration factor based on his transfer).

Defendants seek to compel testimony from Johnston concerning a release of claims provision he agreed to when signing a severance package with Dow Chemical. Johnston refused to answer questions about the release in his deposition, citing attorney-client privilege. Defendants also seek to compel production of emails between Johnston and putative class members after this litigation was underway. Johnston has refused disclosure on the basis of work-product protection.

## I.

Robert Johnston is a retired employee of the Dow Chemical Company and its joint venture with DuPont, DDE. Johnston first joined Dow in 1980. He then worked for Dow for sixteen years. In 1996, he was transferred from Dow to DDE. Johnston then worked for DDE for nine years before rejoining Dow.

The Dow Chemical Company is an international corporation headquartered in Michigan. The Plan is a defined benefit plan established by Dow to provide for the retirement benefit of Dow employees.

### A.

Dow and DuPont established DuPont Dow Elastomers in 1996. DDE was a joint venture "focus[ing] on the development, manufacture, and sale of elastomer products, such as neoprene." Pl.'s Compl. ¶ 9, ECF No. 1. Dow and DuPont concluded DDE in 2005. *Id.* at ¶ 14.

When DDE was first established, a number of Dow and DuPont employees transferred to the joint venture. Johnston was one of these employees.

Dow and DuPont concluded DDE in 2005, at which point a number of DDE employees, including Johnston, transferred back to Dow. Johnston later retired from Dow in 2011. As part of Johnston's separation from Dow Johnston signed a severance agreement. Twenty-three other class members signed severance agreements when their employment with Dow ended. The relevant terms of release of claims in Johnston's agreement are:

> I release and discharge The Dow Chemical Company and any of its affiliates or subsidiary companies (collectively the "Company"), and its officers, directors, employees, shareholders, successors and assigns ("Releasees") from all claims (including claims for attorney's fees and costs), demands and causes of action, known or unknown, which I may have or claim to have against any Releasee, arising out of, or in any way relating to, my employment or termination of my employment with the Company, whether based on any act or omission to act. This includes, but is not limited to, claims of . . . violation of the Employee Retirement Income Security Act of 1974 (ERISA) (as amended) . . . .
> 
> . . .
> 
> This Release does not affect any rights that I may have to file for a benefit under any state workers' compensation or unemployment compensation statute or for vested rights under ERISA-covered employee benefit plans as applicable to me on the date I sign this Release . . . .
> 
> . . .
> 
> 7. That I am aware that, by signing this Release, I am giving up my right to sue any Releasee not only on the basis of the discrimination laws mentioned above, but also for any other claims which I may have or believe that I may have against any Releasee in connection with my employment or termination of my employment, based upon any event which occurred before I sign this Release.

Defs.' Resp. Br. Mot. Certify Class, Ex. 1-F at 173 & 177, ECF No. 35-8. The parties dispute which of these provisions apply to Johnston's current action. Defendants seek to compel Johnston to testify as to what he understood these release terms to mean. Johnston says he only came to such an understanding after consulting with a lawyer—something Defendants suggested he do—and so his understanding is shielded by the attorney-client privilege.

**B.**

When Johnston was transferred from Dow to DDE, his pension assets were transferred to DDE to be administered pursuant to the DDE pension plan. As a result, Johnston no longer had a pension benefit with Dow, despite having worked for Dow prior to being transferred to DDE. His pension benefit, in its entirety, followed Johnston to DDE. When Johnston transferred back to Dow from DDE, there was not a corresponding transfer of assets. His pension remained with DDE and he began accumulating new pension assets with Dow and its pension plan.

**C.**

The Plan calculates pension benefits for Plan participants based on a general benefit formula. The Plan changed that formula beginning January 1, 2006. The older formula froze as of December 31, 2005, meaning that Plan participants could no longer accrue pension assets under that formula and could only accrue assets under the new formula. Thus, going forward, any Plan participant that had accrued a benefit under both formulas was entitled to have his benefit calculated in accordance with the formula that would yield the greatest pension benefit.

Participants that have moved between Dow and certain affiliated entities with their own defined benefit plans were subject to an additional benefit calculation. Those participants would have their years of credited service calculated according to a proration factor in § 9.6 of the Plan. That factor assumed that the participant worked for Dow for the entire period he worked for Dow

and the affiliated entity and calculated his benefit on the basis of those years of service. The factor then adjusted the amount of the hypothetical full Plan benefit to account for the time he actually spent at Dow.

Participants that moved between Dow and DDE were not subject to § 9.6 of the Plan. A more specific proration factor was incorporated into the Plan specifically for transferees from DDE to Dow. Section 10.46 of the Plan was added in June of 2006 and governs Plan participants who transferred from Dow to DDE and then back to Dow. Such individuals, as explained above, are eligible to receive both Dow and DDE pensions. The Plan contends that it transferred all of Johnston's Dow pension assets (and those of other putative class members) to DDE when Johnston's employment was transferred. Those assets were not transferred back to Dow when the DDE joint venture ended. Thus, according to the Plan, when calculating Johnston's pension benefit under § 10.46, his Dow pension benefit only includes credited service (essentially, years worked at Dow) after he transferred back from DDE, not the time before he transferred to DDE.

Johnston seeks to discover the data for similarly situated Plan participants that were subject to an asset transfer and had their pension benefit calculated under § 9.6 of the Plan. Johnston believes that Defendants, when calculating the pension benefit for these individuals, included their time at Dow from before their pension asset transfer and their later time at Dow. The Plan maintains that this is merely speculative since it has applied a uniform calculation to all participants that were subject to an asset transfer. The Plan explains that when a participant's pension assets are transferred, that participant no longer has any credited service with Dow until the participant returns to Dow and accumulates more years of credited service.

**II.**

Parties are permitted under Federal Rule of Civil Procedure 37 to move for an order compelling disclosure or discovery. "The Federal Rules of Civil Procedure are in place to facilitate discovery of all relevant evidence. Rule 26 authorizes a broad scope of discovery, provided the material sought has some probative value in proving or disproving a claim or defense." *Gamby v. First Nat'l Bank of Omaha*, 06-11020, 2009 WL 963116 (E.D. Mich. Apr. 8, 2009) (citing FED. R. CIV. P. 26(b)(1)).

### III.

Plaintiff Robert Johnston moves to compel certain evidence from the Plan concerning the manner in which it has calculated the proration factor in Plan § 9.6 for other beneficiaries that have been subject to an asset transfer. Simply put, Johnston wants to determine if the Plan used a different methodology for other, similarly situated Plan beneficiaries than the methodology that the Plan represented it would apply to him.

Importantly for Johnston's motion, the Plan does not concede that Plan § 9.6 is the proper proration factor for calculating Johnston's benefit. It argues that (and indeed applied) the more specific Plan § 10.46. Johnston argues that Plan § 9.6 is relevant because that is the Plan provision under which his credited service with Dow (prior to being transferred to DDE) should have been calculated. He now seeks information on how the Plan has calculated credited service under that section for individuals who were subject to a transfer of their benefit assets, as he was.

The parties have significantly narrowed the scope of their dispute. Johnston originally requested all § 9.6 calculations performed by the Plan. Since then, the parties have identified 264 individuals that have a "proration" flag in their benefit data. That means that they "may have a calculation performed under Section 9.6." Bisping Decl. ¶ 7, ECF No. 50. Additionally, the parties have identified "almost 500 participants" in the Plan "who transferred from Dow to DAS

[Dow AgroSciences] prior to 1/1/96 and who have commenced benefits by no later than Friday, September 4," 2015. Id. at ¶ 10. Finally, Sue Bisping, an employee of Towers Watson, the Plan's administrator, testified that records of individuals subject to an asset transfer between Dow and DAS would have a searchable note in their data indicating the transfer. Bisping Dep. 191, ECF No. 38-8. Thus, Towers Watson could cross-reference the two groups or, at least, narrow one of the two groups using the search parameters used to identify the other group. This process would produce a record of individuals subject to an asset transfer and subject to the Plan § 9.6 proration factor.

While the result of the cross-reference is unknown, it presumably will not be a negligible number of individuals. All of those individuals, however, should satisfy Johnston's query. Directing Defendants to produce all of those records would be needlessly burdensome since the Plan takes the position that § 9.6 has been applied uniformly. Johnston, on the other hand, thinks that may not be so. Johnston has yet to identify any evidence that the Plan's assertion that it uniformly applied the § 9.6 proration factor is incorrect. That is, Johnston's request seeks information that, at present, does not appear to exist. Because of the important nature of this information, if it exists, to Johnston's case, some discovery will be allowed. But due to the speculative nature of Johnston's inquiry, it will be extremely limited.

Defendants will be required to produce the results of the search for Plan participants that were subject to an asset transfer and subject to the Plan's § 9.6 proration factor for credited service. Johnston may then select three individuals from the list and Defendants must produce calculation data for those individuals. If the selected individuals were not subject to an asset transfer or not subject to a Plan § 9.6 calculation, Johnston may select another participant from the list. Once three individuals meeting the two relevant criteria are identified and their

calculations produced, Johnston may supplement his dispositive motion papers. If any of the three benefit calculations reflect an alternative application of § 9.6 by the Plan, Johnston may then petition the Court for further discovery. If the application of § 9.6 for those individuals is uniform, no additional discovery will be ordered.

## IV.

In Defendants' motion to compel, they seek certain testimony and documents from Johnston. First, Defendants seek testimony from Johnston on his understanding of the claims waiver he signed when he agreed to a severance package with Dow. Second, they seek emails sent by Johnston to putative class members and the responses from class members. Johnston has attempted to shield these areas of discovery behind the attorney-client privilege and the work-product doctrine, respectively.

### A.

During Johnston's deposition, attorneys for Defendants questioned him about his understanding of the waiver of claims provisions contained in his severance agreement. Johnston responded to questions about the release by stating that the information is privileged. He has retained that line of argument in response to Defendants' motion to compel. According to Johnston, testifying to his understanding of the meaning of the release would reveal the advice he received from counsel prior to signing the release, advice he sought at the behest of Defendants.

"The purpose of attorney-client privilege is to ensure free and open communications between a client and his attorney." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 517 (6th Cir. 2014) (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 519 (6th Cir. 2006)). "But because the privilege operates to reduce the amount of information discoverable during the course of a lawsuit, it is narrowly construed." *In re Grand Jury Proceedings Oct. 12,*

*1995*, 78 F.3d 251, 254 (6th Cir. 1996). The Sixth Circuit has articulated the elements of the privilege as:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998).

Here, the testimony sought by Defendants falls perilously close to eliciting the communications between Johnston and his then attorney concerning the meaning and effect of the release Johnston signed. As articulated in their motion to compel, however, Defendants do not seek these communications or the advice conveyed. They seek Johnston's understanding of the effect of the release, admittedly gained after consulting with counsel.

Normally, attempts at eliciting such testimony should be cautiously received in light of the privilege, but the facts of this case overcome the privilege. The relevant dispute focuses on the effect of a contractual provision agreed to by both parties. Defendants argue that "[i]t strains credulity to argue Johnston's subjective understanding is not relevant to understanding his intent." Defs.' Reply Br. 3, ECF No. 58. But that is not always so.

A party's understanding of a contractual term is oftentimes irrelevant if it remains entirely subjective and uncommunicated at the time of contract formation. *See Ingersoll Mill. Mach. Co. v. M/V Bodena*, 619 F. Supp. 493, 506 (S.D.N.Y. 1985) (holding that a later-communicated subjective intent is not relevant to whether a party "had such intent and understanding when they entered into the . . . contract"). But, in general, as Defendants argue, "[t]he intent of a party to a contract in entering into it, and his understanding of the contract, is relevant to the general question of interpretation." *Jefferson Const. Co. v. United States*, 151 Ct. Cl. 75, 86 (1960). *See also Bakery & Confectionery Union & Indus. Int'l Health Benefits &*

*Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998) (acknowledging rule permitting reliance on "the actual intent of and understandings between the contracting parties" although holding it inapplicable); *In re Mardigian Estate*, No. 319023, 2015 WL 5883907 (Mich. Ct. App. Oct. 8, 2015) ("[A] court must interpret contracts in light of the intent of all of the contracting parties.").

Here, Johnston's understanding of the waiver he entered into may be relevant to resolving a potential dispute over the meaning of the waiver. It also may not be. But that is not a reason for restricting discovery. The possibility that his testimony may be relevant is sufficient to render it discoverable. The fact that it may reveal an understanding formed only as a result of confidential client communications does not bar disclosure. The privilege does not shield a contracting party from testifying to his or her understanding of the effect of a contractual term, even if the contract was entered into with and through the advice of counsel. In *United States v. Smith*, 191 F.3d 454, at *2 (6th Cir. 1999), the Sixth Circuit held that that inquiry into a defendant's understanding of the benefits of his plea agreement was not shielded by the attorney-client privilege. The testimony sought of Johnston is not materially different in type.

Johnston will be compelled to testify as to his understanding of the release provision in his severance agreement at a time, place, and in a manner acceptable to both parties. Johnston's questioning shall not exceed thirty minutes in duration (if Plaintiff's counsel wishes to ask questions of Johnston they will be permitted another thirty minutes to do so), exclusive of speaking objections and breaks. Each party will bear its own costs.

**B.**

Next, Defendants seek to compel emails exchanged between Johnston and putative class members discussing this case. The Sixth Circuit has summarized the work product doctrine as follows:

> The work product doctrine "is distinct from and broader than the attorney-client privilege." *In re Antitrust Grand Jury*, 805 F.2d at 163 (quoting *United States v. Nobles*, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975)). The doctrine is designed to allow an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference ... to promote justice and to protect [his] clients' interests." *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947). So-called "fact" work product, the "written or oral information transmitted to the attorney and recorded as conveyed by the client," *In re Antitrust Grand Jury,* 805 F.2d at 163, may be obtained upon a showing of substantial need and inability to otherwise obtain without material hardship. *See Toledo Edison Co. v. G.A. Technologies, Inc.*, 847 F.2d 335, 339–40 (6th Cir.1988). However, absent waiver, a party may not obtain the "opinion" work product of his adversary; i.e., "any material reflecting the attorney's mental impressions, opinions, conclusions, judgments, or legal theories." *In re Antitrust Grand Jury*, 805 F.2d at 163–64 (citations omitted).

*In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002). The work-product doctrine also protects documents and materials prepared by clients at the direction of attorneys. *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F. Supp. 368, 375-76 (E.D. Wis. 1979) (citing *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 492 (7th Cir. 1970)).

A court must ask two questions when determining if a document was prepared "in anticipation of litigation:" "(1) whether that document was prepared 'because of' a party's subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable." *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009) (quoting *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006)). The party asserting work-product protection has the burden of establishing that protection. *See In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006). Johnston

represents in his response to Defendants' motion to compel that the emails to putative class members were prepared after litigation had already begun. Thus, the emails appear to meet the requirement that they be made in anticipation of litigation.

But, as Defendants rightly contend, the Sixth Circuit requires that an objecting party meet its burden of asserting protection with more than a conclusory statement in a brief. "[A] party may satisfy its burden of showing anticipation of litigation in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories, and that the showing can be opposed or controverted in the same manner." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381 (6th Cir. 2009) (internal quotation marks omitted). Johnston has not substantiated the work-product protection with these forms of proof. Like the objecting party in *Biegas*, that alone is sufficient grounds to deny the benefit of the protection. Id. at 382 ("Quickway's response to the Estate's motion to compel, however, was unaccompanied by any form of proof showing that Dailey's statement was created in anticipation of litigation."). The fact that Johnston's assertion of the work-product protection was not substantiated means Johnston did not meet his burden of demonstrating the emails' protected status. He will be directed to disclose the emails to Defendants.

## V.

On March 7, 2016, Johnston filed a motion for a status conference to discuss the trial logistics in light of fast-approaching deadlines.

The final pretrial conference and trial dates will be cancelled in light of the current order. Further, the currently scheduled hearing date for some of the parties' pending dispositive motions will be adjourned to allow the parties to resolve the directives of this order. The motion hearing will be adjourned for 60 days. The parties will be permitted to file supplemental briefs, if

they think it appropriate, following this additional discovery. The parties' supplemental briefs shall not exceed seven pages in length and will be due in approximately 45. Each party may file a five page response to any supplemental brief filed. No replies will be permitted.

In light of the changes to the scheduling order, Johnston's motion for a status conference will be denied.

## VI.

Accordingly, it is **ORDERED** that Plaintiff Robert Johnston's Motion to Compel, ECF No. 37, is **GRANTED in part**.

It is further **ORDERED** that Defendants are **DIRECTED** to produce for Plaintiff a list of individuals employed by Dow and Dow AgroSciences that are subject to the § 9.6 proration factor; Plaintiff is **DIRECTED** to select three individuals from that list; Defendant is then **DIRECTED** to produce calculation data for those three individuals. This process shall continue until Defendants have produced calculations for three individuals that were subject to asset transfers and the § 9.6 proration factor or until Plaintiff has selected fifteen individuals, whichever occurs sooner. This process shall be completed no later than April 29, 2016.

It is further **ORDERED** that Defendants Dow Employees' Pension Plan and Dow Chemical Company Retirement Board's Motion to Compel, ECF No. 44, is **GRANTED**.

It is further **ORDERED** that Plaintiff is **DIRECTED** to make himself available for deposition by Defendants in conformity with the parameters set forth herein, *see supra* § IV.A. The continued deposition must be completed no later than April 29, 2016.

It is further **ORDERED** that Plaintiff is **DIRECTED** to produce for Defendants copies of his emails with putative class members and the responses of those class members that have been requested by Defendants.

It is further **ORDERED** that the final pretrial conference and trial dates are **CANCELLED**.

It is further **ORDERED** that the motion hearing scheduled for April 5, 2016 is **ADJOURNED** to **May 19, 2016 at 2:00 p.m.**

It is further **ORDERED** that following the additional discovery ordered herein, the parties may submit supplemental briefs of no more than seven (7) pages addressing any additional issues raised by the additional discovery. Briefs are due **on or before May 6, 2016**. The parties may also file responses of no more than five (5) pages **on or before May 13, 2016**.

Dated: March 22, 2016                                s/Thomas L. Ludington
                                                     THOMAS L. LUDINGTON
                                                     United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 22, 2016.

                    s/Michael A. Sian
                    MICHAEL A. SIAN, Case Manager

---