UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT JOHNSTON, individually and on behalf
of a class of all other persons similarly situated,

     Plaintiff,        Case No. 14-cv-10427

v.               Honorable Thomas L. Ludington

DOW EMPLOYEES' PENSION PLAN and
DOW CHEMICAL COMPANY RETIREMENT
BOARD,

     Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE, AND DENYING OUTSTANDING MOTIONS AS MOOT**

   Plaintiff Robert Johnston brought this action on behalf of himself and a class of similarly situated individuals against Defendants Dow Employees' Pension Plan ("Plan") and Dow Chemical Company Retirement Board ("Board"). Johnston's purported class consists of individuals initially employed by the Dow Chemical Company, transferred to a joint venture between Dow and E. I. du Pont de Nemours and Company ("DuPont"), and then transferred back to Dow after the joint venture concluded. The crux of Johnston's claims is that the Board improperly introduced a new method of retirement benefit calculation into the Plan for employees that were transferred from Dow to the joint venture—DuPont Dow Elastomers ("DDE")—and then back to Dow. Johnston filed a motion to certify this class of individuals so that the class may seek collective relief.

Despite the initial posture of this case as a class action, the parties agree that this case is first and foremost an administrative appeal of the Board's denial of Johnston's claim for benefits. Thus, the first step in this case is to review that decision. The parties have submitted cross-motions seeking to either affirm or reverse that decision. Those motions are under consideration.

## I.

Robert Johnston is a retired employee of the Dow Chemical Company and its joint venture with DuPont, DDE. Johnston first joined Dow in 1980 where he worked for sixteen years. In 1996, he was transferred from Dow to DDE. Johnston then worked for DDE for nine years until the joint venture closed on June 30, 2005 before rejoining Dow. Johnston retired from Dow in 2011. Johntson is entitled to receive two pensions – one from DDE and one from Dow. The Dow pension is the subject of this case.

 The Dow Chemical Company is an international corporation headquartered in Michigan. The Plan is a defined benefit plan established by Dow to provide for a retirement benefit for Dow employees.

## A.

Dow and DuPont established DuPont Dow Elastomers in 1996. DDE was a joint venture "focus[ing] on the development, manufacture, and sale of elastomer products, such as neoprene." Pl.'s Compl. ¶ 9, ECF No. 1. Dow and DuPont concluded DDE in 2005. *Id.* at ¶ 14.

When DDE was first established, a number of Dow and DuPont employees transferred to the joint venture. Johnston was one of these employees. At some point around July 1, 1997, Dow transferred the pension assets of a number of the transferred employees. Dow transferred the pension assets to the new DDE pension plan.

Dow and DuPont concluded DDE in 2005, at which point a number of DDE employees, including Johnston, transferred back to Dow. DDE did not transfer the pension assets of these individuals back to Dow. Johnston retired from Dow in 2011. As part of Johnston's separation from Dow Johnston signed a severance agreement.

**B.**

The Dow Employees' Pension Plan is a retirement plan established for the benefit of Dow employees. The Plan is a "defined benefit employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A)." Defs.' Answer ¶ 7, ECF No. 7. Under the Plan, each Plan Administrator is a "named fiduciary" within the meaning of ERISA § 402(a)(2). Dow Employees' Pension Plan Effective January 1, 2014 ("January 1, 2014 Plan") § 7.1, ECF No. 26-7. Plan Administrators must carry out the Plan "in accordance with its terms and for the exclusive benefit of Participants and their Spouses and Beneficiaries." Id. The Plan prescribes the duties of Plan Administrators, which includes:

> (b)  To interpret the Plan and to resolve and possible ambiguities, inconsistencies and omissions therein or therefrom;
>
> (c)  To decide all questions of fact arising under the Plan;
>
> (d)  To comply with all of the reporting and disclosure requirements of Part 1 of Subtitle B of Title I of ERISA and any other applicable reporting and disclosure requirements, including preparing and signing the Form 5500 for the Plan and participant communications;
>
> (e)  To retain third party administrators, consultants, accountants, actuaries and other individuals or entities as he deems necessary or advisable to assist him in fulfilling his responsibilities under the Plan, consistent with The Dow Chemical Company's guidelines on hiring and retention of outside service providers; monitor the performance of such individuals and entities, decide whether to discontinue the services of such individuals and entities, and make payment to such individuals and entities in accordance with the terms of the Plan;

> (f)    To settle or compromise and claim or dispute involving the Plan and enforce any release of a claim against the Plan or any covenant not to sue the Plan; . . .

*Id*.

### 1.

Section 7.2 of the January 1, 2014 Plan[1] establishes the duties and powers of the "Initial Claims Reviewer" and the "Appeals Administrator." *Id*. at § 7.2. Defendant Dow Chemical Company Retirement Board serves as the Plan's "Appeals Administrator." *Id*. at § 7.2(b). The Board is also a "named fiduciary" of the Plan. *Id*. at § 7.2(a).

Section 7.10 of the Plan establishes the claims procedure by which a Plan participant or beneficiary may make a claim for benefits. *Id*. at § 7.10. An individual making a claim for benefits first presents the claim to the Initial Claims Reviewer, who then makes a claim determination. *Id*. If the Initial Claims Reviewer "determines that such claim should be denied in whole or in part, the Initial Claims Reviewer (or its delegate) shall, in writing, notify such claimant within 90 days of receipt of such claim that his claim has been denied[.]" *Id*. "If the claim is denied, the Initial Claims reviewer shall set forth in writing the specific reasons for such denial[.]" *Id*. The denial of a claim by the Initial Claims Reviewer must:

> (i)     state the reason why the claim is being denied;

> (ii)    set forth the pertinent Sections of the Plan relied upon;

> (iii)   if applicable, set forth an explanation of any additional material or information necessary for the claimant to perfect his claim and an explanation of why such material or information is necessary; and

> (iv)    set forth an explanation of how the claimant can obtain review of such denial, including a statement of the claimant's right to bring a civil action under ERISA section 502(a) following an adverse benefit determination.

---

[1] Dates are appended to Plan references because the parties dispute certain amendments made to the Plan's language. Thus, it is important to distinguish which iteration of the Plan is being referred to at what time.

- 4 -

*Id*.

Within 60 days of his claim being denied, a claimant may request a review of the denial by the Appeals Administrator. *Id*. If the Appeals Administrator denies a claim, the denial shall "set forth in writing the specific reasons for such denial" and shall:

(i)    state the reason for denial of the claim;

(ii)   set forth the pertinent Sections of the Plan relied upon; and

(iii)  state that the claimant may bring a civil action under ERISA section 502(a) in federal court, provided the claimant institutes such legal proceeding within the time periods provided in Section 7.11.

*Id*. A determination by the Appeal Administrator that "is favorable to the claimant . . . shall be binding and conclusive." *Id*.

If a claimant's claim for benefits is conclusively denied, he may commence a legal action challenging the determination of the Appeals Administrator. A claimant may only file certain claims in court. *Id*. at § 7.11(a). Those are:

(i)    a claim or action to recover benefits allegedly due under the provisions of the Plan or by reason of any law,

(ii)   a claim or action to clarify rights to future benefits under the Plan,

(iii)  a claim or action to enforce rights under the Plan, or

(iv)   any other claim or action that (i) relates to the Plan, and (ii) seeks a remedy, ruling, or judgment of any kind against the Plan, the Company, a participating employer, a Plan Administrator, a Plan fiduciary (within the meaning of section 3(21) of ERISA), or a party in interest (within the meaning of section 3(14) of ERISA) with respect to the Plan.

*Id*. at § 7.11(b). These types of claims may only be filed after "the claimant has exhausted the claims review procedures described in Section 7.10[.]" Id. at § 7.11(a)(i). Furthermore, the Plan imposes a limitations period on any court challenges. A "claim or action" must be "filed in a

- 5 -

court with jurisdiction over such claim or action no later than two (2) years after" certain enumerated events occur. *Id.* at § 7.11(a)(ii). Those events are:

(A)    in the case of a claim or action to recover benefits allegedly due to the claimant under the terms of the Plan or to clarify the claimant's rights to future benefits under the terms of the Plan, the earliest of (i) the date the first benefit payment was actually made, (ii) the date the first benefit payment was allegedly due, and (iii) the date the Plan first repudiated its alleged obligation to provide such benefits (regardless of whether such repudiation occurred before or during the administrative review process),

(B)    in the case of a claim or action to enforce an alleged right under the Plan (other than a right to benefits which are subject to Section 7.11(a)(ii)(A)), the date the Initial Claims Reviewer or Appeals Administrator or its delegate first denied the claimant's request to exercise such right, regardless of whether such denial occurred during administrative review process,

(C)    in the case of any other claim or action described in Section 7.11(b)(iv), the earliest date on which the claimant knew or should have known the material facts on which such claim or action is based, regardless of whether the claimant was aware of the legal theory underlying the claim or action[.]

*Id.*[2] The Plan also provides that "[i]n the event of any Applicable Claim brought by or on behalf of two or more claimants, this Section 7.11, including the Applicable Limitations Period, shall apply separately with respect to each claimant." *Id.* at § 7.11(c).

**2.**

Benefits are calculated under the Plan in different ways depending on the covered individual. Despite differences in calculation, the Plan employs a primary calculation method. There are then subsidiary, more specific calculation methods that apply case by case to certain groups of employees, such as those who spent time with a joint venture, like Johnston.

Section 4.1 of the Plan sets forth the "Normal Retirement Benefit" which is determined by using one of two different formulas. The Plan provides that "[t]he annual amount of the

---

[2] The limitations period provides for the possibility of extension. The parties do not claim that any extension provisions are relevant here.

Normal Retirement Benefit payable to a vested Participant eligible under Section 3.1 in the form of a Life Only Annuity shall be equal to the greater of (i) and (ii) below[.]" *Id.* at § 4.1(b). The subsections refer to the Plan's two different benefit calculation formulas. The Plan has two formulas as a result of an amendment that changed the way in which the "Normal Retirement Benefit" is calculated. Thus, the old benefit calculation method was retained as the "Grandfathered Formula Benefit," *id.* at § 4.1(b)(i), and new calculation method was titled the "Current Formula Benefit," *id.* at § 4.1(b)(ii). Subject to certain conditions, employees are entitled to the more beneficial of the two formulas.

### i.

Before delving into the specifics of the two formulas, it is important to understand certain terms that are specifically used by the Plan when making benefit determinations.

### a.

First, "Credited Service" is the term used by the Plan to denote the years an employee has spent with Dow (or an affiliated entity) that are used in determining an employee's retirement benefit. The Plan defines Credited Service to mean the "service of an Employee which is taken into account for purposes of determining the amount of such Employee's benefit, as more particularly described in Section 2.2." *Id.* at § 1.20(a). Section 2.2 in turn provides, in relevant part, that:

> Credited Service shall be credited each Plan Year by dividing such Employee's Hours of Service for the Plan Year by such Employee's Location Work Schedule Hours and rounding up to the nearest $1/10^{th}$ of a year. In no event shall an Employee be credited with more than one year of Credited Service in any Plan Year.

*Id.* at § 2.2(b). A "Plan Year" means only the calendar year. *Id.* at § 1.56. An "Hour of Service" is "each hour . . . during a Plan Year for which an Employee is paid" or entitled to certain forms of compensation. *Id.* at § 1.39. "Location Work Schedule Hours" is the benchmark number of

Hours of Service that an employee in a certain geographic location is expected to work each year. *Id*. at § 1.45.

Although the description of Credited Service employs a number of Plan-specific terms, the operation of the accrual system is not overly complex. If an employee is expected to work 2,000 hours in a given Plan Year (i.e., calendar year) and the employee works 1,901 hours that year, he gets credited with one year of Credited Service. Similarly, if another employee is expected to work 2,000 hours in a given Plan Year but only works 1,898 hours, he gets credited with .9 years of Credited Service.

Neither party contests the manner in which the definition of Credited Service is applied to Johnston's time with Dow. The root of the dispute between the parties turns on whether certain time when Johnston worked for Dow before being transferred to DDE should be included in his Credited Service when calculating his benefit, but the explanation of how Credited Service is accrued not being challenged by Johnston.

**b.**

The next important concept under the Plan is an employee's "Average Annual Compensation" (referred to as "HC3A"). This is defined by the Plan as "the highest mean Annualized Compensation computable for any three consecutive full calendar years during the Employee's period of Credited Service." Plan § 1.8(a).[3] The Plan also provides for different means of calculating HC3A where an Employee does not have three consecutive full calendar years of Annualized Compensation. The Plan employs a .925 multiplier when calculating HC3A in such situation. For instance, if an Employee has a vested pension benefit under the Plan, but

---

[3] Annualized Compensation is defined by the Plan as, essentially, the compensation received by an Employee during a calendar year. Different rules apply in determining Annualized Compensation depending on the circumstance of the Employee. Here, the parties do not dispute the determination of Johnston's Annualized Compensation for the purposes of calculating his HC3A.

does not have three full consecutive years of Annualized Compensation, the Plan instructs that his HC3A should be calculated by determining his anticipated or actual compensation for the most recent calendar year and multiplying his compensation figure by .925. The .925 compensation multiplier is intended to replicate a gradual increase in an Employee's salary over a three-year period.

HC3A plays an important part in calculating an Employee's benefit under the Plan's prevailing calculation formula. As will be discussed below, the Plan also provides other formulas for determining the benefit of Employees that have had unique employment circumstances. Such as employees that have transferred to or from Dow, like Johnston. HC3A is also relevant to these formulas, although the formulas somehow have slightly different methods for arriving at HC3A. Importantly, these formulas, and the formulas relevant to Johnston, employ the .925 proration factor for employees that do not have sufficient years of Annualized Compensation.

**ii.**

As noted above, the plan contains two benefit-calculation formulas. The first is the older "Grandfathered Formula Benefit." Plan § 4.1(b)(i). The second is the new "Current Formula Benefit." Plan § 4.1(b)(ii). The two formulas operate together to provide full coverage for Plan members. Because Johnston transferred to and from DDE, neither of the benefit formulas alone apply to Johnston. The formulas are modified by more specific plan provisions, discussed below.

The two benefit formulas are sufficiently complex that no benefit would be gained from explaining their operation here. Important to note, though, is that the Grandfathered formula imposes a freeze on the consideration of certain benefit criteria—HC3A, Credited Service, etc.—as of December 31, 2005. As a result, any increase in an employee's HC3A, Credited Service, or other input after December 31, 2005 is disregarded in computing that employee's benefit under

the Grandfathered formula. The Plan implemented the freeze as part of the transition to the Current formula.

**3.**

The Plan includes certain discrete provisions that govern employee plan-participants that did not remain with Dow for the entirety of their employment service. The purpose of these provisions is to modify the application of the benefit formulas to more closely reflect the circumstances of the transferred employees. Accordingly, these discrete provisions do not themselves provide new benefit calculation formulas. The Grandfathered and Current benefit formulas are still the relevant benefit calculation tools under the Plan. The discrete provisions simply modify the way in which some criteria are determined for the purposes of calculating benefits under the primary formulas or modify the benefit calculation resulting from applying the formulas.

The Plan contains a general provision that covers all Dow employees who transferred employment between Dow and another related entity.[4] Section 9.6, found in the "Miscellaneous Provisions" section, sets forth proration factors that modify the benefit arrived at by applying the Grandfathered or Current benefit formula for a specific Plan participant. Relevant to Johnston is § 9.6(b)(i)(B). Section 9.6(b)(i)(B) sets forth a proration factor for individuals "Who Were Hired Before January 1, 2008 and Were Transferred On or After January 1, 1996" and "Who Enter the Plan or Return to Coverage Under the Plan." Plan § 9.6(b). The proration factor is determined as follows: "the numerator of which is the Credited Service with the Company and the denominator of which is the Credited Service with the Company plus the credited service . . . with such other entity related to the Company." Id. at § 9.6(b)(i)(B). Thus, if an employee works for Dow for

---

[4] Unless a more specific transfer provision applies. The parties dispute whether this is the case for Johnston.

five years, and works for a related entity for five years, his proration factor would be .5 (a numerator of five and a denominator of ten). That proration factor would be multiplied against the higher of his benefits under the Grandfathered or Current formulas to determine the employee's final pension benefit.

The second relevant transfer provision is found in § 10.46 of the Plan. This section applies specifically to "Transfers from DuPont Dow Elastomers [(DDE)] Pension and Retirement Plan." Plan § 10.46. Unlike § 9.6, this section modifies the criteria that are used in calculating a pension benefit under the primary formula. Accordingly, it defines HC3A as:

> Average Annual Compensation [(HC3A)] for Employees covered under this section who, since the date of the [transfer], have less [sic] than three years of Annualized Compensation at the time of termination and who are vested at the time of termination shall be such Employee's highest base salary for any Plan Year, determined at the end of such Plan Year, during employment with the Company plus the target performance award, if any, for such Plan Year times a factor of .925.

Plan § 10.46. This definition is essentially identical to the HC3A definition in the Plan's "Definitions" section, with some minor modifications that are not relevant here.

Like § 9.6, and relevant to Johnston, § 10.46 also modifies the result of the general benefit formulas. Section 10.46(c)(i) applies to former employees that Dow transferred to DDE and were part of the July 1, 1997 asset transfer. That subsection reduces the general benefit pension for employees covered by the section. The reduction is equivalent to whatever benefit the employee earned from the DDE pension.

**4.**

The Plan also contains miscellaneous provisions the application of which to Johnston the parties dispute. The first of these provisions is § 4.10. That section is titled "Duplication of Benefits" and provides, in relevant part: "There shall be no duplication of benefits payable under this Plan and under any other private qualified retirement plan to which the Company or any

Subsidiary or affiliated corporation contributes or has contributed except The Dow Chemical Company Employees' Savings Plan." Plan § 4.10.

The other miscellaneous provision that the parties have emphasized is no longer part of the Plan. Prior versions of the Plan used to contain an express bar on the duplication of benefits that occurred as the result of an employee transfer. The Plan eliminated that provision in 1989.

## C.

The parties have two main disputes concerning the application of the Plan to Johnston's retirement benefit. First, Johnston claims that his benefit under § 9.6 of the Plan exceeds his benefit under § 10.46—the section under which the Plan awarded his benefit. The basis of this claim is a result of a difference in the manner in which Johnston and the Plan calculate his benefit under § 9.6. Second, Johnston argues that the Plan improperly calculated his HC3A when it applied the .925 proration factor to his compensation, rather than taking an average of his three highest-earning years.

Although the parties dispute the manner in which these two separate but interrelated Plan provisions apply to Johnston, the true nature of the dispute is narrower. The parties disagree over whether Johnston's service at Dow prior to his transfer to DDE should be included when calculating his pension benefit and his HC3A. Johnston contends that under the plain terms of § 9.6, his prior Dow service should be counted in the numerator of the proration factor, thus making his § 9.6 benefit greater than his § 10.46 benefit. Under this reading of the Plan, Johnston's proration factor would be 22.55/31.8, or .7091, rather than the proration factor of 6.3/31.8 or .1981 as determined by the Board. The proration factor, as explained above, is multiplied against Johnston's full benefit under the Plan. Johnston's full benefit under the Plan is determined by using his total 31.8 years of Credited Service and his other related criteria to

generate a benefit determination under both the Grandfathered and Current formulas. Johnston's benefit is the higher of the two benefits multiplied by his proration factor. Using the higher proration factor, Johnston argues, would result in § 9.6 yielding a higher benefit than § 10.46.

Dow contends that Johnston's prior Dow service cannot be counted under the terms of the Plan and as a result of the fact that the Plan transferred Johnston's Plan assets out of the Plan when he transferred to DDE. Dow reads the Plan in its entirety, specifically the interplay of § 9.6 and § 4.10 to support its claim that counting Johnston's prior service at Dow would result in prohibited double-counting. It also relies on an asset transfer it conducted with a series of employees, including Johnston, transferred to DDE. Under this reading, Dow contends that the numerator on Johnston's proration factor is 6.3. With a lower proration factor, Johnston's benefit is higher under § 10.46, the determination that the Board reached.

Johnston's argument that his HC3A was improperly calculated turns in part on these same determinations and in part on the operation of the benefit freeze in the Grandfathered formula. If Johnston's pension assets were transferred as Dow contends, much of his HC3A argument is moot.

## II.

Generally, a denial of benefits is reviewed de novo by this Court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Plan's terms indicate that "[t]he Plan Administrator, Initial Claims Reviewer, Appeals Administrator, Investment Fiduciaries, and other fiduciaries with respect to the Plan shall have the sole and absolute discretion to interpret Plan documents, make findings of fact and

decide any matters arising with respect to [its] assigned duties and powers under the Plan." Plan § 7.6. Thus, the arbitrary and capricious standard of review applies to Johnston's appeal.

The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.,* 331 F.3d 536, 541 (6th Cir.2003) (quotation marks and citation omitted). The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was "rational." *Id.* Although the evidence may be sufficient to support a contrary conclusion to that reached by the plan administrator, if there is a reasonable explanation for the administrator's decision in light of the plan's provisions, then the decision is neither arbitrary nor capricious. *Williams v. Int'l Paper Co.,* 227 F.3d 706, 712 (6th Cir.2000). "But the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from "a deliberate principled reasoning process" and is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds,* 929 F.2d 1140, 1144 (6th Cir.1991).

The administrator must consider the entire record, not selected portions. *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359-62 (6th Cir. 2002). On review, a court may consider only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms. The court's review is thus limited to the administrative record. *See Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 618 (6th Cir.1998).

- 14 -

Despite agreeing that the arbitrary and capricious standard applies in this case, Johnston argues that the Board's decision to deny his claim should be given little deference because the Board is conflicted and biased. The Board is conflicted, Johnston argues, because Dow both funds and administers the Plan. The Board is biased, Johnston claims, because it took efforts to justify denial, rather than conduct a full and fair review of his claims.

A court must take into consideration the conflict of interest that arises when one entity is both the administrator and the insurer: "where there is a monetary incentive for the insurance company or its claims administrator to deny the claim, 'the potential for self-interested decision-making is evidence.'" *Rabuck v. Hartford Life and Acc. Ins. Co.*, 522 F. Supp. 2d 844, 872 (W.D. Mich. 2007) (quoting *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000)). This consideration applies, however, only where there is "significant evidence" that the insurer was motivated by self-interest. *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

Johnston has not presented "significant evidence" that Dow, as sponsor and administrator of the Plan, has a structural conflict of interest that prevents fair adjudication of benefits claims. Johnston's only claims supported by extrinsic evidence of conflict related to his assertion that the Board was biased in denying his claim. He argues that the Board was biased because it took extraordinary efforts to deny his claim and did not adhere to its own internal procedures and deadlines for processing his appeal.

First, the fact that the Board employed outside counsel to address Johnston's appeal does not justify ascribing less deference to the Plan's decision. As the Plan rightly notes, the fact that Dow "ret[ained] outside counsel to assist it in its claim determination would in fact seem to demonstrate that it took the process seriously and attempted to ensure that its decision had a

strong legal basis." *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 329 (6th Cir. 2009). As in *Kovach*, the Board made the final denial decision on the basis of reasoning that was fully formed by outside counsel. Indeed, the Board took an active role in articulating the bases for denying Johnston's claim, at times engaging in a back-and-forth with outside counsel over the rationale advanced in the decision. Under *Kovach*, there is no justification for reducing the deference owed the Board's decision merely because they employed outside counsel.

Next, Johnston argues that Dow did not comply with the Plan's deadlines, but held Johnston to the deadlines the Plan imposed on him. Such treatment, he claims, favors reducing the deference owed to the Board's decision. Yet Johnston does not introduce any evidence that he was prejudiced by these alleged delays. He states only that some of his deadlines, such as his deadline to file in advance of the Plan's imposed limitations period, were truncated.

Johnston does not advance any justification for reducing the deference owed to the determination made by the Board.[5]

### III.

As explained above, the ultimate dispute between the parties centers on whether Johnston's Dow pension assets from his initial period with Dow were transferred to DDE and, if so, how the Plan accounts for that transfer. But this Court's review is not so broad. The more

---

[5] Johnston argues as a third ground for reducing deference that the Board willfully disregarded relevant evidence. He claims that he presented the Board with evidence that his asset transfer to DDE did not take place on the date the Board alleges and did not take place on the date required by the Plan. This goes to the merits of the Board's determination, though. Indeed, it is curious that Johnston argues that the Board ignored this evidence in reaching its determination about the date of his asset transfer but opposes the Plan's inclusion of similar evidence as part of the Administrative Record.

Even if the Board's alleged failure to consider Johnston's evidence concerning his asset transfer were considered here, it would not be grounds for affording the Board's decision less deference. Johnston's argument in this respect amounts to no more than a request that the Board's decision receive less deference because it weighed evidence in a way Johnston did not like. That is, the Board felt its evidence concerning Johnston's asset transfer was more probative than Johnston's evidence.

- 16 -

appropriate question is whether the Plan acted arbitrarily and capriciously in determining that Johnston's pension assets from his first term with Dow were transferred to DDE on July 1, 1997.

Johnston makes three claims that this determination was arbitrary and capricious. First, he argues that it was arbitrary and capricious to limit the number of years Johnston is credited with under § 9.6. Second, Johnston claims that the Plan arbitrarily and capriciously determined that his benefit should be calculated under § 10.46. Third, it was arbitrary and capricious not to use Johnston's three highest earning years at Dow—following his transfer back from DDE— when the Plan calculated his HC3A under § 9.6 and § 10.46.

## A.

As to Johnston's first claim, it was not arbitrary and capricious for the Plan to calculate § 9.6 to exclude Johnston's prior Dow service. Johnston correctly notes that the relevant provision of § 9.6 opens "Notwithstanding any provision of the Plan to the contrary . . ." Plan § 9.6. The calculation method set forth in § 9.6 goes on to express no limitation as to the exclusion of years of credited service following an employee asset transfer. According to Johnston, then, the fact of the asset transfer is irrelevant. Whether it occurred or not, § 9.6 requires that his prior Dow service be counted.

Johnston overly narrows the scope of the Plan's function. The Plan is required to furnish a "reasonable explanation . . . in light of the plan's provisions." *Williams,* 227 F.3d at 712. This does not require the Plan to ignore a provision of the Plan that can be read to coordinate with other Plan provisions for an accurate determination of benefits. The Plan did just this. It read § 4.10 of the Plan to prohibit double-counting of employee benefits.

Johnston argues that § 4.10 is contrary to the terms of § 9.6 and so § 9.6's "notwithstanding" language should bar its application. But § 4.10 is not directly contrary to the

Plan. Section 9.6 would otherwise allow for the inclusion of Johnston's prior service. Section 4.10, then, acts as a check on the over-inclusivity of § 9.6 to limit the actual benefit awarded to Johnston in light of the asset transfer. Johnston does not reasonably argue that he was not subject to an asset transfer. Thus, he cannot seriously contend that § 4.10 would not, under this reading, apply to him. It was not arbitrary or capricious of the Plan to read § 9.6 and § 4.10 together in this manner.

**B.**

Johnston next argues that the Plan incorrectly calculated Johnston's benefit under § 10.46(c)(i). This section, Johnston claims, applies only to employees who were "Part of Asset Transfer [on] July 1, 1997." Plan § 10.46(c)(i). The Plan concluded, based on the evidence it gathered, that Johnston was a part of that asset transfer.

On appeal, Johnston has not demonstrated that that conclusion was arbitrary or capricious. The main support Johnston furnishes for his claim is that he received two notices of transfer. One notice reflects that assets supporting his benefit were transferred "on March 31 or April 1, 1996." Pl.'s Resp. Br. 27, ECF No. 146. The other notice reflects that the transfer "was not finalized until at least September 1997." *Id*. He provided these documents to the Board and the Board, according to Johnston, still concluded, despite not having any evidence, that his assets were part of the July 1, 1997.

Johnston has to show that the Board's decision was not supported by "substantial evidence." *Baker,* 929 F.2d at 1144. Johnston's argument that the Board's determination was not supported by "any" evidence is belied by the record. While the Board could not locate a document that specifically stated that Dow transferred Johnston's pension assets to DDE on July

1, 1997, it located significant circumstantial evidence that supported that conclusion.[6] These documents include human resources materials from 1996 that explained an upcoming pension asset transfer for Dow employees moving to DDE. They also included spreadsheets that identify a number of employees whose pension assets are to be transferred to the DDE plan. Johnston is identified in each of these spreadsheets. While none of these documents identify the exact date that Johnston's assets transferred to the DDE plan, they all identify periods between late 1996 and mid to late 1997. Perhaps most probative is one of the spreadsheets that identifies Johnston among individuals whose pension assets would be transferred from the Plan to the DDE plan. D.R. 11. After the group of employees subject to transfer is identified (and Johnston is in this group), the spreadsheet identifies another group of employees under the heading "Former Dow, transfer post 7/1/1997." *Id.*

In weighing the evidence it was presented, the Board did not arbitrarily conclude that Johnston's pension asset transfer occurred on July 1, 1997. Rather, the conclusion that Johnston's pension asset transfer occurred on that date was one of several reasonable dates the Board could have identified (in fact, the most reasonable one in light of the significance of that date as the date identified by the Plan itself for asset transfers). Thus, the Board did not abuse its

---

[6] Johnston claims that the materials designated in Defendants' Record ("D.R.") are not part of the Administrative Record and cannot be considered. Defendants disagree. Johnston does not provide any evidence for his claim that they are not a part of the Administrative Record other than the fact that emails sent by employees and lawyers of Defendants and members of the Board claimed to have no evidence of Johnston's asset transfer. To the contrary, Defendants have submitted three affidavits attesting to the fact that the Board did review the materials designated in the Defendants' Record. See ECF Nos. 142, 143, & 144. One of the affidavits was prepared by the Plan's Initial Claims Reviewer that initially rejected Johnston's claim. Another was prepared by a member of the Board that denied Johnston's appeal. The third was prepared by the Board's secretary. These individuals all had personal knowledge of the documents reviewed by the Initial Claims Reviewer and the Board in assessing Johnston's claim. The affidavits are sufficient to substantiate that the documents designated as Defendants' Record form a part of the Administrative Record. *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 457–58 (6th Cir. 2003) (holding that those directly involved in benefit determination can swear affidavits on personal knowledge of documents considered during determination process).

discretion by identifying that date as the date of Johnston's asset transfer, despite the absence of direct, conclusive evidence that it occurred on that date.

### C.

Finally, Johnston argues that the Board incorrectly calculated his HC3A when it applied the .925 proration factor to his compensation. He makes two arguments on this point.

First, he argues that § 9.6 requires the inclusion of his DDE compensation. Because the Board fairly determined that Johnston was subject to an asset transfer and thus properly had his benefit calculated under § 10.46, this claim is moot.

Second, Johnston claims that the Board erroneously applied the .925 proration factor to him under § 10.46. Johnston argues that the plain terms of § 10.46 would require that the Board use his compensation from his second period at Dow and not freeze his compensation as of December 31, 2005. The relevant portion of § 10.46 provides:

> Average Annual Compensation [(HC3A)] for Employees covered under this section who, since the date of the [transfer], have less [sic] than three years of Annualized Compensation at the time of termination and who are vested at the time of termination shall be such Employee's highest base salary for any Plan Year, determined at the end of such Plan Year, during employment with the Company plus the target performance award, if any, for such Plan Year times a factor of .925.

Plan § 10.46. This section does not go on to provide a means of determining the participant's benefit independent from other Plan benefit calculation methods. As with Johnston's prior claim, this section was not read in isolation by the Board. The Board claims that it read this section in conjunction with the Grandfathered Benefit Formula and Current Benefit Formula in determining Johnston's benefit. According to the Plan, the Board concluded that the Grandfathered Benefit Formula yielded the higher benefit for Johnston. Since the Grandfathered Benefit Formula froze all calculation inputs (including Annualized Compensation) as of

December 31, 2005, and years of compensation that came after that date do not factor into HC3A.

The text of § 10.46 concerning HC3A mirrors the definition of HC3A in § 1.8(c) of the Plan. Section 10.46, like § 1.8(c), only furnishes the manner in which HC3A is determined, it does not generate a standalone benefit. HC3A is merely one piece of the puzzle. Thus, the Board had to take into consideration the terms of § 10.46 as they applied to Johnston. The two relevant terms of § 10.46 that applied to Johnston were the definition of HC3A and the asset transfer exclusion in subsection (c)(i). The Board then had to calculate Johnston's benefit under the Plan's two benefit calculation methods, and in light of the limitations in § 10.46, to determine Johnston's benefit. The Grandfathered formula specifically freezes HC3A as of December 31, 2005: "1.6% of the Employee's Average Annual Compensation [(HC3A)] (not in excess of such Employee's Average Annual Compensation as of December 31, 2005)." Plan § 4.1(b)(i)(A)

The Board determined that the HC3A definition in § 10.46 properly applied to Johnston, but that the terms of the Grandfathered benefit had to limit the applicable scope of that definition because of the incorporated freeze. Thus, the Board concluded that the Grandfathered formula freeze excluded Johnston's Dow service after December 31, 2005. It was not arbitrary or capricious to do so.

## IV.

Accordingly, it is **ORDERED** that Defendants' motion for judgment on the administrative record, ECF No. 65, is **GRANTED**.

It is further **ORDERED** that Plaintiff Robert Johnston's motion for summary judgment, ECF Nos. 83 & 87, is **DENIED**.

It is further **ORDERED** that Plaintiff Robert Johnston's complaint, ECF No. 1, is **DISMISSED with prejudice**.

It is further **ORDERED** that Defendants' motion for summary judgment, ECF No. 63, is **DENIED as moot**.

It is further **ORDERED** that Defendants' motion to exclude testimony, ECF No. 67, is **DENIED as moot**.

It is further **ORDERED** that Plaintiff's motion to exclude testimony, ECF No. 75, **DENIED as moot**.

It is further **ORDERED** that Plaintiff's motion to certify class, ECF No. 123, is **DENIED as moot**.


Dated: August 5, 2016                           s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 5, 2016.

                              s/Michael A. Sian
                              MICHAEL A. SIAN, Case Manager